Appeal No. 2015-1920

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FEDERAL CIRCUIT

FREIGHT TRACKING TECHNOLOGIES, LLC,

*Plaintiff-Appellant,*

v.

VIRGINIA INTERNATIONAL TERMINALS, LLC,
NOW SOLUTIONS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Virginia in Case No. 2:13-cv-00708-AWA-DEM
Judge Arenda L. Wright Allen

**CORRECTED NONCONFIDENTIAL BRIEF
OF PLAINTIFF-APPELLANT
FREIGHT TRACKING TECHNOLOGIES, LLC**

James H. Wallace, Jr.
Brian H. Pandya
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000

STEVEN A. MADDOX
    *Counsel of Record*
KAVEH SABA
**MADDOX EDWARDS PLLC**
1900 K St. NW, Suite 725
Washington, DC  20006
(202) 830-0707

October 16, 2015

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Freight Tracking Technologies, LLC certifies the following:

1.    The full name of every party being represented by me is:

Freight Tracking Technologies, LLC.

2.    The real party in interest represented by me is:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are as follows:

Not applicable.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

Law Firm of Maddox Edwards, PLLC:  Steven A. Maddox and Kaveh Saba;

Law Firm of Wiley Rein LLP:  Brian H. Pandya, Floyd B. Chapman, James H. Wallace, Jr., Kevin P. Anderson, Robert J. Scheffel, Adrienne Johnson Kosak, Matthew Dowd*, Eric Weisblatt, Karin A. Hessler, B'anca Glenn, and Wesley Weeks (*No longer affiliated with Wiley Rein LLP);

Law Firm of Crenshaw Ware & Martin PLC:  Donald Charles Schultz, Elaine Inman Hogan, and Cyrus Wiley Grandy.

i

Respectfully submitted,

**MADDOX EDWARDS, PLLC**

By: _/s/ Steven A. Maddox_
STEVEN A. MADDOX
    *Counsel of Record*
KAVEH SABA

*Attorneys for Plaintiff-Appellant*
Freight Tracking Technologies, LLC

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED CASES .................................................... x

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................. 3

    A.    Overview ................................................................................. 3

    B.    The '008 and '564 Patents ...................................................... 5

        1.    The Asserted Claims .................................................... 8

        2.    The Prosecution History of the Asserted Patents Relating to the "Attaching" Limitation .................................................. 10

    C.    VIT's Accused Use Of GPS-Based Freight Tracking Systems ................. 14

        1.    VIT's Use of the RTACTCS .................................................. 15

        2.    VIT's Use of the CTAS .................................................. 19

    D.    The District Court's Claim Construction Ruling ...................... 19

    E.    The Summary Judgment Proceedings .................................... 22

        1.    The Unusual Procedural Posture of VIT/NOW's Motion for Summary Judgment ...................................................... 22

        2.    Summary Judgment of No Literal Infringement ..................... 23

        3.    Summary Judgment of No Infringement under the Doctrine of Equivalents .................................................. 23

SUMMARY OF THE ARGUMENT ....................................................29

ARGUMENT ..............................................................................32

A.   Standard of Review ...................................................................32

B.   The District Court Erred In Limiting "Attaching" to Directly Attaching GPS Receivers to Freight Containers, and Erred in Granting Summary Judgment of No Literal Infringement. ......................................34

   1.   The District Court Erred in Deviating From Plain and Ordinary Meaning of "Attach." ..........................................................34

   2.   The District Court Erred in Failing to Consider the Context of the Prosecution History. .................................................................36

   3.   The District Court Erred in Limiting "Attach" to the Preferred Embodiments of the Specification, and Ignoring the Context of the Rest of the Specification ........................................................38

   4.   The Court Should Reverse the Claim Construction to Include Indirect Attachment, and Reverse the Summary Judgment of No Literal Infringement. ...........................................................40

C.   Factual Issues Should Have Precluded Summary Judgment of No Infringement under the Doctrine of Equivalents. ......................................40

   1.   The District Court Ignored Non-Expert Opinion Evidence in the Record Which Alone Should Have Precluded Summary Judgment. .................41

   2.   The District Court Erred in Finding Dr. Rhyne's Opening Report Failed to Set Forth a Doctrine of Equivalents Opinion Sufficient to Defeat Summary Judgment. ...................................................45

   3.   The District Court Abused its Discretion by Striking Dr. Rhyne's Declaration. ...........................................................51

CONCLUSION ..........................................................................58

APPENDIX I:  CORRESPONDENCE BETWEEN DR. RHYNE'S DECLARATION AND OPENING EXPERT REPORT ........................................60

ADDENDUM ............................................................................63

PROOF OF SERVICE ............................................................................64

CERTIFICATE OF COMPLIANCE ......................................................65

**Confidential Material Omitted:**

Material omitted on pages 4, 14–19, and 30 describes confidential information, documents, and testimony about Appellees' GPS systems.  Material omitted on pages 42–45 and page 60 (Appendix I) describes and quotes Appellees' confidential documents and testimony about their GPS systems.

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................41

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ..................................................50

*AquaTex Indus. v. Techniche Sols.*,
479 F.3d 1320 (Fed. Cir. 2007) ..................................................42

*Arlington Indus. v. Bridgeport Fittings, Inc.*,
632 F.3d 1246 (Fed. Cir. 2011) ..................................................37

*Blackwell Publ'g, Inc. v. Excel Research Grp., LLC*,
No. 07-12731, 2008 WL 506329 (E.D. Mich. Feb. 22, 2008) ......................52

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ....................................41, 46, 47

*Cortland Line Co. v. Orvis Co.*,
203 F.3d 1351 (Fed. Cir. 2000) ..................................................33

*Design Strategy, Inc. v. Davis*,
469 F.3d 284 (2d Cir. 2006) ......................................................57

*Dunning v. Bush*,
536 F.3d 879 (8th Cir. 2008) ......................................................57

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ..................................................37

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) ..................................................38

*Gay v. Stonebridge Life Ins. Co.*,
660 F.3d 58 (1st Cir. 2011).................................................54, 57

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
339 U.S. 605 (1950).................................................................43

*Hill-Rom Serv., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ................................................................34, 35

*In re Kotzab*,
    217 F.3d 1365 (Fed Cir. 2000) .......................................................33

*Ingalls Shipbuilding, Inc. v. United States*,
    857 F.2d 1448 (Fed. Cir. 1988) ...............................................34, 57

*Intellectual Science and Technologies, Inc. v. Sony Electronics, Inc.*,
    589 F.3d 1179 (Fed. Cir. 2009) .......................................................48

*IMS Tech., Inc. v. Hass Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) .......................................................33

*Jacobs v. N.C. Administrative Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015) .........................................................41

*L.J. v. Wilbon*,
    633 F.3d 297 (4th Cir. 2011) ...............................................56, 57

*Lear Siegler, Inc. v. Sealy Mallress Co. of Michigan*,
    873 F.2d 1422 (Fed. Cir. 1989) .......................................................49

*Lemelson v. United States*,
    752 F.2d 1538 (Fed. Cir. 1985) ...............................................36, 37

*M-B-W Inc. v. Multiquip, Inc.*,
    No. 07-cv-390, 2009 WL 3148722 (E.D. Wis. Sept. 29, 2009)....................36

*Metro. Life Ins. Co. v. Bancorp Serv., LLC*,
    527 F.3d 1330 (Fed. Cir. 2008) .......................................................52

*NetMoneyIn, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) .......................................................32

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) .......................................................50

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...............................................35, 37

*Quinn v. Consolidated Freightways Corp. of Del.*,
283 F.3d 572 (3d Cir. 2002) ...........................................................56

*Royal Typewriter Co. v. Remington Rand, Inc.*,
168 F.2d 691 (2d Cir. 1948) ...........................................................36

*RZS Holdings AVV v. PDVSA Petroleo S.A.*,
506 F.3d 350 (4th Cir. 2007) ..........................................................55

*S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*,
318 F.3d 592 (4th Cir. 2003) ..................................................27, 56

*Southco, Inc. v. Five Tech., Inc.*,
661 Fed. App'x 681 (Fed. Cir. 2015) ...........................................35

*SRI Int'l v. Matsushita Corp.*,
775 F.2d 1107 (Fed. Cir. 1985) .....................................................38

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) .....................................................33

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)......................................................................33

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996) ................................................49, 50

*Thompson v. Doane Pet Care Co.*,
470 F.3d 1201 (6th Cir. 2006) .......................................................54

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) .....................................................35

*TNS Media Research, LLC v. Tivo Research and Analytics, Inc.*,
Slip Op. No. 2014-1668 (Fed. Cir. Sept. 16, 2015).......................43

*United States v. Certain Real Prop.*,
141 F.R.D. 221 (D. Me. 1992).......................................................52

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
778 F.3d 1365 (Fed. Cir. 2015) .....................................................43

*Wavetronix LLC v. EIS Elec. Integrated Sys.*,
    573 F.3d 1343 (Fed. Cir. 2009) ......................................................................33

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ........................................................................34

**Federal Statutes**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1295(a)(a) ......................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1338 ...............................................................................................1

**Federal Rules**

Fed. R. Civ. P. 26(a)(2)(B) ...........................................................................27

Fed. R. Civ. P. 37(c)(1) .............................................................................27, 55

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals.

Plaintiff-Appellant currently is not aware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.  Fed. Cir. R. 47.5.

# JURISDICTIONAL STATEMENT

The United States District for the Eastern District of Virginia had jurisdiction of this patent infringement case under 28 U.S.C. §§ 1331 and 1338. The district court issued opinions granting summary judgment of no literal infringement and no infringement under the doctrine of equivalents, on May 27, 2015 and August 7, 2015, respectively.  (A0039; A0074.)  The district court subsequently entered a final judgment, and Appellant timely filed a notice of appeal on August 11, 2015.  (A0001; A0127.)  This Court has jurisdiction over this appeal from the final judgment of the district court under 28 U.S.C. §§ 1291 and 1295(a)(1).

# STATEMENT OF THE ISSUES

1.     Did the district court err in construing the claim language "attaching a number of GPS [Global Positioning Satellite] receivers to a number of freight containers" to exclude directly attaching the freight containers to container-handling equipment incorporating GPS receivers?

2.     Even under its construction of the "attaching" limitation, did the district court err in granting summary judgment of no infringement under the doctrine of equivalents in view of conflicting expert, documentary, and deposition evidence as to the insubstantial difference between directly attaching the containers to equipment incorporating GPS receivers, and directly attaching containers to the GPS receivers themselves?

## STATEMENT OF THE CASE

Plaintiff-Appellant Freight Tracking Technologies, LLC ("Freight Tracking") accuses Virginia International Terminals, LLC's ("VIT") of infringing the freight container tracking methods claimed in U.S. Patent Nos. 6,266,008 ("the '008 patent") and 7,102,564 ("the '564 patent"). (A0002.) The claimed methods use GPS receivers, wireless communications, and a base station computer to track the location and movement of freight containers in freight yards. (A0087–88; A0103.) Appellee NOW Solutions, Inc. ("NOW") intervened in the case due to indemnity obligations owed to VIT. (A0002.)

In opinions of May 27, 2015, and August 7, 2015, the district court granted summary judgment of no literal infringement and no infringement under the doctrine of equivalents, respectively. (A0029–39; A0066–74.)

## A.    Overview

The '008 and '564 patents claim systems and methods of tracking freight containers in freight yards. (A0087–88; A0103.) The systems incorporate GPS receivers, a base station computer, and methods of GPS error correction to generate the hyper-accurate location data needed in the densely packed environment of a freight yard. (*Id.*)

In one embodiment, a GPS receiver attached to the container transmits its location to the base station when the container is picked up by container-handling-equipment ("CHE"), and when the container is put down in a new location by the CHE. (A0085 at 6:11–14.) By requiring the GPS receiver to be attached to the container, the system ensures sufficient proximity of the receiver and container to infer the location of the container from the location of the GPS receiver. (A0084 at 3:41–43; A0085 at 5:29–32.) The system tracks the location and identity of each container by tracking its starting and ending locations. (*Id.* at 3:43–48.)

The district court granted summary judgment of no literal infringement, based on its construction of the term "attaching a number of GPS receivers to a number of freight containers." (A0029–39.) The court limited "attach" to direct attachment of the receivers to the containers. (A0034–36; A0010–13.) The district court also granted summary judgment of no infringement of this limitation under the doctrine of equivalents. (A0066–74.)

## B.     The '008 and '564 Patents

The '008 and '564 patents are entitled "System and Method for Determining Freight Container Locations," and relate to using GPS technology to track freight containers in a freight yard. (A0075; A0090.)[1] As set forth in the specification, the inventors overcame several obstacles to using this technology in the freight yard environment. (*See* A0083.) Specifically, tracking freight containers in such yards required far more accuracy than the version of GPS available for civilian use at the time. (A0083 at 1:60–65, 2:44–62.) The inventors discovered a way to implement so-called "differential GPS" correction in the unique physical environment of a freight yard, which made GPS locations sufficiently accurate for

---

[1]     The '008 and '564 patents share a common specification because the '564 patent issued as a continuation of the '008 patent application. (A0090.) For the sake of convenience, all citations to the specification are to the '008 patent.

tracking individual freight containers in a yard.[2]  (A0083–84 at 2:65–3:48; A1181–82.)

The patents claim systems and methods of tracking freight containers with GPS receivers, wireless communication and a base station computer with a database.[3]  (A0087–88; A0103.)  "The system tracks individual freight containers by intermittently transmitting [to the base computer] the position of a freight container to a base station."  (A0083–84 at 3:65–4:1.)  The transmission comes from the GPS receiver, which is "attached" to the container at the time.  (A0084 at 3:15–19.)

The base station determines an error correction to improve accuracy, and the precise location of the GPS receiver is used to infer the location of the attached container.  (A0084 at 3:32–34.)  "The base station receives and records position

---

[2]      As explained in the specification, "GPS is a spaced based system of satellites which can provide an infinite number of receivers accurate three dimensional position (*i.e.*, horizontal location and altitude), velocity and time. . . . As a GPS receiver locates three or four satellites, it determines its distance from each satellite.  The intersection of these three or four spheres enables a precise location of the receiver . . . ."  (A0083 at 1:29–50.)

[3]      According to the specification, "[i]n one form, the remote [GPS] receivers are simply transmitters for receiving the GPS timing signals, amplifying the signals, and retransmitting the GPS timing signals to the base station.  The base station then calculates the location of the remote receiver.  In another form, the remote receiver include a GPS engine which calculates an apparent position based on the GPS timing signals.  The base station then applies a differential correction to obtain a more accurate position of the remote receivers."  (A0084 at 3:26–34.)

data of the receivers, and inferentially, the containers the receivers are attached to." (*Id.* at 3:42–44.)

Thus, the specification discloses that the "attachment" must place the GPS receiver sufficiently close to the container to enable the system to infer the location of the container from the calculated location of the GPS receiver. (A0084 at 3:32–34, 3:42–44.) Neither the specification nor the claims otherwise limit the type or manner of such an "attachment."

The specification further discloses the possibility of using a motion sensor switch to operate the GPS receiver when a container is picked up from its current location, and to shut-off the receiver after the container is put down in a new location. (A0081; A0085 at 6:8–18.) The possibility of using timers to operate the receivers at pre-set intervals, regardless of movement, also is discussed. (*Id.*)

The claimed and disclosed systems allow the user to know where each container is at any given time—*i.e.*, the last place each container was put down by a CHE. (A0085 at 5:29–32; A0086 at 8:34–40.) An illustration begins with an initial known location of a known freight container X with known cargo Z, stored in the database of the base station computer. (A0084 at 3:46–48.) GPS receiver attached to container X when container X is picked up at its initial location by a CHE determines and transmits its location, time, and other data. (A0085 at 6:11–15.) Error correction is applied to the GPS data to determine the actual location of

7

the receiver within one meter.  (A0084 at 3:2–4; A1182.)  The location of the

container is inferred from the location of the receiver.  (A0084 at 3:42–44.)

The GPS receiver may continue to transmit its location as it and the

container are being moved by the CHE.  (A0087 at 9:20–25.)  But most

importantly, the GPS receiver transmits its location and container identification

whenever the container is put down in a new location.  (A0084 at 3:6–11.)  In this

way, the base computer allows the user to track the current location of container X,

no matter how many times it is moved around the freight yard by CHEs.  (*Id.*)  The

database also allows the user to determine the current location of container X (and

also cargo Z).  (*Id.* at 3:46–48.)

### 1.    The Asserted Claims

The two asserted independent claims are claim 18 of the '008 patent and

claim 1 of the '564 patent.  The "attaching" limitation upon which the district court

granted summary judgment of non-infringement is in bold italics.

| The '008 Patent | The '564 Patent |
|---|---|
| 18. A method for determining freight container locations in a freight yard comprising:<br><br>***attaching a number of GPS receivers to a number of freight containers in said freight yard;*** | 1. A method for determining freight container locations in a freight yard comprising:<br><br>***attaching a number of receivers for GPS signals to a number of freight containers in said freight yard;*** |

8

| | |
|---|---|
| operating each receiver to receive GPS signals and determine its current location;<br><br>intermittently operating each receiver to transmit an identification and position based on the current location of the receiver;<br><br>receiving said identification and position at a base station;<br><br>recording the identification and position of said receivers in said freight yard; and<br><br>determining an error correction for the global positioning satellite system comprising the substeps of<br><br>positioning a global positioning satellite reference receiver at a reference location having a known position,<br><br>determining the apparent position of the reference location using the reference receiver,<br><br>calculating an error correction based on the apparent position and the known position of the reference location, and<br><br>applying the error correction to the position of said receivers to determine a corrected position of said receivers in said freight yard. | intermittently operating each receiver to transmit an identification and position;<br><br>receiving said identification and position at a base station; and<br><br>recording the identification and position of said receivers in said freight yard. |

(A0088; A0103.)  In addition, Freight Tracking also asserted dependent claim 20 of the '008 patent, and dependent claims 2, 5, and 11 of the '564 patent.  (*Id.*)

9

### 2. The Prosecution History of the Asserted Patents Relating to the "Attaching" Limitation

During prosecution of the '008 patent, the Examiner repeatedly found anticipation based on prior art in which the GPS receiver was indirectly connected to the container. Specifically, the prior art disclosed incorporation of the GPS receiver into a vehicle, which in turn was connected to the freight container. (A1539–42; A1009; A1058.) The Examiner found that this art anticipated the pending method claims (which contained the same "attaching" limitation as in the asserted claims here), as well as the pending system claims (which required the receiver to be "attachable to freight containers"). (A1538–42; A1512–15.) The applicants acquiesced on the point of such indirect attachment being within the scope of the claimed inventions. They ultimately overcame these rejections by arguing that the prior art did not disclose how to implement such GPS tracking in the unique environment of a freight yard. (A1651–52; A1666; A1671–72.)

In the first office action of June 14, 1996, the Examiner found that U.S. Patent No. 5,223,844 ("Mansell") anticipated pending claimed methods requiring "attaching" GPS receivers. (A1539.) Mansell used GPS receivers to track various kinds of vehicles in unrestricted outdoor areas, which did not require the same kind of accuracy as a freight yard. (A1008.) Nevertheless, in finding Mansell to be anticipatory art, the Examiner necessarily found that the GPS receivers in Mansell

10

met the "attaching" limitation of the asserted claims with respect to a "freight container."  (A1539; A1512–15.)

According to the Examiner, Figure 1 of Mansell shows the GPS receiver (part of the "Mobile Unit" 100E by Mansell) incorporated into one train car (apparently the engine), which in turn is connected to the freight container 102E to be tracked.



(A1539; A1009.)  The Examiner found:  "Mansell et al teaches the claimed system for determining freight container locations (102E in Figure 1) including remote GPS receiver attachable to freight containers . . . ."  (A1539.)

The Examiner also found that indirect attachment of the GPS receiver to the freight container in U.S. Patent No. 5,491,486 ("Welles") anticipated the claimed methods requiring "attaching."  (A1541; A1057.)  Like Mansell, Figure 1 of Welles shows the GPS receiver in the "Mobile Tracking Unit" (10D), incorporated in what appears to be the engine 12D of the train, which is in turn connected to the freight container car.



(A1058.)

Finally, the Examiner likewise found anticipation of system claims calling for GPS receivers "attachable" to freight containers, based on the same kind of indirect connection of the GPS receiver to the freight container, in U.S. Patent No. 4,896,580 ("Rudnicki"). (A1539–40; A1050.) Figure 1 of Rudnicki shows the GPS receiver (114) attached to a locomotive engine (112), which is then coupled or connected to the freight car or container (117).



(A1051.) The Examiner concluded: "Rudnicki teaches the claimed system for determining container locations [] including remote GPS receivers attachable to freight containers . . . ." (A1004.)

The applicants did not challenge any of these anticipation rejections based on a failure of the prior art to disclose "attaching the GPS receiver to the freight container." (A1543–45.) Instead, they argued that these references did not sufficiently pre-date the claims in order to qualify as prior art. (*Id.*)

In its second office action of February 12, 1997, the Examiner found that patentee was not entitled to the priority date of the '093 parent patent, and again rejected the claims as anticipated by Mansell and Welles. (A1555; A1558–59.)

Once more, there was no dispute that the indirect connection of the GPS receiver to the freight container in Mansell and other prior art met the "attaching" limitation of the claimed inventions.  (A1580; A1584.)

On November 20, 1997, the Examiner issued a final rejection of the method claims with the "attaching" limitation.  (A1592–95.)  Once again, the Examiner found anticipation by Mansell and Welles.  (*Id.*)  The applicants appealed to The Board of Patent Appeals and Interferences.  (A1603–04.)

Throughout the entire time before the Examiner and the Board, the applicants never distinguished *directly* attaching GPS receivers to freight containers from *indirectly* attaching GPS receivers to containers via vehicles carrying containers.  Apart from claiming the priority date of the '093 parent patent, the applicants argued only that their invention was patentable because their invention "calls for attaching a number of GPS receivers to a number of freight containers *in a freight yard*," while the prior art sought "to track vehicles over a wide geographic area."  (A1611 (emphasis added).)  The applicants argued that those two environments presented fundamentally different technical challenges, because "tracking over a wide geographic area does not require much precision" and does not use the type of "differential correction" disclosed and claimed by the '008 patent, which concerned tracking freight in a freight yard. (A1611; A1651–52

13

("A fair reading [of the prior art] does not include tracking the location of freight

containers *in a freight yard*.") (emphasis added).)

On October 10, 2000, the Board found that Mansell did not anticipate

claim 18 because "although [it] teaches using the GPS tracking system disclosed

therein to determine the locations of cargo and freight hauling vehicles, *it does not*

*disclose such use in the environment of a freight yard*." (A1666 (emphasis

added.))[4] The '008 patent issued on July 24, 2001, and the '564 continuation

patent issued on September 5, 2006, subject to a terminal disclaimer. (A0075;

A0090.)

## C.    VIT's Accused Use Of GPS-Based Freight Tracking Systems

Freight Tracking timely served an opening expert report from Dr. Thomas

Rhyne with respect to VIT's infringement of the asserted claims. (A0042.) That

report was part of the summary judgment record. (A0067; A1150–220.) The

opinions, documents, and deposition testimony on infringement presented in that

report are the source of all facts asserted here, unless otherwise indicated.

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

---

[4]    Prior to adjudication, the Examiner withdrew his anticipation rejections of
claim 18 that were based on any references other than Mansell. (A1641–42.)



**1.     VIT's Use of the RTACTCS**







_____

[7]  Because VIT/NOW did not produce Mr. Buck for deposition until *after* opening expert reports, his testimony referenced here could not be included in Dr. Rhyne's opening report on infringement.  (*See* A1323; A0042.)  It was, however, attached to Freight Tracking's summary judgment opposition brief and quoted in Dr. Rhyne's declaration, submitted in opposition to summary judgment.

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

### 2.    VIT's Use of the CTAS

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

### D.    The District Court's Claim Construction Ruling

Freight Tracking maintained that the plain and ordinary meaning of "attach" encompassed both direct attachment and indirect attachment or connection. (A0007–08 ("Plaintiff argues that the scope of the word "attach" should broadly encompass both direct and indirect attachments.").)  Freight Tracking attempted to articulate that inclusion by construing the term to mean "to associate or connect GPS receivers with freight containers."  (*Id.*)  Freight Tracking submitted that the

prosecution history concerning prior art references with indirect attachments reflected the PTO's and the inventors' understanding that such indirect attachments were intended to fall within the scope of the claim.  (A1483–84.)

VIT/NOW urged the court to construe "attach" in a way that would expressly exclude the accused attachment of their GPS receivers to the container through the CHEs into which the receivers were incorporated.  (A0007–08.) VIT/NOW proposed "affixing a GPS to the wall of a freight container (as opposed to affixing it to a powered vehicle that transports freight containers)."  (*Id.*)  The district court recognized that "Defendants argue that Plaintiff disavowed the full scope of the claim term with respect to the use of vehicles in the prosecution history [when distinguishing prior art during prosecution]."  (A0007.)[8]

In its *Markman* ruling of February 24, 2015, the district court rejected Defendants' disavowal argument, and refused to adopt their exclusion of "affixing [the receiver] to a powered vehicle that transports freight containers."  (A0009.)  It also rejected Defendants' request "to add words to the claim to 'make clear' to the

---

[8]    Defendants APM Terminals Virginia, Inc. (now Virginia International Gateway, Inc.) and APM Terminals North America, Inc. (collectively "APMT") also participated in the *Markman* proceedings.  (A0002–03.)  Although VIT/NOW and APMT submitted separate briefs and made separate arguments at the *Markman* hearing, the district court's claim construction order does not distinguish between any differences in the positions taken by VIT/NOW and APMT and instead generically refers to "Defendants."  (A0007–13.)

jury that 'attached' means 'attached to a freight container,' as opposed to a

vehicle," finding that "courts do not redefine words or rewrite patents." (A0013.)

The court concluded that the plain and ordinary meaning of "attach" should

control. (A0009–10.) It went on to find that the cases cited by Freight Tracking

did not support the proposition that the plain and ordinary meaning of "attach"

means "merely" to "associate," and possibly "merely" to "connect to." (*Id.*) The

court did not consider the prosecution history presented by Freight Tracking.

(A0007–13.)

Instead of setting forth what it found to be the plain and ordinary meaning of

"attach," the district court turned to the specification, which it said was "replete

with evidence pointing toward the proper meaning of 'attach.'" (A0011–12.)

Most of the quotations selected by the court did not speak to any requirement of a

direct versus indirect attachment. (*Id.*) The court, however, relied solely on the

facts that the first preferred embodiment referred to the GPS receiver unit as

"designed for mounting on top or sides of a freight container," and that the fourth

preferred embodiment referred to the receiver unit as being "on the container."

(A0012.) Based on these preferred embodiments, the Court concluded that "the

proper meaning [of 'attach' was] 'affixed or fastened to,' and not merely

'associated with.'" (A0012–13.)

To the extent that a fair reading of "affixed or fastened to" in the context of the district court's ruling did not clearly exclude the indirect attachment of VIT's receivers to containers, the district court confirmed this to be the case in dealing with summary judgment, as described in the following section.

### E.     The Summary Judgment Proceedings

#### 1.     The Unusual Procedural Posture of VIT/NOW's Motion for Summary Judgment

On March 10, 2015, VIT/NOW filed a motion for summary judgment, before responsive expert reports were served and before any expert depositions were taken.  (A0043.)  VIT/NOW supported its motion with an expert declaration of Matthew Schor.  (*Id.*; A1236.)  Mr. Schor attempted to refute the opinion, documentary, and deposition evidence of infringement under the doctrine of equivalents, presented in the opening report of Freight Tracking's expert, Dr. Thomas Rhyne.  (A1240–46.)

Two days later, on March 12, 2015, VIT/NOW filed a motion to continue the completion of all expert reports, expert depositions, remaining fact depositions, and trial, until after the Court ruled on the summary judgment motion.  (A0121; A0026.)  Over Freight Tracking's opposition, the district court granted VIT/NOW's motion to continue on the day before Freight Tracking's opposition to the summary judgment motion was due.  (A0027–28.)  The district court stopped expert discovery in mid-stream, precluded Dr. Rhyne from responding to anything

that Mr. Schor said in his declaration, and further precluded Freight Tracking from deposing VIT/NOW's expert-declarant, Mr. Schor.  (*Id.*)

### 2.    Summary Judgment of No Literal Infringement

Although the district court had expressly refused VIT/NOW's bid to exclude "affixing [a GPS receiver] to a powered vehicle that transports freight containers" during claim construction, it nevertheless ruled on summary judgment that its construction excluded precisely that indirect connection.  (A0009; A0013; A0034–36.)  The court granted summary judgment of no literal infringement on May 27, 2015.  (A0039.)

### 3.    Summary Judgment of No Infringement under the Doctrine of Equivalents

The path to summary judgment of no infringement under the doctrine of equivalents was a far more complicated outgrowth of the unusual timing and suspension of discovery.

#### (a)    Mr. Schor's Declaration Response to Dr. Rhyne's Opening Expert Report on the Doctrine of Equivalents with Respect to "Attaching"

Mr. Schor's 33-paragraph declaration was devoted primarily to rebutting the opinion, documentary, and deposition evidence of infringement under the doctrine of equivalents in Dr. Rhyne's opening report.  (A1236–46.)

*Function*:  Dr. Rhyne had concluded from his analysis of the patents and accused systems that attaching containers to CHEs incorporating GPS receivers to

23

containers "performs substantially the same function (linking GPS receivers to containers)" as directly attaching the receivers to the containers.  (A1186 at ¶ 86; A1206 at ¶ 164.)

Mr. Schor disagreed.  He declared "connecting CHEs to freight containers when moving or lifting the containers serves a substantially different function than attaching GPS receivers to freight containers."  (A1244 at ¶ 28.)  Surprisingly, Mr. Schor opined that the function of the indirect attachment in the accused "Real Time Automatic *Cargo Tracking Control System*" was something other than tracking freight containers of cargo.  (A1240 at ¶ 16 (emphasis added); A1243–44 at ¶¶ 26–27.)  He insisted instead that the function was to "allow the terminal operators to perform functions such as optimize route dispatch, manage personnel and verify correct work order performance," in contrast to the function of direct attachment in the patents to "determin[e] the locations of freight containers in a freight yard." (A1243–44 at ¶¶ 26–27.)

*Way*:  Dr. Rhyne had concluded that the indirect attachment of the accused systems performed its function in "a substantially similar way (through a physical connection, albeit indirect)" as the direct attachment.  (A1186 at ¶ 86; A1206 at ¶ 164.)

Mr. Schor disagreed.  Although Mr. Schor's declaration is less than clear on the point, he seemed to suggest that the "ways" are different because "the way the

patents determine the location of freight containers is determining the location of the receivers that are on the freight containers," whereas "in the accused systems, the GPS receivers cannot be what is used to determine the location of individual freight containers." (A1244 at ¶ 29.)

*Result*: Dr. Rhyne had concluded that the indirect attachment produced "substantially the same result (being able to track the movement of containers in a freight yard)" as the direct attachment. (A1186 at ¶ 86; A1206 at ¶ 164.)

Mr. Schor countered that the indirect attachment of the accused systems produced the different result of enabl[ing] NOW and VIT to track the movement *of CHEs* in the freight yard." (A1246 at ¶ 32 (emphasis added).) In so doing, Mr. Schor chose not to acknowledge the VIT/NOW documents to the contrary, which Dr. Rhyne had cited in his opening report. (*See* A1171–81 at ¶¶ 46–69, 85, A1185–87 at ¶¶ 87–90.)

### (b) Freight Tracking's Opposition to the Motion and Dr. Rhyne's Responsive Supporting Declaration

Mr. Schor's declaration was the first time that Freight Tracking and Dr. Rhyne had seen VIT/NOW's proposed function-way-result analysis. Prohibited by the Court from taking Mr. Schor's deposition (A0027), and having offered to forego reply expert reports due to what had been a compressed expert deposition schedule (A0041–42), Freight Tracking responded in two ways: (1) it cited and submitted in its brief numerous documents and deposition testimony which

squarely contradicted Mr. Schor's assertions; and (2) it submitted a responsive declaration from Dr. Rhyne.

Much of Dr. Rhyne's declaration testimony on the doctrine of equivalents was devoted to debunking Mr. Schor's contention that the function of indirectly attaching containers to the GPS receiver in the CHEs was not to track freight containers of cargo. (A1261–67 ¶¶ 26–40.) Citing many of the same VIT/NOW documents that he had cited in his opening report (along with some subsequent deposition testimony from a late-produced Rule 30(b)(6) NOW witness), Dr. Rhyne set forth how NOW's documents contradicted Mr. Schor's position—just as Freight Tracking's counsel would have been able to do in deposing Mr. Schor, if the court had not prohibited that deposition by staying discovery. (*Id.*)

Dr. Rhyne similarly refuted or impeached Mr. Schor and his surprising assertion that in a GPS-based system, "the GPS receivers cannot be what is used to determine the location of individual freight containers." (A1262–69 ¶¶ 29–45.) And with respect to VIT/NOW's newly-claimed "result" of "tracking CHEs" rather than the freight containers the CHEs move, Dr. Rhyne cited the VIT/NOW documents he had previously relied upon in opining that the result was to track containers, just as in the patents. (A1270–71 at ¶¶ 50–55.) Here too, Dr. Rhyne cited testimony subsequently obtained from Mr. Buck, whom VIT/NOW had refused to produce until after opening expert reports. (A1271 at ¶ 54.)

**(c)      The District Court's Order Striking the Doctrine of Equivalents Section of Dr. Rhyne's Declaration Directly Responsive to Mr. Schor's Declaration**

With their expert Mr. Schor protected from deposition, VIT/NOW objected to Dr. Rhyne's response to Mr. Schor's opinions.  (A0038.)  The district court treated the objection as a motion to strike those paragraphs, and invited further briefing.  (*Id.*)  The motion to strike was referred to a magistrate, who granted the motion.  (A0053.)  On August 4, 2015, the district court overruled Freight Tracking's objections to the ruling, and ordered the paragraphs stricken from the summary judgment record.  (A0065.)

The court found that the declaration was an untimely expert report, in violation of Rule 26, and that the evidence must be excluded under Rule 37 because the violation was not "substantially justified or [] harmless."  (A0065.)  *See* Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 37(c)(1).  The court purported to determine the issue of harmlessness under the five-factor test of the Fourth Circuit:  "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony."  (A0058–59.)  *S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

The district court found that VIT/NOW was surprised by Dr. Rhyne's declaration because the parties had elected to forego reply reports. (A0064.) It further agreed with VIT/NOW that the declaration had the potential to disrupt trial—even though VIT/NOW itself had insisted, and the Court had allowed, all dates to be continued *before* Freight Tracking filed its opposition. (A0064; A0027.) Finally, the court recognized that the declaration testimony was important, but concluded that this militated in favor of exclusion. (A0064–65.)

> ### (d)    The District Court Grants Summary Judgment of No Infringement under the Doctrine of Equivalents, Based on Striking Dr. Rhyne's Declaration

With Dr. Rhyne's doctrine of equivalents declaration testimony stricken, the district court, on August 7, 2015, granted summary judgment of no infringement under doctrine of equivalents. (A0074.) The Court found that Dr. Rhyne's opening report (to which the entire Schor declaration had been directed) was legally insufficient to create a genuine issue of fact. (A0071–74.) The court selected only two paragraphs out of Dr. Rhyne's 221-paragraph report, and declared them to be insufficiently particularized, as a matter of law. (*Id.*)

The court dismissed Dr. Rhyne's detailed analysis of the accused devices and the patents beyond these two paragraphs as relevant only to literal infringement. (A0072–73.) Finally, the court declared that the record "is devoid of any other evidence that sufficiently supports Plaintiff's argument." (A0074.) In

28

so doing, the Court did not address the VIT/NOW documents and deposition evidence submitted in opposition to the motion by Freight Tracking.  (A0071–74.)

## SUMMARY OF THE ARGUMENT

The district court erred in several ways in finding that VIT's use of a GPS receiver indirectly attached to the container precluded any kind of infringement liability, without at least hearing evidence at trial.  Under the plain and ordinary meaning of "attach," placement of the GPS on top of the CHE straddling and attached to the container literally infringes.  In any event, the record reflects at least a genuine issue of fact as to whether there is a substantial difference between a receiver attached to the top of the container, on the one hand, and a receiver attached to the top of the CHE which is attached to the container, on the other hand.

The district court's claim construction limited the patents to GPS freight tracking systems in which the location of the container is inferred from a GPS receiver or antenna (the red dot) directly attached to the wall or top of container itself, when the container is attached to the CHE [figure (a) below].  The court's construction excluded any system that infers the location of a container from a GPS receiver attached to any part of the CHE when connected to the container—even if attached barely a foot away, such as on the cross-bar of the CHE that

attaches to the container [figure (b) below], ██████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

In reaching this result, the district court erred by deviating from the plain and ordinary meaning of "attach," which includes both direct and indirect attachment. The plain and ordinary meaning should have controlled as a matter of law, because the inventors neither acted as their own lexicographers nor disavowed any scope of the claims. The district court further erred in ignoring the prosecution history in which the Examiner and inventors agreed that indirect attachment of the GPS receiver in prior art met the "attaching" limitation of the asserted claims. And finally, the court erred in restricting the meaning of "attach" to the direct attachment found in two of the four preferred embodiments, whilst ignoring relevant context from the rest of the specification.

On summary judgment, the district court further erred in not considering evidence of a genuine issue of fact as to infringement under the doctrine of equivalents, even if Dr. Rhyne's declaration had been properly excluded. The documentary and opinion evidence in Dr. Rhyne's opening expert report gave rise to at least a genuine dispute as to the function, way, and result of direct attachment and VIT's indirect attachment of the freight container to the CHE incorporating the GPS receiver. Even apart from Dr. Rhyne's opening report, Freight Tracking proffered a wealth of documentary and deposition evidence in its opposition brief, which also was sufficient to raise at least a genuine issue of fact as to insubstantial differences between direct and indirect attachment of the receivers and containers in the freight tracking methods and systems of the patents.

Finally, the district court erred in excluding Dr. Rhyne's declaration in opposition to summary judgment, which also presented enough evidence to present an issue of genuine fact as to equivalence of directly attaching the GPS receiver to the freight container versus VIT's incorporation of the GPS receiver into the CHE, which is directly attached to the container. The opinions and evidence presented in that declaration were substantially the same as Dr. Rhyne had previously presented in his opening report except for (1) deposition testimony from a witness whom VIT/NOW had withheld until after opening expert reports, and (2) a response to some of the more surprising assertions of Mr. Schor, which could not reasonably

have been anticipated—such as Mr. Schor's opinion that the primary function of the accused GPS-based "Real Time Automatic *Cargo Tracking Control System*" (emphasis added) was something *other than* tracking the freight containers of cargo.

But even if the Rhyne declaration had been a violation of Rule 26, the district court erred in concluding that it was not "harmless" under Rule 37. Indeed, at VIT/NOW's insistence, the district court had continued the completion of expert discovery and the trial date *before* Freight Tracking filed the Rhyne declaration with its opposition papers. There was no question of disrupting any trial, and the cure could have been effected by simply allowing expert discovery to proceed.

For these reasons set forth in more detail below, this Court should reverse the district court's claim construction and remand the case back to the district court. But even if this Court concludes that the district court's claim construction was not erroneous, summary judgment of no infringement under the doctrine of equivalents should be reversed, and remanded to the district court to proceed to trial.

## ARGUMENT

### A.     Standard of Review

The Federal Circuit reviews the grant of summary judgment *de novo*. *NetMoneyIn, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1365 (Fed. Cir. 2008). All

evidence must be viewed in favor of the non-moving party. *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1359 (Fed. Cir. 2000). Underlying claim construction issues are also reviewed *de novo* when—as is the case here—the district court did not hear any expert testimony or make other factual findings of extrinsic evidence in construing the patent claims. (A0007–13.) *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

The Federal Circuit may affirm a district court's grant of summary judgment of non-infringement only if "there is no genuine issue as to whether the accused device is encompassed by the claims." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1358 (Fed. Cir. 2009). That is because "infringement, both literal and under the doctrine of equivalents, is a question of fact." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).

Thus, this Court "must determine whether, after resolving reasonable factual inferences in favor of the patentee, the district court correctly concluded that no reasonable jury could find infringement." *IMS Tech., Inc. v. Hass Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). Although parties must present more than a scintilla evidence in support of their factual findings, the threshold is not that much higher. *See In re Kotzab*, 217 F.3d 1365, 1369 (Fed Cir. 2000) ("Substantial evidence is something less than the weight of evidence but more than a mere scintilla of evidence.").

With respect to the district court's decision to strike Freight Tracking's expert declaration from the summary judgment record, this Court reviews for an abuse of discretion. However, the "discretion to impose sanctions is not unfettered, especially when the *de facto* result of the sanction is dismissal." *Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1451 (Fed. Cir. 1988). "A district court abuses its discretion if its conclusion is guided by erroneous legal principles," or if it "rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

**B.      The District Court Erred In Limiting "Attaching" to Directly Attaching GPS Receivers to Freight Containers, and Erred in Granting Summary Judgment of No Literal Infringement.**

The district court erred in two respects when it construed "attach" to exclude indirect attachment or connection. *First*, the district court deviated from the plain and ordinary meaning of "attach," even though the patentees had not acted as their own lexicographers in the specification, and had not disavowed any part of that plain meaning. *Second*, it failed entirely to consider the context of the prosecution history, and erred in limiting the scope of the plain and ordinary meaning to the preferred embodiments of the specification.

**1.      The District Court Erred in Deviating From Plain and Ordinary Meaning of "Attach."**

"Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution

history." *Hill-Rom Serv., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

In this case, neither party contended that the patentees acted as their own lexicographers with respect to the "attaching" limitation. (A0007–09.) Further, the district court correctly rejected the argument that the patentees had disavowed "affixing [a GPS receiver] to a powered vehicle that transports freight containers." (*Id.*) Accordingly, the term "attach" should have been given its plain and ordinary meaning to a person of ordinary skill, read in light of the prosecution history and specification.

It is well-settled that the common and ordinary meaning of "attach" includes both direct and indirect attachment, such as a connection of two objects through a third linked between the two. This Court has confirmed that meaning as recently as this year. *See Southco, Inc. v. Five Tech., Inc.*, 661 Fed. App'x 681, 686 (Fed. Cir. 2015) ("[T]he ordinary meaning of "attached" includes both direct and indirect attachment.") (A1884). District courts around the country acknowledge this ordinary meaning in construing claims. *See, e.g.*, *M-B-W Inc. v. Multiquip, Inc.*,

35

No. 07-cv-390, 2009 WL 3148722, at *3–6 (E.D. Wis. Sept. 29, 2009) (construing

"attached" to include "connected by an intervening device" in addition to "directly

affixed") (A1857–59).

Judicial recognition of this meaning goes at least as far back as Judge

Learned Hand's analysis in *Royal Typewriter Co. v. Remington Rand, Inc.*, 168

F.2d 691 (2d Cir. 1948):

> However, merely as matter of interpretation of the instrument as a whole, there is no reason to circumscribe the word, "attached," in the claims to the very details of the disclosure and at least of all to the details of the figures. In point of colloquial speech no such limitation is to be implied; we speak of two objects as "attached" to each other, though they are connected by a train of links or even by a chain. Even more than in the case of the "trip bar" the infringement is well within any but a deliberately hostile interpretation of the claims.

*Id.* at 693.  Indeed, the dictionary definition of "attach" *offered by VIT/NOW* as

evidence of the ordinary meaning read:  "to fasten or affix; *join*; *connect*."  (A1144

(emphasis added).)

### 2.   The District Court Erred in Failing to Consider the Context of the Prosecution History.

The district court further erred in construing "attach" without regard to the

prosecution history relevant to the term's understood common meaning.  (A0010–

13.)  Failure to consider the patent prosecution history is error, as a matter of law.

*Lemelson v. United States*, 752 F.2d 1538, 1550 (Fed. Cir. 1985).  In this case, that

failure was not harmless, because the prosecution history confirmed the Examiner's, the Board's, and the patentees' recognition of the full scope of the common and ordinary meaning of "attach"—specifically, attachment of the GPS receiver to a vehicle which is in turn connected to the freight container.

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327 (Fed. Cir. 2009). *See Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1255 (Fed. Cir. 2011) (vacating narrower claim construction adopted by district court where "both the inventors and the PTO understood the unmodified term to encompass unsplit adaptors").

Throughout prosecution, the Examiner found the claimed invention to be anticipated by numerous prior art references, each of which had the GPS receiver indirectly attached to the freight container through another connected vehicle. These references include Mansell, Welles, and Rudnicki, as described in detail in Section B.2, *supra*, at 10–14.

The patentees never questioned that such indirect attachments were within the scope of their invention. They acquiesced to anticipation with respect to the "attach" limitation. (*See, e.g.*, A1539–41; A1548–52; A1543–45.) Even on appeal

to the Board, the patentees did not question that Mansell disclosed "attaching" GPS receivers within the meaning of the claimed inventions.  (A1603–11; A1650–53.) They acquiesced despite the fact that the connection between the GPS receiver in the "mobile unit" of Mansell in the engine is *indirectly* attached to the freight container through the coupling of the container car to the engine.  (A1009.)

This intrinsic evidence, which the district court omitted from its analysis, confirms that "attaching a number of GPS receivers to a number of freight containers" was understood by the PTO and inventors to have its plain and ordinary meaning of directly or indirectly attaching the receivers to the containers.

### 3. The District Court Erred in Limiting "Attach" to the Preferred Embodiments of the Specification, and Ignoring the Context of the Rest of the Specification.

The district court erred by reading limitations from the preferred embodiments of the specification into the plain and ordinary meaning of "attach." The district court observed that the GPS receivers in the first preferred embodiment referred to a unit "designed for *mounting on top or side* of a freight container for GPS signal reception."  (A0012 (emphasis in original).)  It then observed that the fourth embodiment noted that "the remote unit [10] [is] *on* the container."  (*Id.*)  The rest of the specification used the word "attach" without specifying direct or indirect attachment.  (*See generally* A0075; A0083–88.)

38

"[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010) (citations omitted); s*ee also SRI Int'l v. Matsushita Corp.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (*en banc*) ("That a specification describes only one embodiment does not require that each claim be limited to that one embodiment.").

Yet, that is precisely what the district court did here. Based on the fact that two of four preferred embodiments described the GPS receivers as being directly attached to the containers, the district court considered that the meaning of "attach" should be restricted to direct attachment, rather than its plain and ordinary meaning of either direct or indirect attachment. (A0012–13; A0034–36.)

The district court further erred in overlooking what the specification (apart from the preferred embodiments) conveys about the particular context of the attachment between the GPS receiver and container to be tracked. "The base station receives and records the position data of the receivers, and inferentially, the containers the receivers are attached to." (A0084 at 3:42–45.) This context makes clear that the invention will not work if the GPS receiver is so far away from the container as to prevent inferring the location of the container from the location of the GPS receiver. So long, however, as the attachment allows such inference, the context does not require a direct versus indirect attachment.

**4.    The Court Should Reverse the Claim Construction to Include Indirect Attachment, and Reverse the Summary Judgment of No Literal Infringement.**

Properly construed, the term "attach" should have its plain and ordinary meaning of both direct and indirect attachment. Because the district court's grant of summary judgment was based on excluding indirect attachment, the judgment of no literal infringement should be reversed, and remanded with instructions to construe "attach" to include indirect attachment.

**C.    Factual Issues Should Have Precluded Summary Judgment of No Infringement under the Doctrine of Equivalents.**

Under the district court's construction, Freight Tracking presented ample evidence establishing infringement under the doctrine of equivalents, with or without the expert declaration that the district court struck. Aside from Dr. Rhyne's declaration, the supporting evidence included testimony from NOW's head of engineering, VIT/NOW's own technical documents, Dr. Rhyne's opening expert report, and evidence from others skilled in the art. This evidence was also appropriately tied together in Freight Tracking's summary judgment opposition brief—not just Dr. Rhyne's declaration.

The district court, however, struck Dr. Rhyne's declaration from the summary judgment record, and then held that his opening report failed to create a genuine issue of material fact. (A0065; A0071–73.) In so doing, the district court committed reversible error in at least three respects. First, it failed to properly

consider and credit the non-opinion evidence supporting infringement under the doctrine of equivalents. Second, the district court legally erred in dismissing Dr. Rhyne's opening report as insufficient to withstand summary judgment. And third, the decision to strike Dr. Rhyne's declaration was an abuse of discretion.

### 1. The District Court Ignored Non-Expert Opinion Evidence in the Record Which Alone Should Have Precluded Summary Judgment.

It is well-settled that at the summary judgment stage, courts must "credit *all* of the nonmovant's evidence and draw all justifiable inferences in its favor." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (emphasis added). Yet the district court essentially disregarded most of the admissible evidence, other than two paragraphs of Dr. Rhyne's report. (A0073–74.) The district court's summary judgment decision was thus in error. *See Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (reversing summary judgment because "the district court erred by failing to consider all of the evidence in the record"). Consideration of the fact evidence here, particularly in view of Dr. Rhyne's report and Freight Tracking's linking argument, should have led to denial of summary judgment of no infringement.

*First*, there was sufficient evidence in the record for a jury to conclude that directly attaching GPS receivers to containers serves substantially the same

41

*function*—linking receivers to containers to track the latter—as indirectly attaching

receivers by incorporating them into CHEs that attach to containers.  Just as the

'008 patent explains that the invention "tracks individual freight containers,"

(A0083 at 2:67); ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████

██████████████████████████████

████████████████████████████████████████

██████████████████████████████████

This non-expert factual evidence is precisely the type that this Court has

deemed appropriate to prove infringement by equivalents.  *See AquaTex Indus. v.*

*Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("[E]vidence of equivalents

must be from the perspective of someone skilled in the art, for example 'through

testimony of experts or *others versed in the technology*; by documents, including

texts and treatises; and, of course, by the disclosures of the prior art.'") (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)) (emphasis added). *See also TNS Media Research, LLC v. Tivo Research and Analytics, Inc.*, Slip Op. No. 2014-1668, at 41 (Fed. Cir. Sept. 16, 2015) ("[A] party is not required to submit expert testimony as evidence of equivalents.") (A1932).

In fact, earlier this year in *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, this Court found "substantial evidence that the differences between the accused device and the patented technology are insubstantial" based on "admissions by [defendant's] own witnesses." 778 F.3d 1365, 1371 (Fed. Cir. 2015). Freight Tracking presented the same and more here, even apart from Dr. Rhyne's expert opinions.

*Second*, substantial evidence supported Freight Tracking's argument that incorporating GPS receivers into CHEs tracks containers in substantially the same *way* as directly attaching the receivers to the containers. The patents explain that a "base station receives and records position data of the receivers, and *inferentially*, the containers the receivers are attached to." (A0084 at 3:41–44 (emphasis added).)

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

From this highly probative evidence ignored by the district court, a reasonable jury could conclude that direct and indirect attachment of GPS receivers track containers in substantially the same way—by inferring the containers' locations from the positions of the GPS receivers physically tied to them.

*Third*, the fact evidence reveals that both approaches achieve the same *result*—the ability to track and locate the last known location of containers in a freight yard. As the patents explain, "[t]he problems with finding freight in a freight yard are largely solved by the system and method of the present invention." (A0083 at 2:65–67; *see also* A0085 at 5:29–32.)

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

Moreover, the summary judgment record included sworn deposition testimony from the inventor as to the insubstantial difference between direct and indirect attachment of GPS receivers.  (*See* A1361–62 at 138:20–139:05; A1370 at 182:07–182:22.)  Not to mention the prosecution history evidence, which showed that the Examiner considered direct and indirect attachment of receivers to containers to be equivalent, as discussed in Section B.2, *supra*, at 10–14.  (*See also* A1186–87 at ¶¶ 89–90.)  Thus, the record is replete with evidence from those well-versed in the technology, from which a jury could find infringement under the doctrine of equivalents.

Despite this extensive evidence, the district court concluded that "the record is devoid of any other evidence that sufficiently supports Plaintiff's argument that Defendants infringe under the doctrine of equivalents."  (A0074.)  That conclusion was erroneous and should be reversed.

### 2. The District Court Erred in Finding Dr. Rhyne's Opening Report Failed to Set Forth a Doctrine of Equivalents Opinion Sufficient to Defeat Summary Judgment.

The district court also concluded that Dr. Rhyne's opening report was insufficient because (1) Dr. Rhyne's function-way-result opinions were too

conclusory, and (2) Dr. Rhyne's opinions and evidence relating to literal infringement could not be applied to his equivalents theory. (A0072–73.) But neither of these justifications can be squared with this Court's precedent. As such, the district court's conclusion was legal error.

At the heart of this issue is Dr. Rhyne's opinion in paragraph 86 of his opening report: "It is my opinion that indirect attachment via CHE would perform substantially the same function (linking GPS receivers to containers), in a substantially similar way (through a physical connection, albeit indirect), to yield substantially the same result (being able to track the movement of containers in a freight yard). The difference between direct and indirect attachment is insignificant." (A1186 at ¶ 86; *see also* A1206 at ¶ 164.)

This Court has held that nearly identical expert evidence of equivalence precludes summary judgment, as a matter of law. In *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1352 (Fed. Cir. 2013), the Court reversed summary judgment of non-infringement based on the following disclosure in an expert report: "The [accused feature] is equivalent to the [claimed feature] because it performs substantially the same function (allowing the shunt to control the path of current flow to or from the first current circuit) in substantially the same way (wherein an electrical path from the first current circuit can be traced to either the capacitor or the shunt) to achieve substantially the same result (providing an

46

electrical relationship wherein, *e.g.*, the shunt can direct current to flow from the first current circuit to the second current circuit or from the first current circuit to the capacitor)." *Id.* at 1348. This Court held that "[t]his detailed application of the function-way-result test to the claim element and the allegedly equivalent feature of the accused product is sufficient to create a genuine issue of material fact for the jury to resolve." *Id.* The district court's summary judgment decision here directly conflicts with this binding precedent.

The identity of the form and level of detail between the opinion in *Brilliant Instruments* and Dr. Rhyne's report is plain to see in this side-by-side table.

| Expert Report in *Brilliant Instruments* | Dr. Rhyne's Expert Report |
|---|---|
| "The [accused feature] is equivalent to the [claimed feature] because it performs substantially the same function (allowing the shunt to control the path of current flow to or from the first current circuit) | "It is my opinion that indirect attachment via CHE would perform substantially the same function (linking GPS receivers to containers), |
| in substantially the same way (wherein an electrical path from the first current circuit can be traced to either the capacitor or the shunt) | in a substantially similar way (through a physical connection, albeit indirect), |
| to achieve substantially the same result (providing an electrical relationship wherein, *e.g.*, the shunt can direct current to flow from the first current circuit to the second current circuit or from the first current circuit to the | to yield substantially the same result (being able to track the movement of containers in a freight yard). The difference between direct and indirect attachment is insignificant." (A1186 at ¶ 86.) |

| capacitor)." *Brilliant Instruments*, 707 F.3d at 1348. | |

The district court reached the opposite conclusion based on an erroneous reading of *Intellectual Science and Technologies, Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179 (Fed. Cir. 2009). (A0072–73.) In that case, the Court affirmed summary judgment because the expert failed to identify the specific feature of the accused device that allegedly was equivalent to the claimed feature: "Without clear identification of the claimed structure or its equivalent in the accused devices, [the patentee] cannot survive summary judgment." *Intellectual Sci.*, 589 F.3d at 1187. Here, in contrast, Dr. Rhyne explicitly identified the attachment of freight containers to GPS-equipped CHEs (*i.e.*, indirect attachment) as equivalent to the direct attachment of GPS receivers to freight containers. (A1185–86 at ¶¶ 85–86.)[9]

The district court's reliance on *Texas Instruments* and *Lear Siegler* was also misplaced. (A0073–74.) In both those cases, there was *no* articulation of the substantial unity of function, way, and result between the specific claimed and allegedly equivalent accused features. *See, e.g.*, *Texas Instruments Inc. v. Cypress*

---

[9]    Also, unlike in *Brilliant Instruments* and this case, *Intellectual Science* did not involve an expert report; it involved sworn testimony in the form of an affidavit. *Intellectual Sci.*, 589 F.3d at 1182, 1186. This difference is important because, as explained below, experts are permitted to elaborate on their reports. Besides, *Intellectual Science* is inapposite because that case dealt with literal infringement of means-plus-function claims. *See id.* at 1185–87.

48

*Semiconductor Corp.*, 90 F.3d 1558, 1567–68 (Fed. Cir. 1996) (expert's testimony "was merely generalized testimony as to overall similarity. Thus, he did not provide particularized testimony regarding the equivalency of the claim limitations in dispute."); *Lear Siegler, Inc. v. Sealy Mallress Co. of Michigan*, 873 F.2d 1422, 1426 (Fed. Cir. 1989) ("[T]here was neither argument nor evidence explicitly setting forth equivalence of result, function, and means . . . ."). Again, by contrast, Dr. Rhyne here explicitly compared the "attaching" claim limitation to the indirect attaching practiced by VIT, under the function-way-result test, and concluded that any difference between the two is insignificant. (A1185–86 at ¶¶ 85–86.)

Moreover, Dr. Rhyne's analysis of the patented and accused "attaching" methods goes much deeper than the paragraph criticized by the district court. Dr. Rhyne showed substantial sameness between the patented method of "attaching" GPS receivers and VIT's processes in 27 paragraphs of discussion of how GPS receivers are attached to containers at VIT. (A1170–81 at ¶¶ 44–70.) This discussion included extensive analysis of VIT/NOW fact evidence, and was not limited to (or purported to be limited to) literal infringement. (*Id.*) Dr. Rhyne even offered an "illustration of how a system such a RTACTCS 'tracks' the locations of freight containers and the vehicles that move them," which bears directly on substantial similarity of function-way-result. (A1174 at ¶ 54.) Dr. Rhyne similarly explained the CTAS system. (A1181 at ¶ 70.)

The district court dismissed all of this additional analysis in Dr. Rhyne's report, resting only on the proposition that "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." (A0073 (quoting *Texas Instruments* and *Lear Siegler*).) But this proposition does not support the district court's decision.

This Court recognizes that the evidence supporting literal and doctrine-of-equivalents infringements is of course heavily intertwined in many cases. *See, e.g.*, *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007) ("Our 'particularized testimony' standard does not require [an expert] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis."). Dr. Rhyne's analysis of the accused methods and patents was not somehow rendered irrelevant to the doctrine of equivalents simply because it was in an earlier section of his infringement report.

Further, while the linking *argument* must be distinct to show equivalence, such argument can be (and often is) supplemented by the attorney—which is exactly what Freight Tracking did here. (A1297–1301.) *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1335 n.5 (Fed. Cir. 2006) ("[T]he expert declaration *and Applied's argument* provide[] particularized testimony and linking argument.") (emphasis added).

Accordingly, the district court erred by granting summary judgment of non-infringement under the doctrine of equivalents and should be reversed.

### 3.    The District Court Abused its Discretion by Striking Dr. Rhyne's Declaration.

#### (a)    There Was No Violation of Rule 26.

The district court's entry of summary judgment on the doctrine of equivalents should be reversed for another, independent reason:  The court abused its discretion by striking Dr. Rhyne's entire declaration testimony on the doctrine of equivalents, submitted in opposition to summary judgment.

The vast majority of Dr. Rhyne's declaration in substance presented the same function-way-result theory and many of the same VIT/NOW documents as in his opening report.  (*See* A1185–87 at ¶¶ 85–90; A1205–07 at ¶¶ 160–66; A1170–84 at ¶¶ 44–79.)  It was merely structured as a focused response to Mr. Schor's declaration.  (*See* A1261–62 at ¶¶ 27–28; A1267–68 at ¶¶ 41–42; A1270 at ¶¶ 50–51.)  Dr. Rhyne's declaration highlighted the kind of information that Freight Tracking reasonably could have expected to get in an admission from Mr. Schor, if the district court had not precluded Freight Tracking from deposing him by staying the case.  (*See* A0026–27.)

It is fundamental that a party opposing summary judgment is entitled to challenge and depose declarants upon whose declaration testimony the motion is based.  Indeed, this Court has reversed summary judgment where the district court

failed to allow such depositions. *Metro. Life Ins. Co. v. Bancorp Serv., LLC*, 527 F.3d 1330, 1336–38 (Fed. Cir. 2008) (reversing summary judgment based on district court's denial of Rule 56(f) motion for depositions of declarants).

The right is well-settled. Nevertheless, on those rare occasions when the issue is pressed by aggressive summary judgment movants, district courts around the country routinely ensure the non-moving party's right to such depositions. *See, e.g.*, *Blackwell Publ'g, Inc. v. Excel Research Grp., LLC*, No. 07-12731, 2008 WL 506329, at *1 (E.D. Mich. Feb. 22, 2008) ("[I]t is axiomatic that when a party files an affidavit or declaration in support of a motion for summary judgment under Fed. R. Civ. P. 56, the opposing party has the right to depose the affiant or declarant on the assertions made") (A1854); *United States v. Certain Real Prop.*, 141 F.R.D. 221, 222 (D. Me. 1992) (staying summary judgment in order to allow non-movant to depose declarants before opposition to motion).

Here, for instance, Mr. Schor's declaration presented the surprising assertion that "in the accused systems, the GPS receiver cannot be what is used to determine the location of individual freight containers." (A1245 at ¶¶ 30.) This position was (and still is) directly contradicted by the evidence. After all, the name of the NOW system, RTACTCS, stands for "Real Time Automated *Container Tracking* and Control System."). (A1170–71 at ¶ 44; A1171 at ¶ 47; A1319 (emphasis added).)

Other portions of Dr. Rhyne's stricken declaration dealt with deposition testimony that VIT/NOW had withheld until after the opening expert reports were served.  (*See* A1262 at ¶ 30; A1269–70 at ¶¶ 45–49.)  Plainly, the district court lacked any reasonable basis to find that "Rhyne's Declaration added over thirty paragraphs of new opinion information on the doctrine of equivalents, and the new paragraphs were based on information that Plaintiff already possessed prior to Rhyne's Opening Report."  (A0061.)[10]

At a minimum, the district court abused its discretion in striking Dr. Rhyne's entire equivalents declaration testimony, rather than considering which paragraphs could reasonably be considered "new" opinions based on evidence that was available when Dr. Rhyne prepared his opening report.  (*See* A0053; A0065.)

To aid the Court's analysis of this issue, Freight Tracking has provided a table that shows, paragraph-by-paragraph, how each stricken paragraph in Dr.

---

[10]    At very most, only ***one*** paragraph of the entire thirty (30) stricken paragraphs is even arguably new analysis based on information Dr. Rhyne possessed at the time he filed his report (A1271 at ¶ 53).  Assuming for the purposes of this appeal that this single paragraph *may* not have been proper under Rule 26 in rebuttal, there should not have been any question of a Rule 26 violation with respect to the other twenty-nine (29) paragraph, and, consequently, no question of their exclusion.

Rhyne's declaration corresponds to a paragraph in his report, or otherwise falls within one of the categories enumerated above. *See* Appendix I at 60–61, *infra*.[11]

Finally, the district court overlooked that experts are allowed to reasonably explain and elaborate on their reports in providing testimony (and typically do so). (*See* A0059–64.) That is why courts assess the adequacy of a Rule 26 disclosure on whether fair notice was given as to an expert's opinions. *See, e.g.*, *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."); *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011) ("Although his testimony uses different words than the expert report, it was a *reasonable elaboration* of the opinion disclosed in the report.") (emphasis added).

In this case, the doctrine of equivalents theory was intuitive and easy to understand, so Dr. Rhyne's treatment of that issue in his report was sufficient. Certainly, VIT/NOW apparently knew Dr. Rhyne's doctrine of equivalents opinions well enough to rebut them in the Schor declaration. (A1242–46 at ¶¶ 24–

---

[11]     The text in Appendix I is included in the word-count in Freight Tracking's Certification of Compliance pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C).

32.)  This was not a new theory or "an issue left virtually unaddressed," as the district court found.  (A0065.)

### (b)    Any Violation of Rule 26 Was Harmless.

Even if portions of Dr. Rhyne's declaration did run afoul of Rule 26 (they did not), the district court's legal error in finding the purported violation harmful requires reversal here.  *See RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356 (4th Cir. 2007) ("By definition, a district court abuses its discretion when it makes an error of law.").

Under Rule 37, a district court may not exclude evidence if the Rule 26 violation is either (a) harmless, or (b) substantially justified.  Fed. R. Civ. P. 37(c)(1).[12]  In determining whether Dr. Rhyne's declaration was harmless or substantially justified, the district court turned to the Fourth Circuit's five-factor test:  "[T]o determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against

---

[12]    Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi)." Fed. R. Civ. P. 37(c)(1).

whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *S. States*, 318 F.3d at 597. (A0058–59.) In doing so, the district court committed legal error by twisting the fourth factor beyond recognition.

In applying the fourth factor—the importance of the evidence to be excluded—the district court got it backwards. It reasoned that the Rhyne declaration was so important it should be kept *out*. (A0064–65 ("[T]he claimed importance of the testimony is exactly why it should have been disclosed with Rhyne's Opening Report.") (internal quotation marks omitted).) But the fourth *Southern States* factor is intended to weigh *against exclusion* of important evidence because it calibrates the harshness of the sanction to the severity of the violation. *C.f. Quinn v. Consolidated Freightways Corp. of Del.*, 283 F.3d 572, 576 (3d Cir. 2002) ("[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."). Instead, the district court treated the information's importance as proof that it *should* be excluded. (A0064–65.) As such, the district court committed legal error in "fail[ing] to consider [a] judicially

recognized factor[] constraining its exercise of discretion." *L.J. v. Wilbon*, 633 F.3d 297, 304 (4th Cir. 2011).

By turning the fourth factor on its head, the district court also imposed a sanction tantamount to dismissal without first considering a lesser sanction, compounding its mistake. *See Ingalls*, 857 F.2d at 1451 ("Discovery sanctions, however, are meant to deter intentional abuse of the discovery process, not as a means to resolve the merits of a case."); *Dunning v. Bush*, 536 F.3d 879, 890 (8th Cir. 2008) ("The district court should have considered a lesser sanction, if any, before imposing one that resulted in the dismissal of a claim."). The district court's failure to consider a lesser sanction here was an abuse of discretion.[13]

As to the remaining factors, the district court failed to realize that if there was any prejudice, it was VIT/NOW's own doing. Dr. Rhyne's declaration would not have caused *any* disruption to trial, which was initially about two months away, and was further delayed *at VIT/NOW's request prior to* the declaration's submission. (A0026–27; A1465.) In fact, *no* expert depositions had taken place

---

[13]    The district court seemed to think that it could not impose lesser sanctions, calling the sanction "automatic," as other courts have erred in so doing. (A0058.) As the Second Circuit has explained, calling "Rule 37(c)'s exclusion of evidence 'automatic,' . . . cannot be squared with the plain language of Rule 37(c)(1) itself. Rule 37(c)(1) itself recognizes that [i]n addition to or in lieu of this [preclusion] sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006) (internal quotation marks omitted); *see also, e.g.*, *Gay*, 660 F.3d at 62 ("The district court has the discretion to choose a lesser sanction.").

yet, so VIT/NOW would still have had ample opportunity to depose Dr. Rhyne on all of his opinions, as well as have its own expert respond in kind. (A1460–64.) Thus, any surprise would have been cured in the natural course of the litigation anyway—but for VIT/NOW's urging to halt discovery (including all expert depositions).

For each of the foregoing reasons, the district court's decision to strike the Rhyne report was an abuse of discretion.

## CONCLUSION

This Court should reverse the district court's erroneous construction of "attaching," reverse the judgment of no infringement based on that erroneous construction, and remand the case to the district court to complete expert discovery and to proceed to trial of both literal infringement and infringement under the doctrine of equivalents.

In the event, however, that this Court finds no error in the district court's construction of "attaching," the Court should reverse the judgment of no infringement under the doctrine of equivalents. With or without Dr. Rhyne's declaration excluded by the district court, the record contained numerous genuine issues of material fact which should have precluded summary judgment.

Respectfully submitted,

**MADDOX EDWARDS, PLLC**

Dated:  October 16, 2015

By: */s/ Steven A. Maddox*
STEVEN A. MADDOX
    *Counsel of Record*
KAVEH SABA

**WILEY REIN LLP**
James H. Wallace, Jr.
Brian H. Pandya

*Attorneys for Plaintiff-Appellant*
Freight Tracking Technologies, LLC

**APPENDIX I: Correspondence between Dr. Rhyne's Declaration and Opening Expert Report**

| Stricken Paragraph in Declaration | Corresponding Paragraphs in Expert Report, or Explanation for New Material |
|---|---|
| (A1261 at ¶ 26) | (A1186 at ¶ 86; A1206 at ¶ 164) |
| (A1261–62 at ¶ 27) | Direct response to Schor's new declaration. |
| (A1262 at ¶ 28) | (A1186 at ¶ 86; A1206 at ¶ 164) |
| (A1262 at ¶ 29) | (A1170–72 at ¶¶ 44, 47; A1186 at ¶ 86; A1206 at ¶ 164) |
| (A1262 at ¶ 30) | Analysis of new deposition testimony, not available at the time Dr. Rhyne submitted his report. |
| (A1262–63 at ¶ 31) | (A1175 at ¶ 55) |
| (A1263 at ¶ 32) | (A1172–74 at ¶¶ 48, 52; A1186 at ¶ 85) |
| (A1265–67 at ¶¶ 33-38) | ██████████████████████████████████████████████████████████ (*See* A1171 at ¶ 46; A1173 at ¶ 51; A1192–93 at ¶¶ 106–07; A1193–94 at ¶ 111; A1202–03 at ¶ 150.) |
| (A1267 at ¶ 39) | (A1177 at ¶ 59) |
| (A1267–68 at ¶ 40) | Direct rebuttal of new assertion in VIT/NOW's motion for summary judgment. |
| (A1268 at ¶ 41) | Direct response to Schor's new declaration. |
| (A1268 at ¶ 42) | (A1186 at ¶ 86; A1206 at ¶ 164) |
| (A1268 at ¶ 43) | Quotation from patents in comparison with new deposition testimony, not available at the time Dr. Rhyne submitted his report. (*Compare* A1268 at ¶ 43 ("records position data of the receivers, and <u>inferentially</u>, the containers the receivers are attached to.") (emphasis added) *with* A1269 at ¶ 45 ██████████████████████████████████████ |

| (A1268 at ¶ 44) | (A1173–74 at ¶ 52) |
|---|---|
| (A1269 at ¶ 45) | Analysis of new deposition testimony, not available at the time Dr. Rhyne submitted his report. |
| (A1269 at ¶ 46) | Summary of Schor's new declaration. |
| (A1269 at ¶ 47) | Direct response to Schor's new declaration.  (*See also, e.g.*, A1182–83 at ¶ 76.) |
| (A1269 at ¶ 48) | Direct response to Schor's new declaration. |
| (A1269–70 at ¶ 49) | Analysis of new deposition testimony, not available at the time Dr. Rhyne filed his report, in direct response to Schor's new declaration. |
| (A1270 at ¶ 50) | Direct response to Schor's new declaration. |
| (A1270 at ¶ 51) | (A1186 at ¶ 86; A1206 at ¶ 164) |
| (A1270 at ¶ 52) | (A1182 at ¶ 74) |
| (A1271 at ¶ 53) | New discussion quoting NOW documents included in Freight Tracking's evidence opposing summary judgment. |
| (A1271 at ¶ 54) | Analysis of new deposition testimony, not available at the time Dr. Rhyne submitted his report. |
| (A1271–72 at ¶ 55) | (A1186 at ¶ 86; A1206 at ¶ 164) |

# ADDENDUM

# ADDENDUM

**Page No.**

Final Judgment
     (2:13-cv-00708-AWA, D.E. 216), dated 08/11/2015.............................A0001

Claim Construction Opinion and Order
     (2:13-cv-00708-AWA, D.E. 135), dated 02/24/2015.............................A0002

Order on VIT and NOW's Motion for Continuance
     (2:13-cv-00708-AWA, D.E 167), dated 03/25/2015.............................A0026

First Order and Opinion on Summary Judgment
     (2:13-cv-00708-AWA, D.E. 186), dated 05/27/2015.............................A0029

Magistrate Order on Rhyne Declaration
     (2:13-cv-00708-AWA, D.E. 205), dated 06/10/2015.............................A0040

Order on Rhyne Declaration
     (2:13-cv-00708-AWA, D.E. 214), dated 08/04/2015.............................A0054

Second Order and Opinion on Summary Judgment
     (2:13-cv-00708-AWA, D.E. 215), dated 08/07/2015.............................A0066

U.S. Patent No. 6,266,008.............................................................................A0075

U.S. Patent No. 7,102,564.............................................................................A0090

AO 450 Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

FREIGHT TRACKING TECHNOLOGIES, LLC,
      **Plaintiff,**

v.                                             **Civil No. 2:13cv708**

VIRGINIA INTERNATIONAL TERMINALS, et al.,
      **Defendants.**

## JUDGMENT IN A CIVIL CASE

      **Decision by Court:** This action came on for decision before the Court. The issues have been decided and a decision has been rendered.

      **IT IS ORDERED AND ADJUDGED** Defendants" Motion for Summary Judgment (ECF 141) was properly GRANTED.

 August 11, 2015                          FERNANDO GALINDO, CLERK
          Date

                                  By**:**        **/s/**
                                     Lara Dabbene, Deputy Clerk

**A0001**



FILED

FEB 2 4 2015

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREIGHT TRACKING TECHNOLOGIES, LLC,

        Plaintiff,

                                  Civil Action No: 2:13cv708
                                  Civil Action No: 2:14cv105

v.

VIRGINIA INTERNATIONAL TERMINALS, LLC *et al.*,

        Defendants.

## ORDER

This matter comes before the Court for claim construction. On November 21, 2014, the Court conducted a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ("*Markman* Hearing"), and heard argument from the parties as to the meaning of the terms in the disputed claims of the patent at issue. This Order details the Court's claim constructions and explains its reasoning for these constructions.

## FACTURAL & PROCEDURAL BACKGROUND

This is a patent infringement case relating to the use of Global Position Systems ("GPS") tracking methods. This case involves two lawsuits related to the same patents. On December 20, 2013, Plaintiff Freight Tracking Technologies, LLC ("Plaintiff") brought suit against Virginia International Terminals, LLC ("VIT"). NOW Solutions Inc. ("NOW") intervened. On that same day, Plaintiff brought suit against APM Terminals Virginia, Inc. and APM Terminals North America, Inc. (collectively "APM Terminals").[1] The cases were consolidated on April 29, 2014.

---

[1] Intervenor NOW Solutions, Inc. is an indemnitor that provides some of the equipment used by VIT (and previously by APM Terminals). Pl. Opening Claim Const. Br. at 2 n.2 (hereinafter "Pl. Op.

Plaintiff is prosecuting the defense of two patents, United States Patent Nos. 6,266,008 ("the '008 patent"), originally filed on November 4, 1994 and 7,102,564 ("the '564 patent"), originally filed on April 13, 2004. Pl. Op. Br. at 4. According to Plaintiff, the '564 patent is a continuation of the '008 patent. *Id.* The '008 patent was a continuation-in-part of a different patent, U.S. Patent No. 5,364,093 ("the '093 patent"), filed on December 10, 1991. *Id.*

Plaintiff contends that VIT and APM Terminals are using the GPS tracking methods that Plaintiff claimed in the '008 and '564 patents. Pl. Op. Br. at 1. Plaintiff argues that "the use of this technology has allowed VIT and APM Terminals to enjoy significant cost savings and labor reductions by being able to more efficiently track containers['] movements." *Id.* at 1-2. Plaintiff contends that "by using the patented GPS tracking technologies, a terminal operator can know with a high degree of accuracy, and in real time, where a container has been moved." *Id.* at 3. "By knowing exactly where a container has been placed, port operators are able to better plan container movements and therefore operate ports more efficiently by not having to move, restack, and reshuffle containers as frequently." *Id.*

Defendants assert that VIT does not use Plaintiff's tracking technologies, but instead uses NOW's freight tracking technology—a system VIT and NOW claim has been in use in terminals across the country for over 20 years. Def. VIT/NOW Op. Br. at 1.

The parties requested a *Markman* Hearing to construe terms prior to further litigation. This Order resolves the claim construction issues presented to the Court.

---

Br."). NOW Solutions, Inc. claims that it developed the technology used by VIT. Defs. VIT & NOW Op. Claim Const. Br. at 1 (hereinafter "Defs. VIT/NOW Op. Br.").

**APPLICABLE LAW**

A determination of patent infringement requires a two-step analysis: "First the court determines the scope and meaning of the patent claims asserted, and [second,] the properly construed claims are compared to the allegedly infringing device[.]" *Cybor Corp. v. FAS Techs. Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (internal citations omitted). Claim Construction concerns the first step. *See id.*

THE CLAIMS

To determine the meaning of disputed terms, the Court must first examine the claims themselves, as it is a "'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also Vitronics Corp. v. Conceotronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention."). "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term[,]" in part because "claim terms are normally used consistently throughout the patent[.]" *Phillips*, 415 F.3d at 1314.

The Federal Circuit has instructed repeatedly that "the words of a claim 'are generally given their ordinary and customary meaning,'" and that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1312-13 (citations omitted). This provides "an objective baseline from which to begin claim interpretation[,]" and is based on "the well-settled understanding that inventors are typically persons skilled in the field of the invention

3

**A0004**

and that patents are addressed to and intended to be read by others of skill in the pertinent art."
*Id.* at 1313.

Although claims must be construed through the eyes of a person of ordinary skill in the art, "[i]n some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1314) (internal quotation marks omitted).

PATENT SPECIFICATION

Notwithstanding the above, the claims "do not stand alone." *Phillips*, 415 F.3d at 1315. In other words, the claims are not construed in isolation. *See id.* The Court also reviews the same resources as would a person skilled in the pertinent art: the patent specification and the prosecution history. *Id.*

The specification, as required by statute, describes the manner and process of making and using the patented invention, and the "claims must be construed so as to be consistent with the specification." *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003); *see* 35 U.S.C. § 112 (establishing the requirement that the specification describe the invention in "full, clear, concise, and exact terms"). The Federal Circuit has long emphasized the specification's important role in claim construction, noting that the specification usually "is dispositive[,]" as it is "the single best guide to the meaning of the disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582) (internal quotation marks omitted); *see Markman*, 517 U.S. 370, 389 (1996) ("[A claim] term can be defined only in a way that comports with the instrument as a whole."); *Multiform Dessicants, Inc., v. Medzam, Ltd.*, 133

4

**A0005**

F.3d 1473, 1478 (Fed. Cir. 1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.")

THE PROSECUTION HISTORY

In addition to the claims and specification, the Court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980) (internal quotation marks omitted). The prosecution history, which is part of the "intrinsic evidence," consists of the record of the proceedings before the Patent and Trademark Office, including the prior art cited during the examination of the patent. *Id.* The prosecution history is useful because it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citing *Vitronics*, 90 F.3d at 1582-83); *see Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)).

EXTRINSIC EVIDENCE

If necessary, in addition to the intrinsic record, the Court may also examine extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Technical dictionaries may be used to illustrate the underlying technology and "the way in which one [with] skill in the art might use the claim terms." *Phillips*, 415 F.3d at 1318. General usage dictionaries may also be consulted as they can be "useful to assist in understanding the commonly understood meaning of words[.]" *Id.* at 1322. However, the

5

Federal Circuit has cautioned that a general usage dictionary cannot "'overcome art-specific evidence of the meaning' of a claim term," and that courts should avoid putting too much reliance on such definitions. *Id.* (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1321 (Fed. Cir. 2004)). Accordingly, "while extrinsic evidence 'can shed useful light on the relevant art,' [the Federal Circuit has] explained that it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).

Importantly, "[a]lthough we construe claims, if possible, so as to sustain their validity, it is well settled that . . . courts do not redraft claims." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003) (omission in original) (internal quotation marks omitted) (quoting *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995)).

Notwithstanding the well-developed rules governing claim interpretation discussed in detail above, "there is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324.

## ANALYSIS

### A. "Attaching"

The parties do not contend that the word "attach" has any special meaning in the art. Instead they argue that the plain meaning applies, but disagree as to what that plain meaning entails. This dispute is two-fold: First, Defendants seek to distinguish their method of tracking freight containers because they attach GPS receivers to an equipment handling vehicle that picks up the freight containers. Defendants argue that Plaintiff disavowed the full scope of the claim term with respect to the use of vehicles in the prosecution history, and that this Court should add words to the claim language to "make clear" to the jury that "attached" means "attached to a freight container," as opposed to a vehicle. Plaintiff argues that the scope of the word "attach"

6

should broadly encompass both direct and indirect attachments. [2] Second, Plaintiff argues that the term "attach" should be construed to mean to "associate or connect." Defendants disagree, arguing that the terms "associate or connect" do not define the meaning of "attach" as used in the patents.

| Existing Usage in Plaintiff's '008 Patent (claim 18) & Plaintiff's '564 Patent (claim 1) | | |
|---|---|---|
| **Plaintiff's '008 Patent (Claim 18):** | "*attaching* a number of GPS receivers to a number of freight containers in said freight yard" | |
| **Plaintiff's '564 Patent (Claim 1):** | "*attaching* a number of receivers for GPS signals to a number of freight containers in said freight yard" | |
| **Plaintiff's Proposed Construction** | **VIT & NOW's Proposed Construction** | **APM Terminals Proposed Construction** |
| to associate or connect GPS receivers with freight containers | Affixing a GPS receiver to the wall of a freight container (as opposed to affixing it to a powered vehicle that transports freight containers) | Attaching a number of GPS receivers to a number of freight containers in said freight yard, as opposed to attaching the receivers to powered vehicles that transport freight containers

OR

Attaching a number of receivers for GPS signals to a number of freight containers in said freight yard, as opposed to attaching the receivers to powered vehicles that transport freight containers |

As noted above, "the words of a claim 'are generally given their ordinary and customary meaning,'" and "the ordinary and customary meaning of a claim term is the meaning that the

---

[2] Plaintiff also argued that the Defendants attach the GPS receiver to the freight container via an intermediate structure called a "twist lock." Pl. Op. Br. at 7. However, Defendants asserted that the NOW system does not attach GPS receivers to freight containers. Defs. VIT/NOW Op. Br. at 1. At the *Markman* Hearing, evidence was presented suggesting that VIT attaches GPS receivers to handling equipment that picks up and transports the freight containers.

term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceotronic. Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The "use of the term 'attach[ing]' in this [claim] does not meet either of these exceptions." *See id.*

"To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (citation omitted). The "patentee must 'clearly express an intent' to redefine the term." *Id.* (citation omitted). "The standard for disavowal of claim scope is similarly exacting." *Id.* at 1366. A disclaimer must be "clear and unmistakable." *Id.* at 1366-67.

The Court concludes that the prosecution history does not present a "clear and unmistakable" disavowal of the claim scope. *See id.* Defendants argued that in the specifications and prosecution history, applicants expressly disavowed the full scope of the claim term. In support, Defendants quoted from the prosecution history, during which Plaintiff distinguished another patent involving connection of GPS devices onto vehicles. However, Defendants mischaracterized Plaintiff's statements in the prosecution history by substantially redacting relevant portions of the document. Viewed in context, the prosecution history does not contain a "clear and unmistakable disavowal" of the claim scope. *See id.*

To support its position that "attached" should be afforded a broad definition of "associated" or "connected," Plaintiff relies on the *Thorner* case. 669 F.3d 1362. In *Thorner,*

the Federal Circuit held that the district court erred where it did not employ the "plain and ordinary meaning" of the word "attached." *Id.* at 1368. In that case, the disputed phrase was "attached to said pad" (with "said pad" referring to a "flexible" pad used for computers or video game systems). *Id.* at 1367. The district court held that "attached to said pad" meant "affixed to an exterior surface" as opposed to an "interior surface." *Id.* The district court agreed with the defendants, who had argued that the patent clearly identified "two different connects, 'attached to' and 'embedded within.'" *Id.* at 1367. The plaintiff appealed, arguing that the use of the word "embedded" did not mean that "attached can only mean connected to an exterior surface" rather than an interior surface.

The Federal Circuit agreed with the plaintiff, holding that because the applicant had not specifically disavowed the plain and ordinary meaning of the term, and the use of "embedded" did not rise to the level of lexicography, the plain and ordinary meaning must control. *Id.* at 1367-68. The Federal Circuit held that "the plain meaning of the term 'attached' encompasses either an external or internal attachment." *Id.* at 1367.

Here, Plaintiff's reliance on *Thorner* is two-fold: first, to support its contention that the plain and ordinary meaning of the word "attach" should control, and second, to support its contention that the plain and ordinary meaning of the word "attach" does not mean "affix," but instead means "to associate or connect with." Plaintiff's reliance on *Thorner* is meritorious in the first instance, but misplaced in the second. Although the "plain and ordinary meaning" applies, nothing in *Thorner* supports the proposition that "attach" means merely "to associate or connect with."[3]

---

[3] Similarly, Plaintiff's reliance on *Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349 (Fed. Cir. 2012) (construing the term "into engagement with" and not addressing "attached"), and *M-B-W Inc. v. Multiquip, Inc.,* No. 07-CV-390, 2009 U.S. Dist. LEXIS 90418 (E.D. Wis. Sept. 29, 2009) (construing "attached" to include connecting two objects using a gearbox given the language of that particular patent,

Both the '008 and '564 Patents are replete with evidence pointing toward the proper meaning of "attach":

- "[a] remote unit that includes a GPS receiver is attached to the freight containers." '008 Abstract; '564 Abstract;

- "[b]roadly speaking, the system includes a number of remote GPS receivers attachable to freight containers in a freight yard. The remote receivers are configured to intermittently transmit *their* location data to a base station." '008 Patent 3:12-15 (emphasis added); '564 Patent 3:20-23;

- "[t]he base station is configured to receive and display the location of a particular remote receiver attached to a freight container upon request[,]" and "[t]he base station then calculates the location of the remote receiver." '008 Patent 3:17-19; 3:29-30; '564 Patent 3:25-28; 3:37-38;

- "[t]he base station receives the positioning data from the remote receivers and displays the *location of the remote receivers* in the building." '008 Patent 3:60-63; '564 Patent 3:67; 4:1-2 (emphasis added).

- "[t]he base station receives and records position data of the receivers, and inferentially, the *containers the receivers are attached to*." '008 Patent 3:42-44 (emphasis added).

- "[t]he base station receives and records position data of the receivers, and inferentially, *the containers to which the receivers are attached*." '564 Patent 3:49-51 (emphasis added).

---

but also recognizing that one meaning of "attached" is "directly affixed") is unavailing. Neither of those cases supports the proposition that "attached," as used in these claims, means merely "associated with."

The First Embodiments of Patents '008 and '564 also reveal that "the remote unit 10 is designed for *mounting on top or sides of* a freight container for GPS signal reception." '008 4:45-47; '564 Patent 4:53-55 (emphasis added).

The Second Embodiment of Patent '008 notes that "the motion detector 64 can initiate operation when motion is detected—i.e. movement of the freight container to which the remote unit 10 is attached." '008 6:11-14; *see also* '564 6:20-23 (same).

The Third Embodiment of Patent '008 notes that "[r]emote units 10 in accordance with the first and second embodiments . . . are attached to the freight containers." '008 6:66-67; 7:1-3; *see also* '564 7:7-9 (same).

The Fourth, and final, Embodiments of Patents '008 and '564 note that "the remote unit 10 [is] *on* the container[.]" '008 8:12-13; '564 Patent 8:22-23 (emphasis added).

Because the patentee is "required to define precisely what his invention is . . . it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks and citation omitted). The Court will not apply a broader definition of "attach" than the plain import of its terms as used in the claim. *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 117 (Fed. Cir. 2009) (noting that "it is improper to read [a claim] term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.").

The patents' specifications reveal that the remote units are "designed for *mounting on top or sides of* a *freight container* for GPS signal reception[,]" and are "*on* the container[.]" '008 4:45-47; '564 Patent 4:53-55; '008 8:12-13; '564 Patent 8:22-23 (emphasis added). In the instant case, the patent disclosures point toward the proper meaning—"affixed or fastened to,"

11

not merely "associated with." *See Felix*, 562 F.3d at 1179 (affirming the district court's conclusion that "mounted" meant "securely affixed or fastened to"); *see also Bilstad v. Wakalopulos*, 386 F.3d 1116, 1122 (Fed. Cir. 2004) ("[W]here there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning.") (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Defendants urge this Court to add words to the claim to "clarify" that Plaintiff means "freight containers" rather than vehicles. The Court declines to do so. The claim at issue reads: "attaching a number of GPS receivers to a number of freight containers in said freight yard." This language describes a specific act. *Cf. SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339 (Fed. Cir. 2005) (noting that the language in a claim was not ambiguous but described a specific compound). It is well-established that courts do "not redefine words" or rewrite patents. *See Thorner*, 669 F.3d 1362, 1366-67.

Conclusion: "Attach" is afforded its plain and customary meaning, which in this instance means "affix or fasten to."

## B. "Intermittently Operating"

The dispute surrounding "intermittently operating" centers on (1) the meaning of the term "intermittently," (2) whether "operating" includes intermittently transmitting as well as receiving, and (3) whether the purpose of the intermittent operation is to conserve power.

| Existing Usage in Plaintiff's '008 Patent (claim 18) & Plaintiff's '564 Patent (claim 1) | | |
|---|---|---|
| **Plaintiff's '008 Patent (Claim 18):** | | "*intermittently operating* each receiver to transmit an identification and position based on the current location of the receiver" |
| **Plaintiff's '564 Patent (Claim 1):** | | "*intermittently operating* each receiver to transmit an identification and position" |
| **Plaintiff's Proposed Construction** | **VIT & NOW's Proposed Construction** | **APM Terminals Proposed Construction** |
| Plain and Ordinary Meaning<br><br>Alternatively: "operating each receiver so that an identification and position based on the current location of the receiver are non-continuously transmitted" | Non-continuously operating each GPS receiver to transmit an identification and position based on the current location of the receiver to conserve power<br><br>OR<br><br>Non-continuously operating each receiver to transmit an identification and position to conserve power | Periodically operating each receiver to transmit an identification and position based on the current location of the receiver to conserve power<br><br>OR<br><br>Periodically operating each receiver to transmit an identification and position to conserve power |

### 1. Meaning of "Intermittently"

"The specification is always highly relevant to the claim construction analysis." *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1283 (Fed. Cir. 2010) (citation and internal quotation marks omitted). "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (citation and internal quotation marks omitted).

The Court needs to look no further than the patent specification for a definition of "intermittent." *See id.* The patent specification defines "intermittent" as follows: "'Intermittent'

13

means noncontinuous operation in the context of present invention." '008 Patent at 3:19-20; '564 Patent at 3:27-28.

2. Meaning of "Intermittently Operating"

The next issue is to determine the scope of the word "operating." Defendants VIT and NOW suggest that "operating" includes transmitting and receiving. Plaintiff suggests that "operating" means "intermittently transmitting."

Again, the Court needs to look no further than the patent specification to resolve this issue. The language of the claim terms is clear and unambiguous, and the specification treats "intermittently operating" and "intermittently transmitting" as separate acts. The specification says "[t]he method . . . [of] the present invention includes attaching a number of GPS receivers to freight containers; *intermittently operating* receivers to receive GPS signals, and *intermittently transmitting* data indicative of container location an[d] identification to a base station." '008 Patent at 3:35-41 (emphasis added). The specification further states: "Continuous operation is usually unnecessary and adds battery bulk to a remote receiver where minimal size and weight is important." '008 Patent at 3:21-23; '564 Patent at 3:29-31.

"Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (emphasis added). With respect to whether "intermittently operating" applies only to either receiving or transmitting but not both, the "plain and customary meaning" controls.

3. Purpose to Conserve Power

This Court denies Defendants' request to add the phrase "to conserve power" to the claim language to clarify the purpose of the intermittent operation. *See Thorner v. Sony Computer*

14

*Entm't America LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) (courts do not "redefine words" or rewrite claims). "If we need not rely on a limitation to interpret what the patentee meant by a particular term or phrase in a claim, that limitation is 'extraneous' and cannot constrain the claim." *Renishaw*, 158 F.3d at 1249. The "purpose" behind the "intermittent operation" is not a necessary limitation to interpret what Plaintiff meant by the phrase at issue. Therefore, the words "to conserve power" are "extraneous" and will not be added. *See id.*

Conclusions: (1) "'Intermittent' means noncontinuous operation in the context of present invention." '008 Patent at 3:19-20; '564 Patent at 3:27-28. (2) With respect to whether "intermittently operating" applies only to either receiving or transmitting but not both, the "plain and customary meaning" controls, and (3) the words "to conserve power" will not be added.

## C. "Said Receivers"

| Existing Usage in Plaintiff's '008 Patent (claim 18) | | |
|---|---|---|
| **Plaintiff's '008 Patent (Claim 18):** | "applying the error correction to the position of *said receivers* to determine a corrected position of *said receivers* in said freight yard." | |
| **Plaintiff's Proposed Construction** | **VIT & NOW's Proposed Construction** | **APM Terminals Proposed Construction** |
| Plain and Ordinary Meaning<br><br>Alternatively: "applying the error correction to the GPS receivers to determine a corrected position of the GPS receivers in the freight yard." | "applying the error correction to the position of the GPS receivers and the reference receiver to determine a corrected position of said receivers in said freight yard."<br><br>Alternatively: Indefinite | "applying the error correction to the position of the GPS receivers and the reference receiver to determine a corrected position of said receivers in said freight yard."<br><br>Alternatively: Indefinite |

This dispute centers on the meaning of the term "said receivers." Understanding this claim requires a closer look at the context in which it is used. Claim 18 of the '008 patent is excerpted below:

> . . . attaching a number of *GPS receivers* to a number of freight containers in said freight yard; operating each receiver to receive GPS signals and determine its current location; intermittently operating each receiver to transmit an identification and position based on the current location of the receiver; receiving said identification and position at a base station; recording the identification and position of *said receivers* in said freight yard; and determining an error correction for the global positioning satellite system comprising the substeps of positioning a *global positioning satellite reference receiver* at a reference location having a known position, determining the apparent position of the reference location using the *reference receiver*, calculating an error correction based on the apparent position and the known position of the reference location, and applying the error correction to the position of <u>said receivers</u> to determine a corrected position of <u>said receivers</u> in said freight yard.[4]

'008 Patent 11:14-34; 12:1-3 (emphasis and underline added).

Plaintiff contends that "no construction is necessary because this phrase is readily understandable and nothing in the intrinsic record suggests that the pantentee deviated from the plain and ordinary meaning." Pl. Op. Br. at 14. In the alternative, Plaintiff argues that "said

---

[4] The underlined terms indicate the terms in dispute. The italicized terms indicate prior iterations of receivers that may serve as an antecedent basis for the underlined terms.

16

receivers" should be construed as "GPS receivers," so the term is construed consistently throughout the claim.

Defendants argue that applying the plain and ordinary meaning "leaves the term 'said receivers' vague and indeterminate." VIT/NOW Op. Br. at 13. Defendants assert that "said receivers" refers to both the GPS receiver and to the reference receiver. Alternatively, Defendants argue that this Court should view the term as indefinite.

Without an antecedent basis, it is unclear as to which receiver this claim refers. *See, e.g.*, MANUAL OF PATENT EXAMINING PROCEDURE § 2173.05(e) (9th ed.) (noting that "if two different levers are recited earlier in the claim, the recitation of 'said lever' in the same or subsequent claim would be unclear where it is uncertain which of the two levers was intended.").

However, "an antecedent basis can be present by implication." *See e.g., Energizer Holdings, Inc. v. International Trade Com'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode").

Furthermore, "[a] claim is not invalid for indefiniteness if its antecedent basis is present by implication." [5] *Fisher-Price, Inc. v. Graco Children's Products, Inc.*, 154 F. App'x 903, 909 (Fed. Cir. 2005).

---

[5] The standard for indefiniteness and the standards governing other related claim construction analysis have changed recently. *See, e.g., Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). This Court carefully reviewed the new standards, which contributed to a delayed, but more comprehensive Claim Construction Order. Under the new standard of indefiniteness, a "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124. However, the guidance regarding antecedent bases has not changed. *See, e.g., Horus Vision, LLC v. Applied Ballistics, LLC*, No. 13-CV-05460-BLF, 2014 WL 6989233, at *11 (N.D. Cal. Dec. 9, 2014) ("An antecedent basis can be present by implication") (citation omitted); *Adaptix, Inc. v. Huawei Technologies Co.*, No. 6:13CV438, 2014 WL 6609560, at *7 (E.D. Tex. Nov. 20, 2014) (finding that "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite," even under the new

17

The Court finds that an antecedent basis is present by implication.  The antecedent of "said" in the phrase "applying the error correction to the position of said receivers *to determine a corrected position* of said receivers in said freight yard" can only be the GPS receiver, not the reference receiver, because the claim itself reveals that the "reference receiver" is at a "reference location *having a known position*." '008 Patent 11:14-34; 12:1-3 (emphasis added).  Under this design, it would make little sense for the position of something with a known position to be calculated.  *See Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1181 (Fed. Cir. 2009) (noting that "[t]he antecedent of 'it' in the phrase 'in its closed position' can only be the noun 'lid.' It would make no sense for either the 'gasket' or the 'flange' to be 'in its closed position.'").

Conclusion: The Court construes this claim as follows:  "applying the error correction to the position of *the GPS receivers* to determine a corrected position of *the GPS receivers* in said freight yard."

---

standard); *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, No. CIV.A. 12-859, 2014 WL 3973870, at *21 (E.D. Pa. Aug. 15, 2014) (same).

## D. "Positioning"

This dispute centers on the meaning of the term "positioning." Defendants argue that "positioning" should be construed as "placing." Defs. VIT/NOW Op. Br. at 15; Defs. APM Terminals Op. Br. at 18. In support, VIT and NOW argue that there are two meanings to the word "positioning" in the claims: first, as GPS data indicating coordinates, and second, as the placement of an object. *Id.* VIT and NOW point out that the phrase at issue uses the word "position" as both a verb and a noun: "*positioning* a global *positioning* satellite receiver at a reference location having a known position." *Id.* (quoting '008 Patent at 11:27-29, 12:7-9 (emphasis added)). VIT and NOW assert that "as written, the use of the same word to mean [two] different functions is confusing to both a layperson and a person of ordinary skill in the art." *Id.*

Plaintiff agrees that "positioning" as used here means "placing or arranging." *See* Pl. Repl. Br. at 15. However, Plaintiff argues that jurors will understand this meaning without assistance of the Court. *See id.*

| Existing Usage in Plaintiff's '008 Patent (claim 18) | | |
|---|---|---|
| **Plaintiff's '008 Patent (Claim 18):** | "*positioning* a global positioning satellite reference receiver at a reference location having a known position" | |
| **Plaintiff's Proposed Construction** | **VIT & NOW's Proposed Construction** | **APM Terminals Proposed Construction** |
| Plain and Ordinary Meaning | "*placing* a global positioning satellite reference receiver at a reference location having a known position" | "*placing* a global positioning satellite reference receiver at a reference location having a known position" |

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008). Here,

"positioning" has more than one ordinary meaning as used. First, "positioning" is used to refer to placing something at a location, and then "positioning" is used to refer to a device, a global positioning satellite reference receiver. The patent disclosures point away from the incorrect meaning and toward the proper meaning. *See Bilstad v. Wakalopulos*, 386 F.3d 1116, 1122 (Fed. Cir. 2004).

Conclusion: the Court construes this claim as follows: "*positioning* a global positioning satellite reference receiver at a reference location having a known position" means "*placing* a global positioning satellite reference receiver at a reference location having a known position."

20

### E. "If" versus "Only if"

This dispute centers on whether the word "if" means simply "if," or "only if." Plaintiff contends that the plain and ordinary meaning demonstrates that "if" simply means "if," not "only if." Pl. Op. Br. at 17. Defendants VIT and NOW disagree with Plaintiff. They argue that "if" means "*only* if," as evidenced by the "context" of the surrounding words of the claim. Defs. VIT/NOW Op. Br. at 17-18. However, Defendant APM Terminals largely sides with the Plaintiff on this point, and opposes VIT and NOW's construction of this term. Defendant APM Terminals argues that this Court should not construe "if" to mean "only if," and that this Court should expressly instruct the jury that it should not interpret "if" to mean "only if." Defs. APM Terminals Op. Br. at 18.

| Existing Usage in Plaintiff's '008 Patent (claim 18) | | |
|---|---|---|
| **Plaintiff's '008 Patent (Claim 18):** | "transmitting the current location *if* different from a previous location" | |
| **Plaintiff's Proposed Construction** | **VIT & NOW's Proposed Construction** | **APM Terminals Proposed Construction** |
| Plain and Ordinary Meaning | "transmitting the current location *only if* it is different from the previous location" | "transmitting the current location *if* it is different from the previous location" *i.e.* claim language does NOT say "ONY IF" and the Court should instruct the jury that the word "only" is not contained in the limitation and that they are NOT to treat the limitation as though the word "only" preceded the word "if." |

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceotronic. Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). This Court would be rewriting the

claim if the word "if" was replaced with the words "only if." To say "A *only* if B" means that A can *only* ever be true when B is true. In other words, B is a *necessary* condition for A to be true. However, to say "A if B" means that A is true if B is true, but it does not mean that B is *necessary* for A to be true. "If" does not constrain A in the way that "only if" constrains A. Because VIT and NOW seek to rewrite the claim, this Court must reject their argument. *See Thorner*, 669 F.3d at 1366-67.

    Conclusion: The plain and ordinary meaning of "if" applies.

## F. "Timer"

This dispute centers on the meaning of the word "timer." Plaintiff contends that the term should be given its plain and ordinary meaning. Defendants VIT and NOW argue that a "timer" is really a "circuit that functions at a time interval for the purpose of conserving power." Defs. VIT/NOW Op. Br. at 19. In support, VIT and NOW argue that the terms leave the fact-finder without a defined boundary on the scope of the claim, and that Plaintiff improperly substitutes a layperson's definition for a technical term. *Id.* at 19-20. This claim is not disputed by APM Terminals.

| Existing Usage in Plaintiff's '008 Patent (claim 18) | | |
|---|---|---|
| **Plaintiff's '008 Patent (Claim 18):** | "a *timer* which periodically initiates said transmission" | |
| **Plaintiff's Proposed Construction** | **VIT & NOW's Proposed Const.** | **APM Terminals Proposed Const.** |
| Plain and Ordinary Meaning | "a circuit that is used to initiate transmissions at a time interval to conserve power" | N/A |

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceotronic. Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The use of the term "timer" in this specification does not meet either of these exceptions.

Conclusion: The plain and ordinary meaning of "timer" applies.

## CONCLUSION

In summary, after considering intrinsic and extrinsic evidence, the Court issues the following constructions:

- *Attach*: "Attach" is afforded its plain and customary meaning, which means "affix or fasten to."

- *Intermittently Operating:* (1) "'Intermittent' means noncontinuous operation in the context of present invention." '008 Patent at 3:19-20; '564 Patent at 3:27-28. (2) With respect to whether "intermittently operating" applies only to either receiving or transmitting but not both, the "plain and customary meaning" controls. (3) The words "to conserve power" are not added.

- *Said receivers:* The Court construes this claim as follows: "applying the error correction to the position of *the GPS receivers* to determine a corrected position of *the GPS receivers* in said freight yard."

- *Positioning:* "*positioning* a global positioning satellite reference receiver at a reference location having a known position" means "*placing* a global positioning satellite reference receiver at a reference location having a known position."

- *If versus "Only If":* The plain and ordinary meaning of "if" applies.

- *Timer:* The plain and ordinary meaning of "timer" applies.

**IT IS SO ORDERED.**

Feb 24, 2015
Norfolk, Virginia

_____
Arenda L. Wright Allen
United States District Judge

24

**A0025**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREIGHT TRACKING TECHNOLOGIES, LLC,

      Plaintiff,

                                    Civil Action No: 2:13cv708
v.                             (consolidated with 2:14cv105 for
                                  pretrial purposes and *Markman*)

VIRGINIA INTERNATIONAL TERMINALS, LLC *et al.*,

      Defendants.

## ORDER

Before the Court is a Motion for Continuance (ECF 151) filed by Defendant Virginia

International Terminals, LLC ("VIT") and Intervenor NOW Solutions ("NOW") (collectively

"Defendants"). Defendants move this Court for a continuance of "all proceedings and deadlines,

including the trial date, pending consideration of the Defendants' Motion for Summary Judgment

of Non-Infringement filed on March 10, 2015." Defs. Mot. Cont. at 1. Trial is currently

scheduled for May 19, 2015.

Defendants assert that the limited motion for summary judgment on the issue of non-

infringement based on the Court's construction of the claim terms "attaching" and "intermittently

operating" will "resolve this case." Defs. Mem. Supp. Mot. Cont. at 1. Defendants further assert

that if "summary judgment of non-infringement is granted, Defendants agree to dismiss all other

claims and counterclaims, which will resolve all remaining claims at issue in this case." *Id.* at 2.

A continuance, Defendants argue, will "allow all parties to avoid unnecessarily incurring

additional expenses and burdening the Court with any motions or disputes relating to the

completion of fact discovery, expert reports, expert discovery, and trial preparation that may become moot."[1]  *Id.*  Defendants maintain that they will be prepared to proceed to trial within seventy days of any Order denying summary judgment. *Id.* at 5.

Plaintiff Freight Tracking Technologies, LLC opposes the Motion for Continuance. Plaintiff argues that the "trial date has been set for months now." Pl. Opp. Defs. Mot. Cont. at 1. Plaintiff asserts that "[i]f the matter is continued at this point, trial may not be held until late fall 2015." *Id.* "Continuing the trial date would thus inevitably result in the expenditure of additional resources and delay the resolution of Freight Tracking's claims against Defendants, thereby unfairly prejudicing Freight Tracking." *Id.*  Plaintiff also notes that halting the proceedings would interfere with depositions scheduled for March 18-19, 2015. *Id.* at 2.

This Court has carefully considered the parties' positions.  Defendants' Motion for Continuance (ECF 151) is **GRANTED** as follows: The proceedings and deadlines in Case No: 2:13cv708 and Case No: 2:14cv105 are **STAYED** pending resolution of Defendants' Motion for Summary Judgment (ECF 141). After the Motion for Summary Judgment is resolved, the stay will be lifted and all relevant deadlines will be reset. The trial currently scheduled for May 19, 2015 is **STRICKEN.**  Trial **SHALL COMMENCE** on July 7, 2015. The parties are **ORDERED** to contact the Court's Courtroom Deputy no later than March 30, 2015 to confirm this trial date.

---

[1] Defendants also note that the Defendants from the consolidated case (2:14cv105), Virginia International Gateway, Inc. and APM Terminals North America, Inc., do not oppose this request for a continuance in both cases.

2

The parties are **ENCOURAGED** to seek a resolution of this matter. Should the Motion for Summary Judgment prove not to be dispositive, the parties will be **ORDERED** to attend mediation prior to trial.[2]

**IT IS SO ORDERED.**

3‧25, 2015

Norfolk, Virginia

/s/

Arenda L. Wright Allen
United States District Judge

---

[2] Additionally, the parties in Case No. 2:14cv105 must submit written proposals for trial dates in that matter no later than March 27, 2015 per this Court's March 20, 2015 Order.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREIGHT TRACKING TECHNOLOGIES, LLC,

      Plaintiff,

                            Civil Action No: 2:13cv708

  v.

VIRGINIA INTERNATIONAL TERMINALS, LLC *et al.*,

      Defendants.

## **ORDER**

Before the Court is a Motion for Summary Judgment (ECF 141) filed by Defendant Virginia International Terminals, LLC ("VIT") and Intervenor NOW Solutions Inc. ("NOW"). For the reasons that follow, this motion must be GRANTED IN PART. The parties must file additional briefing on the issue of the timeliness of Dr. Rhyne's Declaration.

## **BACKGROUND**

This is a patent infringement case relating to the use of Global Position Systems ("GPS") tracking methods. This case involves two lawsuits related to the same patents. On December 20, 2013, Plaintiff Freight Tracking Technologies, LLC ("Plaintiff") brought suit against Virginia International Terminals, LLC ("VIT"). NOW Solutions Inc. ("NOW") intervened.

Plaintiff is prosecuting the defense of two patents, United States Patent Nos. 6,266,008 ("the '008 patent"), originally filed on November 4, 1994 and 7,102,564 ("the '564 patent"), originally filed on April 13, 2004. Pl. Opening Claim Const. Br. at 4 (hereinafter "Pl. Op. Br."). According to Plaintiff, the '564 patent is a continuation of the '008 patent. *Id.* The '008 patent was a continuation-in-part of a different patent, U.S. Patent No. 5,364,093 ("the '093 patent"), filed on December 10, 1991. *Id.*

Plaintiff contends that VIT is using the GPS tracking methods that Plaintiff claimed in the '008 and '564 patents. Pl. Op. Br. at 1. Plaintiff argues that "the use of this technology has allowed VIT to enjoy significant cost savings and labor reductions by being able to more efficiently track containers['] movements." *Id.* at 1-2. Plaintiff contends that "by using the patented GPS tracking technologies, a terminal operator can know with a high degree of accuracy, and in real time, where a container has been moved." *Id.* at 3. "By knowing exactly where a container has been placed, port operators are able to better plan container movements and therefore operate ports more efficiently by not having to move, restack, and reshuffle containers as frequently." *Id.*

Defendants assert that VIT does not use Plaintiff's tracking technologies, but instead uses NOW's freight tracking technology—a system that has been in use in terminals across the country for over 20 years. Def. VIT/NOW Op. Br. at 1.

Plaintiff's patent describes a method by which a number of GPS receivers are attached to freight containers in order to determine the location of freight containers in a freight yard. It is undisputed that VIT/NOW's system equips vehicles, known as Container Handling Equipment (CHEs), with GPS receivers. The CHEs are operated by drivers in a freight yard who use the CHEs to pick up freight containers. VIT/NOW can track the location of freight containers and other materials that are picked up by the CHEs.

The Court held a claim construction hearing on November 21, 2014. By Order dated February 24, 2015, the Court resolved claim construction. Though a number of claims were examined during claim construction, the current summary judgment motion focuses on two limitations: (1) "*attaching* a number of GPS receivers to a number of freight containers in said freight yard" ('008 Patent – claim 18; '564 Patent – claim 1) and (2) "*intermittently operating*

2

**A0030**

each receiver to transmit an identification and position based on the current location of the receiver" or "*intermittently operating* each receiver to transmit an identification and position" (respectively, '008 Patent – claim 18; '564 Patent – claim 1).

Defendants now argue that based on the proper construction of the claim terms, Defendants are entitled to summary judgment of non-infringement.

## APPLICABLE LEGAL PRINCIPLES

A determination of patent infringement requires a two-step inquiry. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1476 (Fed. Cir. 1998). First, the claim must be properly construed to determine its scope and meaning. *Id.* Second, the claim properly construed must be compared to the accused device or process. *Id.* Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where, on the basis of undisputed facts, the moving party is entitled to judgment as a matter of law. *Hunter Innovations Co. v. Travelers Indem. Co. of Connecticut*, 753 F. Supp. 2d 597, 602 (E.D. Va. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* at 585. Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will

3

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[G]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Guinness PLC v. Ward*, 955 F.2d 875, 883 (4th Cir. 1992) (internal quotation marks and citations omitted). "A 'genuine' issue concerning a 'material' fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor." *Tucker v. Beneficial Mortgage Co.*, 437 F. Supp. 2d 584, 587 (E.D. Va. 2006) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

A. Literal Infringement

"A claim is literally infringed when the accused device literally embodies each limitation of the claim." *CIVIX-DDI, LLC v. Microsoft Corp.*, 18 F. App'x 892, 895 (Fed. Cir. 2001). "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims." *Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.*, 414 F. App'x 294, 300 (Fed. Cir. 2011) (quoting *Mas–Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)).

B. Doctrine of Equivalents

"A device that does not literally infringe a claim may infringe under the doctrine of equivalents." *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1373 (Fed. Cir. 2014). "To find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial." *Alcohol Monitoring Sys.*, 414 Fed. App'x at 300. "One way of proving infringement under the doctrine of equivalents is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the

4

patented product." *Id.* (internal quotation marks omitted) (citing *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)).

"A plaintiff must provide 'particularized testimony and linking argument to show the equivalents' are insubstantially different." *Gemalto*, 754 F.3d at 1374 (citation omitted). "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.* (internal quotation marks omitted). "These requirements assure that the fact-finder does not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Id.* (internal quotation marks omitted).

Importantly, the Supreme Court "has made clear that the doctrine of equivalents must be applied in a rigorous and precise manner, holding that 'each element contained in a patent claim is deemed material in defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not the invention as a whole.'" *N5 Technologies*, 56 F.Supp.3d at 760 (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). When addressing the doctrine of equivalents, "courts should be cautious not to shortcut this inquiry by identifying a 'binary' choice in which an element is either present or 'not present.'" *Epos Technologies Ltd. v. Pegasus Technologies Ltd.*, 766 F.3d 1338, 1348 (Fed. Cir. 2014). Importantly, the "concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014).

5

## ANALYSIS

A. Literal Infringement

*"attaching* a number of GPS receivers to a number
of freight containers in said freight yard"

Plaintiff argues that Defendants' method literally infringes upon the patents in dispute.

This argument is foreclosed by the Court's prior claim construction ruling. Despite Plaintiff's

prior contentions that "attach" means merely "associate with" as used in the context of the

patent, the Court construed "attach" to mean "affix or fasten to." Feb. 25, 2015 Order at 12.[1]

Because the patentee is "required to define precisely what his invention is . . . it is unjust

to the public, as well as an evasion of the law, to construe it in a manner different from the plain

import of its terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal

quotation marks and citation omitted). The Court will not apply a broader definition of "attach"

---

[1] In so construing, the Court noted that both the '008 and '564 Patents are replete with evidence pointing toward the proper meaning of "attach": "[a] remote unit that includes a GPS receiver is attached to the freight containers." '008 Abstract; '564 Abstract; "[b]roadly speaking, the system includes a number of remote GPS receivers attachable to freight containers in a freight yard. The remote receivers are configured to intermittently transmit *their* location data to a base station." '008 Patent 3:12-15 (emphasis added); '564 Patent 3:20-23; "[t]he base station is configured to receive and display the location of a particular remote receiver attached to a freight container upon request[,]" and "[t]he base station then calculates the location of the remote receiver." '008 Patent 3:17-19; 3:29-30; '564 Patent 3:25-28; 3:37-38; "[t]he base station receives the positioning data from the remote receivers and displays the *location of the remote receivers* in the building." '008 Patent 3:60-63; '564 Patent 3:67; 4:1-2 (emphasis added); "[t]he base station receives and records position data of the receivers, and inferentially, the *containers the receivers are attached to.*" '008 Patent 3:42-44 (emphasis added); "[t]he base station receives and records position data of the receivers, and inferentially, *the containers to which the receivers are attached.*" '564 Patent 3:49-51 (emphasis added).

The First Embodiments of Patents '008 and '564 also reveal that "the remote unit 10 is designed for *mounting on top or sides of* a freight container for GPS signal reception." '008 4:45-47; '564 Patent 4:53-55 (emphasis added). The Second Embodiment of Patent '008 notes that "the motion detector 64 can initiate operation when motion is detected—i.e. movement of the freight container to which the remote unit 10 is attached." '008 6:11-14; *see also* '564 6:20-23 (same). The Third Embodiment of Patent '008 notes that "[r]emote units 10 in accordance with the first and second embodiments . . . are attached to the freight containers." '008 6:66-67; 7:1-3; *see also* '564 7:7-9 (same). The Fourth, and final, Embodiments of Patents '008 and '564 note that "the remote unit 10 [is] *on* the container[.]" '008 8:12-13; '564 Patent 8:22-23 (emphasis added).

The patents' specifications reveal that the remote units are "designed for *mounting on top or sides of a freight container* for GPS signal reception[,]" and are "*on* the container[.]" '008 4:45-47; '564 Patent 4:53-55; '008 8:12-13; '564 Patent 8:22-23 (emphasis added).

6

than the plain import of its terms as used in the claim. *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 117 (Fed. Cir. 2009) (noting that "it is improper to read [a claim] term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.").

Now with the proper construction, Defendants assert that their method does not literally infringe. Specifically, Defendants do not affix or fasten GPS receivers to freight containers. Defendants equip CHEs with GPS receivers. The CHEs move freight containers. This fact is not disputed. However, Plaintiff argues that because the GPS is attached to the CHE, and the CHE picks up the container, the GPS thereby becomes "attached" to the container. Specifically, Plaintiff's reasoning is as follows:

> [A] GPS device and its associated hardware (collectively "the receiver") ("A") are installed on the CHE ("B"). A container ("C") is then picked up by the CHE. Thus, the container is attached to the CHE (C --> B), which is attached to the receiver (B -->A). This A --> B --> C constitutes attaching a GPS receiver to a freight container under the plain and ordinary meaning of the claim term.

Pl. Mot. Opp. Def. Mot. Summ. J. at 14 (citations omitted).

Plaintiff asserts that "because the NOW system is integrated into the vehicle (e.g., the CHE or UTS), when a container is attached to the vehicle, it necessarily follows that the GPS receiver is attached to the container." *Id.* at 16. This argument is unavailing.

"A claim is literally infringed when the accused device literally embodies each limitation of the claim." *CIVIX-DDI, LLC v. Microsoft Corp.*, 18 F. App'x 892, 895 (Fed. Cir. 2001). In order to show literal infringement, Plaintiff would have to show that Defendants "affix or fasten" the GPS receiver to the freight container. *See id.* The evidence Plaintiff offers to argue that Defendants' method meets the "attach" limitation, "merely rehashes [Plaintiff's] claims construction arguments[,]" seeking a broader construction of the claim. *See id.*

7

Plaintiff concedes that Defendants affix the GPS receiver to the CHE, not the freight container. The GPS receivers are not affixed to or fastened to the freight containers. The term attach, as used here, "denotes something more than an abstract or attenuated link between two things." *See Microstrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 432, 441 (E.D. Va. 2004) *aff'd*, 429 F.3d 1344 (Fed. Cir. 2005). The act of putting a GPS receiver in a vehicle maneuvered by drivers who then pick up freight containers simply does not resemble the process of fastening a number of GPS receivers to a number of freight containers, much less "literally match" it. *See Tech. Patents LLC v. Deutsche Telekom AG*, 800 F. Supp. 2d 690, 703 (D. Md. 2011) *aff'd sub nom. Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012) (finding no literal infringement after concluding that Plaintiff's "description of the accused system simply does not even resemble Claim 4, much less literally match it.").

Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that every limitation recited in the properly construed claim is found in the accused method "literally." Therefore, Defendants are entitled to summary judgment on the issue of literal infringement. *See, e.g., L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007) (affirming the district court's grant of summary judgment to defendants where the district court concluded that "[t]here is no dispute that the mesh layer in Amerimax's gutter guard is not attached to the guard panel by 'welding' as construed above."); *Cf. Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1334 (Fed. Cir. 2014) (affirming district court's finding of no literal infringement).

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED IN PART** as follows: on the issue of literal infringement, Defendant's Motion (ECF 141) is **GRANTED**.

8

**A0036**

B. Doctrine of Equivalents

Plaintiff also asserts that if the Court finds that the method employed by Defendants do not literally infringe, then the method infringes under the doctrine of equivalents. "A plaintiff must provide 'particularized testimony and linking argument to show the equivalents' are insubstantially different." *Gemalto*, 754 F.3d at 1374 (citation omitted). "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.* (internal quotation marks omitted). "One way of proving infringement under the doctrine of equivalents is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Alcohol Monitoring Sys.*, 414 Fed. App'x at 300 (internal quotation marks omitted) (citing *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)).

In moving for summary judgment, Defendants asserted that Plaintiff's expert report from Dr. Rhyne failed to provide particularized testimony to support the assertion that the differences are insubstantial. Defendants noted that the expert "fail[ed] to provide any evidence or analysis supporting what he contends is the function, way, and result of the method used by NOW and VIT." Def. Br. Supp. Mot. Summ. J. at 15. In response, Plaintiff discloses for the first time, a new expert report from Dr. Rhyne, admittedly prepared in response to the Defendant's "Brief in Support of their Motion for Summary Judgment of Non-Infringement." Declaration of Dr. Rhyne at 1 ¶ 2 (hereinafter "Rhyne – Exhibit N"). This new report, titled a "declaration," remedies many of the deficiencies in the first report.

The relevant timeline is critical. This report was filed with the Plaintiff's Opposition to the Motion for Summary Judgment on March 26, 2015. The deadline for expert disclosures

required by Rule 26(a)(2)(B) was February 20, 2015. ECF 88. Rule 26(a)(2)(B) requires reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). All discovery of experts closed on March 24, 2015. While a party is permitted to supplement expert reports under the guidelines enumerated by Rule 26(e), a party may not use supplementation as a pretext for "sandbag[ging] one's opponent with claims and issues which should have been included in the expert witness' report." *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 629; 630 (E.D.N.C. 2008) (excluding an expert report that was disclosed for the first time attached to the party's opposition to a motion for summary judgment, where the expert also admitted in the report that the new report "address[es] the concerns" raised in the motion for summary judgment). "Supplementation of an expert report permits a party to correct inadvertent errors or omissions. [It], however, is not a license to amend an expert report to avoid summary judgment." *Id.* at 630.

In their Reply, Defendants request that the Court strike this new declaration as untimely. The Court construes this request as a motion to strike Exhibit N, the Rhyne Declaration (ECF 168-1). The Rhyne Declaration, filed on March 26, 2015, may or may not be sufficiently dispositive, but it addresses the issue of equivalents more substantively than the previously disclosed report. An expert report with particularized statements would be essential to Plaintiff's efforts to prove by a preponderance of the evidence that Defendants' method infringes under the doctrine of equivalents.

## CONCLUSION

Accordingly, Plaintiff is **ORDERED** to file a Response to Defendants' request to strike and not consider the Rhyne Declaration as a part of the Court's summary judgment analysis.

The Response shall be filed no later than **NOON on Monday, June 1, 2015**. Defendants shall file a Reply no later than **5:00PM on Wednesday, June 3, 2015**.

The Court's previous stay on proceedings is **LIFTED** to allow counsel to submit the aforementioned documentation. Counsel's schedule regarding preparation for the Final Pretrial Conference remains applicable as calculated from the trial date of July 7, 2015.

Defendants' Motion for Summary Judgment is **GRANTED IN PART** as follows: on the issue of literal infringement, Defendant's Motion (ECF 141) is **GRANTED**.

The parties are strongly encouraged to pursue settlement and/or mediation. Any party appearing in this action may initiate a request for judicial assistance in attempting to negotiate a settlement. If the parties agree to pursue a settlement and/or medication with judicial assistance, contact Ms. Angie Forehand at 757-222-7260 for a referral to a Magistrate Judge. If the parties agree upon settlement or resolve this matter through mediation, Plaintiff shall promptly notify the Court, with copies to all other counsel of record.

The Final Pretrial Conference remains set for June 12, 2015. The Court will consider resetting this conference if deemed necessary.

**IT IS SO ORDERED.**

Arenda L. Wright Allen
United States District Judge

May 27, 2015
Norfolk, Virginia

11

**A0039**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREIGHT TRACKING
TECHNOLOGIES, LLC                    :
                                     :
          Plaintiff,                 :
                                     :
v.                                   :          No. 2:13cv708
                                     :
VIRGINIA INTERNATIONAL               :
TERMINALS, LLC.                      :
                                     :
          Defendant,                 :
                                     :
and                                  :
                                     :
NOW SOLUTIONS, INC.                  :
                                     :
          Intervenor.                :

## ORDER

This patent claim is before the Court on a request by Virginia International Terminals,

LLC ("VIT") and NOW Solutions, Inc. ("NOW") (collectively "Defendants") to strike from the

summary judgment record the "Declaration" of V. Thomas Rhyne, Ph.D., attached as Exhibit N

to Freight Tracking Technologies, LLC ("Freight Tracking" or "Plaintiff")'s brief opposing

Defendants' motion for summary judgment. See Defs. Reply Br. (ECF No. 178-1, at 8); Rhyne

Decl. (ECF No. 173-4). In the Court's Order partially granting summary judgment, (ECF No.

186), the Court directed supplemental briefing on Defendants' request to strike Rhyne's

declaration. That briefing concluded June 3, 2015, and the matter was referred to the

undersigned United States Magistrate Judge for an appropriate disposition. See 28 U.S.C. §

636(b)(1)(A).

1

Defendants argue that because Plaintiff failed to timely disclose Rhyne's opinions – specifically, those on the doctrine of equivalents – the Court should strike those opinions from the summary judgment record. See Defs.' Brs. (ECF Nos. 178-1, at 9; 194, at 6). Plaintiff argues that the Court should consider Rhyne's declaration because it "discloses the same function-way-result equivalency analysis contained in Rhyne's February 20, 2015 opening expert report." Pl.'s Br. (ECF No. 187, at 1). In the alternative, Plaintiff argues that even if the Court finds that Plaintiff failed to make a disclosure required by Rule 26(a), its failure was substantially justified and/or harmless. See id. at 1-2; see Fed. R. Civ. P. 37(c)(1). For the reasons outlined below, the Court GRANTS Defendants' motion and STRIKES Rhyne's Declaration, Pl.'s Br., Ex. N (ECF No. 173-4, at 12-23), from the record for purposes of Defendants' motion for summary judgment, to the extent that it discloses new opinion evidence on the doctrine of equivalents.[1] See Fed. R. Civ. P. 56(c)(4).

## I. Background

Plaintiff filed this action on December 20, 2013, alleging infringement of patents related to the GPS-tracking of freight containers. (ECF No. 1). The maker of an accused technology, NOW, intervened, and the Court issued a supplemental Rule 16(b) Scheduling Order on October 23, 2014. (ECF No. 88). That Order set February 20, 2015 as the deadline for opening reports from experts proffered by the party "having the burden of proof upon the primary issue" to which the expert evidence is directed. (ECF No. 88, at 1-2). Responsive reports were due March 20, 2015 and "any rebuttal disclosure by the party bearing the initial burden of proof" was due April 6, 2015. Id. at 2. However, the parties later agreed to forgo preparing and serving rebuttal expert disclosures. See Defs.' Br., Ex. 1 (ECF No. 194-1, at 2) (correspondence

---

[1] Because Defendants have not raised any argument with respect to the paragraphs of Rhyne's declaration that address literal infringement of the "attaching" limitation or the "intermittently operating" limitation, the Court will not address or strike that material.

confirming that "as previously discussed, NOW and VIT accept Freight Tracking's proposal to forgo reply expert reports"); Pl.'s Br. (ECF No. 187, at 4) ("[T]he parties agreed that to save costs and with expert depositions planned either side could forgo serving rebuttal expert reports . . . .").

Plaintiff served Rhyne's opening infringement report on February 20, 2015. That report conveyed Rhyne's opinion that VIT's use of the accused technology literally infringed both of Plaintiff's patents-in-suit: U.S. Patent No. 6,266,008 ("the '008 patent") and U.S. Patent No. 7,102,564 ("the '564 patent"). See generally (ECF Nos. 166-4, 166-5). Rhyne's report focused on literal infringement and provided a claim-by-claim, step-by-step analysis, explaining how, in his opinion, VIT's use of GPS receivers, which it attached to container handling equipment ("CHE"), infringed Plaintiff's patents. See (ECF Nos. 166-4, at 37-50, 166-5, at 1-23). His opening report mentioned the doctrine of equivalents in three places. First, Rhyne recited his understanding of the doctrine generally, as a "relevant legal principle[]." Rhyne Report ¶ 34 (ECF No. 166-4, at 15, 19). Second and third, Rhyne opined:

> It is my understanding Defendants contend that the attaching step must be performed by connecting a GPS receiver directly to the container, indeed even to the wall of the container. To the extent that the Court determines that the ordinary meaning, or the specification, dictates that construction, it is my opinion that the accused devices described herein meet this limitation under the doctrine of equivalents for the same reasons discussed in the prior paragraph. It is my opinion that indirect attachment via CHE would perform substantially the same function (linking GPS receivers to containers), in a substantially similar way (through a physical connection, albeit it [sic] indirect), to yield substantially the same result (being able to track the movement of containers in a freight yard). The difference between direct and indirect attachment is insignificant.

Id. ¶ 86, 164 (ECF No. 166-4, at 39; ECF No. 166-5, at 9).[2]

---

[2] This paragraph appeared word-for-word twice in Rhyne's report: once with respect to each of the accused systems in use. ¶¶ 86, 164.

On February 24, 2015, the Court issued its ruling on claim construction. (ECF No. 135). Relevant here, the Court construed the claim term "attach" in accordance with its plain and ordinary meaning, which in this instance means to "affix or fasten to." Order (ECF No. 135, at 12). On March 10, 2015, Defendants moved for summary judgment of non-infringement. (ECF No. 141). In support of their motion, Defendants attached as an exhibit, a declaration from their infringement expert, Matthew J. Schor. (ECF No. 142-4). The declaration explained Schor's opinions that the accused systems neither literally infringe Plaintiff's patents, nor infringe under the doctrine of equivalents. See (ECF No. 142-4, at 6-12). Defendants served their opening expert report March 20, 2015, in accordance with the Rule 16(b) Order's deadline.[3] On March 26, 2015, Plaintiff filed its brief opposing Defendants' motion for summary judgment. (ECF No. 168). Plaintiff attached as Exhibit N to their brief, a declaration from Rhyne. (ECF No. 173-4). Rhyne's declaration again addressed literal infringement. See (ECF No. 174-4, at 7-11). The declaration also addressed the doctrine of equivalents, over the course of ten pages. Id. at 12-23.

On March 25, 2015, the Court granted Defendants' motion to continue the then-scheduled trial date of May 19, 2015. (ECF No. 167). The Court stayed the proceedings and deadlines, pending resolution of Defendants' summary judgment motion, and set a new trial date for July 7, 2015. Id. at 3. On May 27, 2015, the Court granted summary judgment to Defendants on Plaintiff's claims of literal infringement. (ECF No. 186, at 10-11). In that same order, the Court lifted the stay and directed supplemental briefing on Defendants' argument in their reply brief that the Court should strike Rhyne's declaration. Id. Defendants' motion for summary judgment as to the doctrine of equivalents remains unresolved.

---

[3] It is not clear from the record whether this report differed from Schor's declaration attached as an exhibit to Defendants' motion for summary judgment.

## II. Legal Standard

Rule 37 provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion,[4] at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).  In turn, Rule 26(a) provides that experts like Rhyne, who are "retained or specially employed to provide expert testimony in the case," must submit a written report, which must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  Thus, the remedy Defendants seek requires a finding that Plaintiff failed to disclose "a complete statement of all opinions [Rhyne] will express and the basis and reasons for them."  Id.  And if the Court makes that finding, Rule 37(c)(1) operates as a "'self-executing sanction for failure to make a disclosure required by Rule 26(a),' designed to provide a 'strong inducement for disclosure.'"  Rambus, Inc. v. Infineon Technologies AG, 145 F. Supp. 2d 721, 724 (E.D. Va. 2001) (quoting Carney v. K Mart Corp., 176 F.R.D. 227, 229 (S.D. W.Va. 1997)); see also Fed. R. Civ. P. 37(c), 1993 advisory committee note ("automatic sanction"). Because striking an expert's report under Rule 37 is a discovery sanction, its imposition lies within the court's discretion and is reviewed for abuse.  Southern States Rack and Fixture, Inc. v.

---

[4]  Relevant to the motion at issue, Rule 56 requires that any "declaration used to support or oppose a motion [for summary judgment] must . . . set out facts that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(4).

Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003). However, "Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: (1) when the failure to disclose is 'substantial[ly] justifi[ed],' and (2) when the nondisclosure is 'harmless.'" Id. at 596.[5]

Courts generally address these two exceptions together, by applying the five-factor test adopted in Southern States. See 318 F.3d at 596-97; Rambus, 145 F. Supp. 2d at 726-27; Swimways Corp. v. Zuru, Inc., No. 2:13cv334, 2014 U.S. Dist. LEXIS 101663, *8 (E.D. Va. July 10, 2014); East West, LLC v. Rahman, No. 1:11cv1380, 2012 WL 4105129, at *5 (E.D. Va. Sept. 17, 2012). Nevertheless, the court is "not required to tick through each of the Southern States factors. Southern States explains that district courts have 'broad discretion' to decide harmlessness and 'should' – not 'shall' – 'be guided by' the five factors." Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014) (emphasis in original). Those factors are:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence

Southern States, 318 F.3d at 597.

### III. Discussion

**A. Plaintiff Failed to Provide a Complete Disclosure of Rhyne's Opinions, as Required by Rule 26(a).**

Rule 26(a)(2)(B) requires an expert's opening report to include "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Plaintiff's first argument to support Rhyne's declaration is that it discloses the

---

[5] The advisory committee notes provide examples of "situations" in which these exceptions, "[l]imiting the automatic sanction," are "needed to avoid unduly harsh penalties." Fed. R. Civ. P. 37(c), 1993 advisory committee note ("e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures"). These examples are far afield from the omission in this case.

same doctrine of equivalents opinion that Rhyne provided in his opening report. As a result, Plaintiff argues, it was a timely rebuttal report, per the 16(b) Scheduling Order, which merely reiterated an "identical" function-way-result analysis already disclosed. Pl.'s Br. (ECF No. 187, at 5). However, the declaration was neither a proper rebuttal report nor a Rule 26(e) supplementation. Rather, it featured new expert opinion evidence that Rule 26(a) required to be disclosed in Rhyne's opening report.

First, it is clear from Rhyne's declaration itself that his initial report did not contain a complete statement of all of his opinions that Plaintiff would use to carry its initial burden of proof. See Fed. R. Civ. P. 26(a)(2)(B). Rhyne's opening report contained one paragraph that discussed the doctrine of equivalents, as applied to NOW's technology or VIT's terminals: Paragraph 86 (repeated at Paragraph 164). (ECF No. 166-4, at 39; ECF No. 166-5, at 9). By contrast, Rhyne's declaration contains ten pages and over thirty numbered paragraphs on the subject. See (ECF No. 173-4, at 12-23). Plaintiff admits that Rhyne's declaration "contains a lengthier discussion of equivalency," but explains that was because it rebuts Schor's specific opinions. Pl.'s Br. (ECF No. 187, at 6). However, the sheer volume of equivalency analysis contained in the declaration, compared to Rhyne's opening report, undermines that assertion. The declaration dedicates multiple pages to each element of Rhyne's function-way-result analysis, while his opening report confines all three to a single, conclusory paragraph. His opening report chose to focus on literal infringement. And even his sole opinion on equivalency relied on a reference back to his discussion on literal infringement. See Rhyne Report ¶¶ 85-86 (ECF No. 166-4, at 38-39) ("[I]t is my opinion that the accused devices described herein meet this limitation under the doctrine of equivalents for the same reasons discussed in the prior paragraph."). But notably, "evidence and argument on the doctrine of equivalents cannot merely

be subsumed in plaintiff's case of literal infringement." <u>Lear Siegler, Inc. v. Sealy Mattress Co.</u>, 873 F.2d 1422, 1425 (Fed. Cir. 1989). Moreover, Paragraph 86 of Rhyne's opening report is the type of minimal and conclusory equivalency opinion that courts often find insufficient as a matter of law to carry the plaintiff's burden. <u>See, e.g.</u>, <u>Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.</u>, 589 F.3d 1179, 1185-86 (Fed. Cir. 2009) (rejecting a similar equivalency opinion as insufficient to survive summary judgment). As a result of the expert testimony required by substantive patent law, Rhyne's equivalency "analys[i]s" in his opening report is almost non-existent, for purposes of the summary judgment record. Pl.'s Br. (ECF No. 187, at 5). Accordingly, the declaration cannot be fairly characterized as the same opinion as the conclusory paragraph contained in his opening report. It is a "new and improved" expert report, designed to avert summary judgment. <u>See, e.g.</u>, <u>Gallagher v. Southern Source Packaging, LLC</u>, 568 F. Supp. 2d 624, 631 (E.D. N.C. 2008).

Further, even if characterized as a timely rebuttal disclosure, the parties previously agreed that neither would serve rebuttal expert reports. <u>See</u> Pl.'s Br. (ECF No. 187, at 4); Defs.' Br., Ex. 1 (ECF No. 194-1, at 2). Thus, not only did Plaintiff's additional declaration violate Rule 26(a) by failing to contain a complete statement of Rhyne's opinions, but it directly breached the parties' discovery agreement. <u>Cf.</u> Local Civ. R. 26(D)(1) ("Counsel are encouraged to agree upon the sequence and timing of the expert disclosures required by Fed. R. Civ. P. 26(a)(2)."). The Court will not construe Rhyne's declaration to contravene the parties' agreement.

Finally, Rhyne's declaration is not a Rule 26(e) supplementation. In fact, Plaintiff does not appear to make the argument that it is a supplementation.[6] In short, because Plaintiff failed

---

[6] Rather, Plaintiff's reliance on NOW's 30(b)(6) testimony and the Court's claim construction ruling as new facts comes in Plaintiff's argument addressing whether the belated disclosure was substantially justified. <u>See</u> Pl.'s Br. (ECF No. 187, at 7, 10-13). Notably,"[s]upplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to

to make a complete disclosure of Rhyne's opinions, Plaintiff is now subject to Rule 37's exclusion of the new opinions contained in his declaration, unless the failure was harmless or substantially justified.

### B. Plaintiff Cannot Rely on Rhyne's Declaration in Opposing the Summary Judgment Motion Because Its Failure to Disclose Was Not Harmless or Substantially Justified.

Rule 37 mandates that, absent harmlessness or substantial justification, the party who failed to disclose relevant Rule 26(a) information "is not allowed to use that information or witness to supply evidence on a motion . . . ." Fed. R. Civ. P. 37(c)(1). "[I]n exercising its broad discretion" to address substantial justification and harmlessness, the Court is guided by the Southern States factors. See, e.g., Wilkins, 751 F.3d at 222. Here, the relevant factors are: (1) the surprise to Defendants; (2) the ability of Defendants to cure the surprise; (3) the extent to which allowing Rhyne's equivalency opinion would disrupt the trial; (4) the importance of Rhyne's equivalency opinion; and (5) Plaintiff's explanation for its failure to disclose the evidence. Southern States, 318 F.3d at 597. The first four factors "relate mainly to the harmlessness exception, while the remaining factor – explanation for the nondisclosure – relates primarily to the substantial justification exception." Id. Based on these factors, the facts and circumstances of this case warrant striking Rhyne's declaration from the summary judgment record.

As to the first factor, Plaintiff rendered Defendants unfairly surprised by the supplemental declaration because the parties had previously agreed to refrain from serving

---

amend an expert report to avoid summary judgment." Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 630 (E.D. N.C. 2008). And, to read Rule 26(e) to encompass Rhyne's declaration "would promote gamesmanship and delay." Id. at 631 (citing Fed. R. Civ. P. 1 ("These rules . . . should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."); Tucker v. Ohtsu Tire & Rubber Co., 49 F. Supp. 2d 456, 460 (D. Md. 1999)).

9

rebuttal expert reports. Based on their prior negotiations, Plaintiff's abandonment of the agreement to forgo rebuttal reports had to have been surprising to Defendants. But in addition to the surprise which arose from the mere drafting and filing of a purported rebuttal report, Rhyne's declaration set out an entirely more elaborate analysis of the doctrine of equivalents. The substance of his report, i.e., the thirty new paragraphs on function-way-result analysis, surprised Defendants because it signaled a new theory of liability that Defendants surmised – based on Rhyne's opening report – was not being pursued by Plaintiff. Indeed, Defendants credibly proffer that had Rhyne provided a complete disclosure of his equivalency opinion, Defendants may have pursued summary judgment on invalidity as well. Defs.' Br. (ECF No. 194, at 6-7). Even if the Court discounts that hypothetical proffer, the stark contrast between Rhyne's equivalency recital in his report and the analysis in his declaration necessarily results in prejudice because it unfairly prevented Defendants from forming reasonable expectations of Plaintiff's case. As the Fourth Circuit has noted, "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278-79 (4th Cir. 2005); see id. (quoting Southern States, 318 F.3d at 595) ("For this reason, 'we give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1).'").

As to the second, third, and fourth factors, Plaintiff has not demonstrated that its failure to disclose was harmless. For the second factor – ability to cure – Plaintiff argues that Defendants can cure any surprise by deposing Rhyne and could have cured the surprise with their opportunity to respond in their reply brief on summary judgment. However, Defendants do not

have time or the ability to adequately cure the prejudice resulting from the late disclosure. Notably, Defendants previously agreed with Plaintiff to forgo expert rebuttal reports, such that they would have to cure Plaintiff's breach of that agreement with their own breach. Additionally, Plaintiff, as the party opposing "a properly supported motion for summary judgment" had the burden to produce a sufficient quantum of evidence on the doctrine of equivalents to survive summary judgment, by showing there was a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c). Recognizing that the "mere existence of a scintilla of evidence in support of [its] position will be insufficient," Plaintiff supplied Rhyne's new declaration. Anderson, 477 U.S. at 252. In light of the summary judgment standard, the "cure" proposed by Plaintiff – Rhyne's deposition and/or a reply brief – is insufficient to undo the backwards sequence of expert disclosures created by Plaintiff's late use of Rhyne's testimony. Moreover, the circumstances of this case – such as the Court's stay, the immediately impending trial date, and the parties' agreement to forgo rebuttal reports – do not allow time for additional expert disclosures from Defendants. As to the fourth factor, Rhyne's new equivalency opinion testimony is "important," in the sense that it is offered to avert summary judgment in Defendants' favor on the issue left virtually unaddressed by Rhyne's opening report. Although the declaration does serve to rebut Schor's opinions, this fourth factor is outweighed by the others. Over the long lifespan of this case, Rhyne's opinion on equivalency has seemingly become important only now, in Plaintiff's opposition to summary judgment. For the same reason that Rhyne's declaration is important to Plaintiff, its late disclosure cannot be termed "harmless" to Defendants. Fed. R. Civ. P. 37(c)(1).

Finally, the fifth factor weighs heavily in favor of striking Rhyne's declaration. Plaintiff has not offered an explanation for its failure that is sufficient to conclude that Rhyne was

substantially justified in waiting until summary judgment briefing to disclose his complete opinion on equivalency. The significant development of Rhyne's opinion on the doctrine of equivalents, from report to declaration, is based almost entirely on facts and data that Rhyne and Plaintiff have known for some time. As the party bearing the burden of proof on infringement, under whatever theory it pursued, Plaintiff was fully capable and aware of the need to produce sufficient expert testimony for a rational trier of fact to conclude that Defendants infringed its patents under the doctrine of equivalents. See generally Amgen Inc. v. F. Hoffman-La Roche Ltd, 580 F.3d 1340, 1382 (Fed. Cir. 2009) (discussing the requirements for proving doctrine of equivalents). Rhyne simply did not rely on new facts or data in disclosing his new function-way-result analysis.

In arguing the expanded opinion is substantially justified, Plaintiff points to NOW's Rule 30(b)(6) deposition testimony, the Court's claim construction ruling, and Schor's declaration as new material that justifies Rhyne's late declaration. But, a close reading of the declaration reveals that none of the three inform his much more detailed analysis. Despite Rhyne's nominal citations to the 30(b)(6) deposition testimony, his function-way-result opinion rested primarily on the patent disclosures and NOW's documents that have long been produced to Plaintiff. E.g., Rhyne Decl. ¶¶ 28, 29, 31-39, 42-44, 47, 49, 51-53. Of the thirty new paragraphs on equivalency in Rhyne's declaration, four cite NOW's deposition testimony. See id. ¶¶ 30, 45, 49, 54. Moreover, the 30(b)(6) testimony cited by Rhyne does not convey previously unknown facts. Plaintiff has long known, for example, that "when a CHE picks up a container, the system records that event and infers the location of the container . . . ." Id. ¶ 54 (citing NOW's 30(b)(6) testimony). Although an expert is entitled, and required, to supplement his disclosure under Rule

12

26(e) if the party learns it is materially "incomplete or incorrect," Rule 26(e) is "not a license to amend an expert report to avoid summary judgment." Gallagher, 568 F. Supp. 2d at 630.

Further, Plaintiff's argument that the declaration was justified in addressing Schor's assertions is foreclosed by their previous agreement and out-weighed by the surprise Rhyne's declaration created with its extensively augmented equivalency analysis. The fact that Rhyne's more elaborate opinions begin with a recital of Schor's opinion, and then proceed to explain why he disagrees, does not alter the disclosure's underlying failure – that all of Rhyne's opinion stating why he disagrees with Schor is previously undisclosed function-way-result analysis, which should have been included in his initial report. In fact, Rhyne asserted a different "function" and a different "way" as the starting points for his analysis. Compare Rhyne Report ¶¶ 86, 164 (ECF Nos. 166-4, at 39, 166-5, at 9) (identifying the function as "linking GPS receivers to containers") and id. (identifying the way as "through a physical connection, albeit it [sic] indirect"), with Rhyne Decl. ¶¶ 28, 29 (identifying the function as "to track containers by 'linking GPS receivers to containers'" (quoting his Report)) and id. ¶ 42 (identifying the way as "identify[ing] the locations of containers from the position data provided by GPS receivers which are physically connected to the containers, albeit indirectly").

Finally, while Plaintiff is correct that the Court's claim construction ruling occurred after Rhyne's initial report, the Court's construction did not materially vary from the arguments set forth in Defendants' briefing. Compare Defs.' Claim Construction Br. (ECF No. 73, at 8) (proposing the construction for "attach" as "[a]ffixing a GPS receiver to the wall of a freight container (as opposed to affixing it to a powered vehicle . . .")), with Order (ECF No. 135, at 12) (holding that "attach" means "affix or fasten to"). Moreover, Rhyne can hardly claim surprise on the Court's construction of "attach," given that his cursory opening opinion on equivalency fully

anticipated the possibility that the Court would adopt a construction of "attach" similar to Defendants' proposal. See Rhyne Report ¶ 86 (ECF No. 166-4, at 39) ("It is my understanding Defendants contend that the attaching step must be performed by connecting a GPS receiver directly to the container, indeed even to the wall of the container. To the extent that the Court determines that the ordinary meaning, or the specification, dictates that construction, it is my opinion that the accused devices described herein meet this limitation under the doctrine of equivalents for the same reasons discussed in the prior paragraph.").

From comparing Rhyne's declaration to his opening report, it is clear that the declaration contains new opinion evidence that could and should have been disclosed previously. Plaintiff has failed to show that this failure to disclose was harmless or substantially justified. Accordingly, Rule 37 requires that the declaration be stricken from the summary judgment record.

## IV. Conclusion

Based on the foregoing, Defendants' request to strike Rhyne's declaration is GRANTED and the Court STRIKES from the summary judgment record Paragraphs 26 through 55 of Exhibit N to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, located at (ECF No. 173-4, at 12-23) (un-redacted, sealed version) and (ECF No. 168-1, at 12-23) (redacted).

IT IS SO ORDERED.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 10, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREIGHT TRACKING TECHNOLOGIES, LLC,

        Plaintiff,

                                    Civil Action No: 2:13cv708

    v.

VIRGINIA INTERNATIONAL TERMINALS, LLC *et al.*,

        Defendants.

## ORDER

On June 10, 2015, the Magistrate Judge granted Defendants' request to strike a declaration from the summary judgment record. Specifically, the Magistrate Judge's ruling struck Paragraphs 26 through 55 of Exhibit N to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (un-redacted, sealed version). Objections to this ruling were filed by Plaintiff Freight Tracking Technologies, LLC ("Freight Tracking") (ECF No. 206) pursuant to Federal Rule of Civil Procedure 72 ("Rule 72"). Plaintiff's objections to this ruling were **OVERRULED** by Order issued June 17, 2015 (ECF No. 209). This Order provides the Court's reasoning for that decision.

## BACKGROUND

This is a patent infringement case relating to the use of Global Position Systems ("GPS") tracking methods. This case involves two lawsuits related to the same patents. On December 20, 2013, Plaintiff brought suit against Virginia International Terminals, LLC ("VIT"). NOW Solutions Inc. ("NOW") intervened.

Plaintiff is prosecuting the defense of two patents, United States Patent Nos. 6,266,008 ("the '008 patent"), originally filed on November 4, 1994 and 7,102,564 ("the '564 patent"),

originally filed on April 13, 2004. Pl. Opening Claim Const. Br. at 4 (hereinafter "Pl. Op. Br.").

According to Plaintiff, the '564 patent is a continuation of the '008 patent. *Id.* The '008 patent was a continuation-in-part of a different patent, U.S. Patent No. 5,364,093 ("the '093 patent"), filed on December 10, 1991. *Id.*

Plaintiff contends that VIT is using the GPS tracking methods that Plaintiff claimed in the '008 and '564 patents. Pl. Op. Br. at 1. Plaintiff argues that "the use of this technology has allowed VIT to enjoy significant cost savings and labor reductions by being able to more efficiently track containers['] movements." *Id.* at 1-2.

Defendants assert that VIT does not use Plaintiff's tracking technologies, but instead uses NOW's freight tracking technology—a system that has been in use in terminals across the country for over twenty years. Def. VIT/NOW Op. Br. at 1.

Plaintiff's patent describes a method by which a number of GPS receivers are attached to freight containers in order to determine the location of freight containers in a freight yard. It is undisputed that VIT/NOW's system equips vehicles that are known as Container Handling Equipment (CHEs) with GPS receivers. The CHEs are operated by drivers in a freight yard who use the CHEs to pick up freight containers. VIT/NOW can track the location of freight containers and other materials that are picked up by the CHEs.

The Court held a claim construction hearing and by Order dated February 24, 2015, the Court resolved claim construction. Plaintiff served Rhyne's opening report ("Rhyne Opening Report") on February 20, 2015. Rhyne's Opening Report focused on literal infringement and provided a claim-by-claim, step-by-step analysis on literal infringement. *See* ECF Nos. 166-4, at 37-50, 166-5, at 1-23. Rhyne's Opening Report mentioned the doctrine of equivalents in three

places. ECF No. 166-4, at 15, 19. Defendants served their opening expert report on March 20, 2015 in accordance with the deadline provided by the Court's Scheduling Order.

Although a number of claims were examined during claim construction, Defendants filed a Motion for Summary Judgment that focused on two limitations: (1) "*attaching* a number of GPS receivers to a number of freight containers in said freight yard" ('008 Patent – claim 18; '564 Patent – claim 1) and (2) "*intermittently operating* each receiver to transmit an identification and position based on the current location of the receiver" or "*intermittently operating* each receiver to transmit an identification and position" (respectively, '008 Patent – claim 18; '564 Patent – claim 1).

Defendants argued that based on the proper construction of the claim terms, Defendants are entitled to summary judgment based upon non-infringement. In moving for summary judgment, Defendants also asserted that the Rhyne Opening Report failed to provide particularized testimony to support the doctrine of equivalents claim. In response, Plaintiff disclosed (for the first time) Rhyne's expert declaration (the "Rhyne Declaration") attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment as Exhibit N.

On May 27, 2015, this Court granted Defendants' Motion for Summary Judgment in part, ruling that there was no genuine issue concerning any material fact regarding literal infringement. The Court also ordered the parties to complete supplemental briefing on the issue of whether the Rhyne Declaration should be stricken from the summary judgment record.

On June 10, 2015, the Magistrate Judge determined that the Rhyne Declaration was an untimely disclosure of new opinion evidence on the doctrine of equivalents, and should be stricken from the summary judgment record. Plaintiff sought review of this ruling.

## APPLICABLE LEGAL PRINCIPLES

### FEDERAL RULE OF CIVIL PROCEDURE 72

Pursuant to Federal Rule of Civil Procedure 72(a), a district court will only overturn a Magistrate Judge's Order on a non-dispositive matter if the Order is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72. Under this deferential "clear error" standard, the Court may not reverse "simply because it would have decided the case differently. Rather, a reviewing court must ask whether . . . it is left with the definite and firm conviction that a mistake has been committed." *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012) (quotation and punctuation omitted).

Pursuant to Federal Rule of Civil Procedure 72(b), for dispositive matters the "district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b). "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.*

### FEDERAL RULE OF CIVIL PROCEDURE 26

Federal Rule of Civil Procedure 26 provides that experts who are "retained . . . to provide expert testimony in the case," must submit a written report, which must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

4

**FEDERAL RULE OF CIVIL PROCEDURE 37**

Federal Rule of Civil Procedure 37 provides that:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

If the Court finds that the expert report failed to comport with Rule 26, Rule 37(c)(1) operates as an "automatic sanction" of exclusion, which "provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence." *Southern States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 599 n.2 (4th Cir. 2003) (citing Fed. R. Civ. P. 37(c) advisory committee note (1993)). "The alternative sanctions referenced in the rule are primarily intended to apply when a party fails to disclose evidence helpful to an *opposing* party." *Id.* (emphasis in original) (citing 7 James Wm. Moore *et al.*, *Moore's Federal Practice* §§ 37.60[2][b], 37.61 (3d ed. 2002)); *see also Rambus, Inc. v. Infineon Technologies AG*, 145 F. Supp. 2d 721, 724 (E.D. Va. 2001).

Rule 37 provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: "(1) when the failure to disclose is 'substantial[ly] justifi[ed],' and (2) when the nondisclosure is 'harmless.'" *Southern States*, 318 F.3d at 596; *accord* Fed. R. Civ. P. 37(c)(1). Striking an expert report under Rule 37 is a discovery sanction, and the Court's decision is reviewed for abuse of discretion. *Id.* at 595.

Courts often employ the following five-factor test from *Southern States* for determining whether nondisclosure of evidence is substantially justified or harmless: "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the

5

explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony." *Id.* at 595. Courts are "not *required* to tick through each of the *Southern States* factors," and the factors are merely a guide for helping courts exercise their "broad discretion" in this area. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

## ANALYSIS

The dictates of Rule 37 are clear. If a party fails to disclose information required under Rule 26, the party may not use that information unless two exceptions are met. Fundamentally, the issue before the Court involves a three-step inquiry: (1) did Plaintiff fail to disclose information required under Rule 26 that it now seeks to use? (2) If so, was the failure substantially justified or (3) was the failure harmless? *See, e.g., Southern States*, 318 F.3d at 596.

Plaintiff objected to the Magistrate Judge's ruling on three grounds. First, Plaintiff argued that the "ruling erred as a matter of law by finding Dr. Rhyne's [Opening Report] 'conclusory' and not 'expert testimony required by substantive patent law,' and . . . deeming the [Rhyne Declaration] a belated disclosure of new opinions." Pl. Obj. Mag. J. Order at 1. Second, Plaintiff argued that "the ruling erred as a matter of law by finding [that] 'the Court's claim construction did not materially vary from the arguments set forth in Defendants' briefing,' and that Dr. Rhyne therefore should not have been allowed to supplement his earlier opinions even though the claim construction issu[ed] after his [Opening Report]." *Id.* at 2. Third, Plaintiff argued that the "finding that Defendants [did] not have time or the ability to adequately cure the prejudice resulting from the late disclosure' was clearly erroneous." *Id.* Each of Plaintiff's arguments lacked merit.

## A. Rule 26 Violation

The Court must first determine whether a violation of Rule 26 has occurred before invoking Rule 37's automatic sanction of exclusion. The Court agrees with the Magistrate Judge that Rhyne's Declaration was a belated disclosure of new opinions, and violated Rule 26.[1] Rule 26 required that Rhyne's Opening Report include a "complete statement of all opinions" that he will express and the "basis and reasons for them." *See* Fed. R. Civ. P. 26.

Plaintiff argues that Rhyne's Opening Report adequately disclosed Dr. Rhyne's opinions on the doctrine of equivalents. This argument is unavailing and is summarily foreclosed. Dr. Rhyne's Opening Report contained only a few conclusory sentences regarding the doctrine of equivalents and lacked particularized information regarding how and why the claim limitations were equivalent. Rhyne's Opening Report contained one paragraph that discussed the doctrine of equivalents (paragraph 86, repeated at Paragraph 164). ECF No. 166-4, at 39; ECF No. 166-5, at 9.

In contrast, Rhyne's Declaration, prepared in response to Defendants' summary judgment motion, contains ten pages and over thirty numbered paragraphs on the subject. *See* ECF No. 173-4, at 12-23. Defendants argued that Rhyne's Opening Report failed to sufficiently support Rhyne's function-way-result analysis under the doctrine of equivalents for the purposes of surviving summary judgment. After Defendants presented this argument, Plaintiff submitted a new Declaration from Dr. Rhyne that dedicated multiple pages to each element of his function-

---

[1] Plaintiff argues that this Court should review the Magistrate Judge's Order de novo if the Court later decides that the exclusion of Dr. Rhyne's report compels the Court to grant summary judgment in favor of Defendants. *See* Pl. Obj. Mag. J. Order. at n.1. Typically, discovery motions are non-dispositive within the meaning of Rule 72(a), which means that the more deferential standard of review, not de novo review, applies. *See U.S. ex rel. Carter v. Halliburton*, 266 F.R.D. 130, 132 (E.D. Va. 2010). Nevertheless, Plaintiff's concern is of no consequence, because this Court concludes that under either a de novo review or a deferential review of the Magistrate Judge's Order, the Magistrate Judge's ruling was proper.

7

way-result analysis. Rhyne's Opening Report focused on literal infringement, and even his sole conclusory opinion on equivalency referenced back to his discussion on literal infringement.

The Federal Circuit has made it clear that "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) (quoting *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425 (Fed. Cir. 1989)).[2] "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Texas Instruments*, 90 F.3d at 1567.

Rhyne's Declaration added over thirty paragraphs of new opinion information on the doctrine of equivalents, and the new paragraphs were based on information that Plaintiff already possessed prior to Rhyne's Opening Report. Because Rule 26 requires disclosure of "a complete statement of all opinions the witness will express and the basis and reasons for them," and Rhyne's Declaration added opinions and reasons that were not included in Rhyne's Opening Report, Rule 26 was implicated.

Plaintiff, in an effort to save Rhyne's Declaration from exclusion under Rule 37, argued that the declaration could be viewed as a proper supplementation to the Opening Report and/or as a proper rebuttal expert report. These arguments were unavailing.

First, Rhyne's Declaration was not a proper supplementation. "Supplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to amend an expert report to avoid summary judgment." *Gallagher v.*

---

[2] Plaintiff argues that *Lear* is inapposite because that case involved evidence presented at trial and not pretrial matters. That argument is erroneous. *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) (applying the rationale from *Lear* to pretrial matters in holding that the district court did not err in granting summary judgment of noninfringement because, *inter alia*, "conclusory statements regarding equivalence . . . do not raise any genuine issues of material fact").

*S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008) (noting that "[c]ourts distinguish 'true supplementation' (*e.g.*, correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report."); *see also E.E.O.C. v. Freeman*, 778 F.3d 463, 471 n.3 (4th Cir. 2015) (Agee, J., concurring) ("As the majority notes, the district court correctly saw these last-minute changes for what they were: 'poorly disguised attempts to counter [Freeman]'s arguments with new expert analyses.' The EEOC nevertheless insists that the tardy reports were merely supplements. But '[t]o construe Rule 26(e) supplementation to apply whenever a party wants to bolster or submit additional expert opinions would wreak havoc in docket control and amount to unlimited expert opinion preparation.'") (citation omitted) (quoting *Campbell v. United States*, 470 Fed.Appx. 153, 157 (4th Cir. 2012)).

Plaintiff did not file the new Declaration to correct an inadvertent error or omission. It filed the Declaration "in order to address the numerous problems in the expert report that [Defendants] discussed in moving for summary judgment." *See Gallagher*, 568 F. Supp. 2d at 631. "Although a party generally may engage in 'true supplementation' at any point before the pretrial disclosure deadline, [Plaintiff] seeks to contort this sensible rule into the unacceptable rule that a party may permissibly submit a new expert report" in order to save the case from summary judgment. *See id.* Plaintiff did not assert that Rhyne's Opening Report contained inadvertent errors or omissions that warranted supplementation. Indeed, Plaintiff asserted that the Opening Report was "complete." Plaintiff's "argument hinges on an erroneous reading of the Federal Rules and the Scheduling Order[,]" and to "accept the argument would promote gamesmanship and delay." *See id.*

Plaintiff submitted a new and improved expert report from Dr. Rhyne after Defendants brought the deficiencies of the Opening Report to light in their Motion for Summary Judgment. This is the sort of "sandbag[ging]" the Federal Rules of Civil Procedure seek to prevent.[3] *See, e.g., Gallagher*, 568 F. Supp. 2d at 630.

Second, the Rhyne Declaration cannot properly be categorized as a rebuttal report because the parties agreed, at Plaintiff's suggestion, to forgo filing expert rebuttals. Plaintiff now asserts that the parties agreed that they *could* forgo expert rebuttal reports, not that they *would* forgo filing such reports. Plaintiff's assertion is belied by the record.

In March 2015, after the Court's Claim Construction ruling, Defendants agreed to Plaintiff's suggestion that the parties forgo rebuttal reports. *See* ECF No. 194-1 (email correspondence) (noting that Plaintiff "proposed we do not do reply expert briefs" and that Defendants "accept Freight Tracking's proposal to forgo reply expert reports"). Plaintiff did not challenge the reliability or authenticity of these documents reflecting the parties' agreement. Instead, Plaintiff attempted to cast Rhyne's new Declaration as a rebuttal expert report. This

---

[3] Plaintiff also argued that the Court's Claim Construction ruling regarding the word "attach" was so different from what both parties proposed that neither party could have anticipated how to respond to such a construction, and therefore, supplementation is warranted. This argument is summarily foreclosed because as explained above, the Rhyne Declaration was not a supplementation. Nevertheless, the Court notes that the Claim Construction ruling did not materially vary from the arguments set forth in Defendants' briefing. *Compare* Defs. Claim Construction Br. (ECF No. 73, at 8) (proposing the construction for "attach" as "[a]ffixing a GPS receiver to the wall of a freight container (as opposed to affixing it to a powered vehicle . . ."), *with* Claim Construction Order (ECF No. 135, at 12) (holding that "attach" means "affix or fasten to"). Further, Plaintiff cannot claim surprise regarding the Court's construction of "attach," given that Rhyne's cursory opening opinion on equivalency fully anticipated the possibility that the Court could adopt a construction of "attach" similar to Defendant's proposal. *See* Rhyne Report ¶ 86 (ECF No. 166-4, at 39) ("It is my understanding Defendants contend that the attaching step must be performed by connecting a GPS receiver directly to the container, indeed even to the wall of the container. To the extent that the Court determines that the ordinary meaning, or the specification, dictates that construction, it is my opinion that the accused devices described herein meet this limitation under the doctrine of equivalents for the same reasons discussed in the prior paragraph."). Lastly, Plaintiff provided no binding authority that permits parties to supplement expert reports because of a Claim Construction ruling. Accordingly, Plaintiff's arguments regarding supplementation because of the Court's construction of "attach" were unavailing.

argument is unavailing. The Court will not construe the Rhyne Declaration in a matter that contradicts the parties' agreement under these circumstances.

## B. The Violation Was Not Substantially Justified or Harmless

Having concluded that a Rule 26 violation occurred, the Court turns to whether the violation was nevertheless substantially justified or harmless. As the Magistrate Judge noted, "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." June 10, 2015 Order at 10 (ECF No. 205) (quoting *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278-79 (4th Cir. 2005)).

The facts and circumstances of this case warrant striking the Rhyne Declaration from the summary judgment record. Plaintiff unfairly surprised Defendants by submitting what Plaintiff referred to as a rebuttal report after the parties agreed to forgo submitting rebuttal reports at Plaintiff's suggestion. Defendants cannot adequately cure their surprise. The party opposing a properly supported motion for summary judgment bears the burden of producing a sufficient quantum of evidence to survive summary judgment. It would be severely prejudicial to allow Plaintiff to defeat a properly supported motion for summary judgment on improper evidence. *See* Fed. R. Civ. P. 37(c)(1) (noting that a party cannot use the undisclosed information to supply evidence on a motion).

The late disclosure also had a potential to disrupt trial because Defendants would have had to cure Plaintiff's breach of their agreement by committing a breach of their own— submitting rebuttal expert reports. Although the Rhyne Declaration is important, Defendants correctly noted that "the claimed importance of the testimony is exactly why it should have been

11

disclosed with" Rhyne's Opening Report. Defs. Reply in Supp. Mot. Strike Rhyne Declaration at 194. Rhyne's Declaration was offered to avert summary judgment in Defendants' favor on an issue left virtually unaddressed by Rhyne's Opening Report.

Lastly, Plaintiff's explanation for its failure to disclose the evidence was insufficient because an examination of the additional thirty paragraphs of analysis in the Rhyne Declaration reveals that they are based almost entirely on facts and data that Rhyne and Plaintiff have known for some time. The Magistrate Judge's determination that the late disclosure was not substantially justified or harmless was correct.

## CONCLUSION

For the foregoing reasons, Plaintiff's Objections to the Magistrate Judge's June 10, 2015 Order (ECF No. 206) were properly **OVERRULED**.

**IT IS SO ORDERED.**

_____
Arenda L. Wright Allen
United States District Judge

_____, 2015
Norfolk, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FREIGHT TRACKING TECHNOLOGIES, LLC,

        Plaintiff,

                                         Civil Action No: 2:13cv708

  v.

VIRGINIA INTERNATIONAL TERMINALS, LLC *et al.*,

        Defendants.

## ORDER

    Before the Court is a Motion for Summary Judgment (ECF No. 141) filed by Defendant Virginia International Terminals, LLC ("VIT") and Intervenor NOW Solutions Inc. ("NOW") (collectively, "Defendants"). On May 26, 2015, this Court partially granted the Motion for Summary Judgment, holding that Defendants were entitled to summary judgment on the issue of literal infringement. ECF No. 186. After additional briefing from the parties and a discovery ruling from the Magistrate Judge, the remainder of the Motion for Summary Judgment was GRANTED. ECF No. 213. This Order provides the Court's reasoning for that decision.

## BACKGROUND

    This is a patent infringement case relating to the use of Global Position Systems ("GPS") tracking methods. This case involves two lawsuits related to the same patents. On December 20, 2013, Plaintiff brought suit against Virginia International Terminals, LLC ("VIT"). NOW Solutions Inc. ("NOW") intervened.

    Plaintiff is prosecuting the defense of two patents, United States Patent Nos. 6,266,008 ("the '008 patent"), originally filed on November 4, 1994 and 7,102,564 ("the '564 patent"), originally filed on April 13, 2004. Pl. Opening Claim Const. Br. at 4 (hereinafter "Pl. Op. Br.").

According to Plaintiff, the '564 patent is a continuation of the '008 patent. *Id.* The '008 patent was a continuation-in-part of a different patent, U.S. Patent No. 5,364,093 ("the '093 patent"), filed on December 10, 1991. *Id.*

Plaintiff contends that VIT is using the GPS tracking methods that Plaintiff claimed in the '008 and '564 patents. Pl. Op. Br. at 1. Plaintiff argues that "the use of this technology has allowed VIT to enjoy significant cost savings and labor reductions by being able to more efficiently track containers['] movements." *Id.* at 1-2.

Defendants assert that VIT does not use Plaintiff's tracking technologies, but instead uses NOW's freight tracking technology—a system that has been in use in terminals across the country for over twenty years. Def. VIT/NOW Op. Br. at 1.

Plaintiff's patent describes a method by which a number of GPS receivers are attached to freight containers in order to determine the location of freight containers in a freight yard. It is undisputed that VIT/NOW's system equips vehicles that are known as Container Handling Equipment (CHEs) with GPS receivers. The CHEs are operated by drivers in a freight yard who use the CHEs to pick up freight containers. VIT/NOW can track the location of freight containers and other materials that are picked up by the CHEs.

The Court held a claim construction hearing and by Order dated February 24, 2015, the Court resolved claim construction. Plaintiff served Rhyne's opening report ("Rhyne Opening Report") on February 20, 2015. Rhyne's Opening Report focused on literal infringement and provided a claim-by-claim, step-by-step analysis on literal infringement. *See* ECF Nos. 166-4, at 37-50, 166-5, at 1-23. Rhyne's Opening Report mentioned the doctrine of equivalents in three places. ECF No. 166-4, at 15, 19. Defendants served their opening expert report on March 20, 2015 in accordance with the deadline provided by the Court's Scheduling Order.

Although a number of claims were examined during claim construction, Defendants filed a Motion for Summary Judgment that focused on two limitations: (1) "*attaching* a number of GPS receivers to a number of freight containers in said freight yard" ('008 Patent – claim 18; '564 Patent – claim 1) and (2) "*intermittently operating* each receiver to transmit an identification and position based on the current location of the receiver" or "*intermittently operating* each receiver to transmit an identification and position" (respectively, '008 Patent – claim 18; '564 Patent – claim 1). Defendants sought summary judgment on Counts I and III of their counterclaims—non-infringement of the '008 Patent (Count I) and non-infringment of the '564 patent (Count III).[1]

Defendants argued that based on the proper construction of the claim terms, Defendants are entitled to summary judgment based upon non-infringement. In moving for summary judgment, Defendants also asserted that the Rhyne Opening Report failed to provide particularized testimony to support the doctrine of equivalents claim. In response, Plaintiff disclosed (for the first time) Rhyne's expert declaration (the "Rhyne Declaration") attached to Plaintiff's Opposition to Defendants' Motion for Summary Judgment as Exhibit N.

On May 27, 2015, this Court granted Defendants' Motion for Summary Judgment in part, ruling that there was no genuine issue concerning any material fact regarding literal infringement. The Court also ordered the parties to complete supplemental briefing on the issue of whether the Rhyne Declaration should be stricken from the summary judgment record.

On June 10, 2015, the Magistrate Judge determined that the Rhyne Declaration was an untimely disclosure of new opinion evidence on the doctrine of equivalents, and should be stricken from the summary judgment record. Plaintiff sought review of that ruling. This Court

---

[1] Because the Court granted summary judgment on Counts I and III of the counterclaim, Counts II and IV (declarations of invalidity for both patents) are moot.

overruled Plaintiff's objections to the Magistrate Judge ruling. With the disputed portions of the Rhyne Declaration conclusively stricken from the summary judgment record, the matter is ripe for disposition.

## APPLICABLE LEGAL PRINCIPLES

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where, on the basis of undisputed facts, the moving party is entitled to judgment as a matter of law. *Hunter Innovations Co. v. Travelers Indem. Co. of Connecticut*, 753 F. Supp. 2d 597, 602 (E.D. Va. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* at 585. Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[G]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Guinness PLC v. Ward*, 955 F.2d 875, 883 (4th Cir. 1992) (internal quotation marks and citations omitted). "A 'genuine' issue concerning a 'material' fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor." *Tucker v. Beneficial Mortgage Co.*, 437 F. Supp. 2d 584, 587 (E.D. Va. 2006) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

4

A determination of patent infringement requires a two-step inquiry. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1476 (Fed. Cir. 1998). First, the claim must be properly construed to determine its scope and meaning. *Id.* Second, the claim properly construed must be compared to the accused device or process. *Id.* Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"A device that does not literally infringe a claim may infringe under the doctrine of equivalents." *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1373 (Fed. Cir. 2014). "To find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial." *Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.*, 414 F. App'x 294, 300 (Fed. Cir. 2011). "One way of proving infringement under the doctrine of equivalents is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Id.* (internal quotation marks omitted) (citing *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)).

"A plaintiff must provide 'particularized testimony and linking argument to show the equivalents' are insubstantially different." *Gemalto*, 754 F.3d at 1374 (citation omitted). "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.* (internal quotation marks omitted). "These requirements assure that the fact-finder does not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on

5

which the public is entitled to rely in avoiding infringement." *Id.* (internal quotation marks omitted).

Importantly, the Supreme Court "has made clear that the doctrine of equivalents must be applied in a rigorous and precise manner, holding that 'each element contained in a patent claim is deemed material in defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not the invention as a whole.'" *N5 Technologies*, 56 F.Supp.3d at 760 (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)). When addressing the doctrine of equivalents, "courts should be cautious not to shortcut this inquiry by identifying a 'binary' choice in which an element is either present or 'not present.'" *Epos Technologies Ltd. v. Pegasus Technologies Ltd.*, 766 F.3d 1338, 1348 (Fed. Cir. 2014). Additionally, the "concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014).

The United States Court of Appeals for the Federal Circuit has made it clear that "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) (quoting *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425 (Fed. Cir. 1989)). Further, expert reports that fail to represent the required evidence fail to create a genuine issue of material fact. *See Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335-36 (Fed. Cir. 2014).

## ANALYSIS

Having resolved the issue of literal infringement in a prior Order on Summary Judgment, the Court focuses its analysis on the remaining issue—infringement under the doctrine of

6

equivalents.    Defendants assert that Freight Tracking's expert offers only generalized conclusions regarding the doctrine of equivalents in his expert report, and that his testimony is legally insufficient to prevent Summary Judgment non-infringement.  This Court agrees.

Plaintiff served Rhyne's opening report ("Rhyne Opening Report") on February 20, 2015.  Rhyne's Opening Report focused on literal infringement and provided a claim-by-claim, step-by-step analysis on literal infringement.  *See* ECF Nos. 166-4, at 37-50, 166-5, at 1-23. Rhyne's Opening Report mentioned the doctrine of equivalents in three places (ECF No. 166-4, at 15, 19), contained only a few conclusory sentences regarding the doctrine of equivalents, and lacked particularized information regarding how and why the claim limitations were equivalent.

It is, therefore, insufficient for two reasons:  first, it lacks the requisite particularity; *see Texas Instruments*, 90 F.3d at 1567 (noting that "[g]eneralized testimony as the overall similarity between the claims and the accused infringer's product or process will not suffice"); second, Plaintiff cannot compensate for sparse testimony regarding the doctrine of equivalents by relying exclusively on testimony regarding literal infringement. *See id.* at 1567 (noting that "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement.").

1. Generalized Testimony

"A plaintiff must provide 'particularized testimony and linking argument to show the equivalents' are insubstantially different." *Gemalto*, 754 F.3d at 1374 (citation omitted).  The Federal Circuit case of *Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179 (Fed. Cir. 2009) is instructive.  In *Intellectual Science*, the Federal Circuit examined an expert report similar to the one presented here and concluded that the report failed to create a genuine issue of material fact to preclude summary judgment of non-infringement. *Id.* at 1185-86.

7

The Federal Circuit held that:

> [the expert's] affidavit supplied only the statement that the structures in the accused devices "perform the same function as the claim 'data transmitting means' (*i.e.*, transmitting to the host computer), in the same way (*i.e.*, through a time division multiplexed structure) to achieve the same result (*i.e.*, transmitted information sets)." That conclusory statement is insufficient.

*Id.* at 1185.

Similarly, Dr. Rhyne's Opening Report states, in relevant part, that:

> It is my opinion that indirect attachment via CHE would perform substantially the same function (linking GPS receivers to containers), in a substantially similar way (through a physical connection, albeit it [sic] indirect), to yield substantially the same result (being able to track the movement of containers in a freight yard). The difference between direct and indirect attachment is insignificant.

Rhyne Opening Report ¶ 86.

Much like the report in *Intellectual Science*, Rhyne's conclusory statement is insufficient and fails to present 'particularized testimony and linking argument to show the equivalents' are insubstantially different." *See Intellectual Sci.*, 589 F.3d at 1185; *Gemalto*, 754 F.3d at 1374. Therefore, Rhyne's Opening Report failed to create a genuine issue of material fact to preclude summary judgment of non-infringement.

2. Testimony on Literal Infringement

In an effort to save the matter from summary judgment, Plaintiff argues that the information Rhyne provided on literal infringement supported his argument on the doctrine of equivalents. This argument is unavailing. A party cannot rely solely on testimony regarding literal infringement to compensate for cursory testimony regarding the doctrine of equivalents. *See Texas Instruments*, 90 F.3d at 1567 ("[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement.") (quoting *Lear*, 873 F.2d at 1425); *see also N5 Technologies LLC v. Capital One N.A.*, 56 F. Supp. 3d 755,

763 (E.D. Va. 2014). Further, expert reports that fail to represent the required evidence, fail to create a genuine issue of material fact. *See Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335-36 (Fed. Cir. 2014). Accordingly, Plaintiff's argument is unavailing.

Lastly, viewing the evidence in the light most favorable to Plaintiff, the record is devoid of any other evidence that sufficiently supports Plaintiff's argument that Defendants infringe under the doctrine of equivalents. Defendants properly made and supported their motion for summary judgment. Plaintiff has failed to come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986) (noting that once a motion for summary judgment is properly made and supported, the opposing party must come forward with specific facts showing that there is a genuine issue for trial).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF 141) was properly **GRANTED.**[2]

**IT IS SO ORDERED.**

_____
Arenda L. Wright Allen
United States District Judge

_____, 2015
Norfolk, Virginia

---

[2] Defendants also sought summary judgment on a separate, independent basis—that Defendants do not infringe based on the "intermittently operating" claim limitation. *See* Defs. Br. Supp. Mot. Summ. J. at 2 (ECF No. 157-1). Because the Court granted summary judgment of non-infringement on the "attaching" claim limitation, the Court need not reach the issue of whether Defendants are also entitled to summary judgment under the "intermittently operating" claim limitation.

9

**A0074**



US006266008B1

(12) **United States Patent** (10) Patent No.: **US 6,266,008 B1**

Huston et al. (45) Date of Patent: **Jul. 24, 2001**

(54) **SYSTEM AND METHOD FOR DETERMINING FREIGHT CONTAINER LOCATIONS**

(76) Inventors: **Charles D. Huston**, 4607 Trail West Dr., Austin, TX (US) 78735; **Darryl J. Cornish**, 8017 Davis Mountain Pass, Austin, TX (US) 78726

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/334,733**

(22) Filed: **Nov. 4, 1994**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 07/804,368, filed on Dec. 10, 1991, now Pat. No. 5,364,093.

(51) **Int. Cl.**[7] .............................. **H04B 7/185**; G01S 5/02

(52) **U.S. Cl.** .................................... **342/357.09**; 342/357.1

(58) **Field of Search** .............................. 342/357, 357.09, 342/357.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,896,580 | * | 1/1990 | Rudnicki | 89/1.815 |
| 5,129,605 | * | 7/1992 | Burns et al. | 246/5 |
| 5,223,844 | * | 6/1993 | Mansell et al. | 342/357 |
| 5,491,486 | * | 2/1996 | Welles, II et al. | 342/357 |
| 5,512,902 | * | 4/1996 | Guthrie et al. | 342/357 |
| 5,519,403 | * | 5/1996 | Bickley et al. | 342/352 |
| 5,550,551 | * | 8/1996 | Alesio | 342/457 |

* cited by examiner

*Primary Examiner*—Theodore M. Blum

(57) **ABSTRACT**

A system and method for determining the locations of freight containers in a freight yard is described. A remote unit that includes a GPS receiver is attached to the freight containers. The remote unit has an independent power supply—a battery. Intermittently, either by a timer or by a motion detector, the remote receivers are operated. During operation, the remote receivers receive signals from the global positioning satellite system and at an allotted time, transmit the GPS data to a base station before shutting down to conserve power. The base station processes the GPS data to determine a position in the freight yard of each freight container. When a particular freight container or contents is desired, a data base in the base station can be consulted and the contents and location of a particular freight container located. The freight yard is typically outside with a view of the GPS constellation, such as a rail yard, airport baggage area, ship yard, truck park, etc. An alternative is described for use where the freight yard is a warehouse and the satellite view is obstructed. The alternative uses psuedolites or repeaters to track freight containers within the warehouse.

**22 Claims, 7 Drawing Sheets**





Figure 1



Figure 2



FIGURE 3

Remote Unit

FIGURE 4

Packet Radio
Network



FIGURE 5

Base Station





**FIGURE 6**

Remote Unit
Alternative
Embodiment



Figure 7

US 6,266,008 B1

1

# SYSTEM AND METHOD FOR DETERMINING FREIGHT CONTAINER LOCATIONS

The present invention is a continuation-in-part of Ser. No. 07/804,368 filed Dec. 10, 1991 U.S. Pat. No. 5,364,093 entitled "Golf Distance Measuring System and Method."

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to a system and method for tracking inventory and freight using the global positioning satellite system.

### 2. Description of the Related Art

The present invention utilizes the global positioning satellite system (GPS) to determine the location of freight, inventory, packages or the like ("freight") in a holding area, such as a freight terminal, railyard, airport, warehouse or other storage area. Knowledge of GPS and freight or inventory problems and procedures is useful for an appreciation of the present invention. U.S. Pat. No. 5,364,093 entitled "Golf Distance Measuring System and Method" (incorporated by reference) describes inter alia a system for tracking golf carts and players on a golf course using GPS and is analogous to the present invention which tracks freight.

## THE GLOBAL POSITIONING SATELLITE SYSTEM

GPS is a spaced based system of satellites which can provide an infinite number of receivers accurate three dimensional position (i.e. horizontal location and altitude), velocity, and time. A general understanding of GPS is useful to appreciate the operation of the present invention. Numerous books and articles are available on GPS operation and theory. See e.g., GPS—A Guide to the Next Utility, Trimble Navigation (incorporated by reference for background).

The GPS system is an umbrella of satellites circling the earth passively transmitting signals. Each satellite has a very accurate atomic clock which is periodically updated. A GPS receiver with an accurate clock can identify a satellite and determine the transit time of the signal from the satellite to the receiver. Knowing the transit time and knowing that the speed of light is 186,000 miles per second enables a calculation of the distance from the satellite to the receiver. The signal carries with it data which discloses satellite position and time of transmission, and synchronizes the GPS receiver with the satellite clocks.

As a GPS receiver locates 3 or 4 satellites it determines its distance from each satellite. The intersection of these 3 or 4 spheres enables a precise location of the receiver (and some compensation for timing errors in the receiver's internal clock). The GPS system should have 21 satellites and 3 spares once the system is fully deployed. The full constellation of 24 satellites was declared operational in 1994.

There are basically two types of GPS receivers—P (precision) code and C/A (coarse availability) code. P code is for government use only and requires specialized equipment. C/A code receivers are becoming widely available with the continuing deployment of GPS satellites. One difficulty with C/A code receivers is that the government from time to time intentionally degrades the satellite signals—so called "selective availability." With selective availability turned on horizontal accuracy is on the order of 50–100 meters. With selective availability disabled horizontal accuracy can improve to around 15 meters, often better than 5 meters.

2

There are several methods presently available for improving the horizontal accuracy of GPS. One method is called "differential" and generally involves sending a correction signal from a base station located at a known coordinate. For example, the U.S. Coast Guard has placed a number of GPS base stations at known locations around the U.S. coast region. These base stations compare their GPS computed positions with the known coordinates of their location to calculate a differential correction. This differential correction is then broadcast to any GPS receiver in range. This correction may be a position correction, but normally the correction is to the timing signal for each individual satellite so that GPS receivers looking at different satellites may calculate their own correction. This is a "wide area" approach. A "local area" approach is also often used for differential correction where a private gps base station is positioned at a known location and broadcasts a private or local correction.

Another correction approach which has not yet matured but is promising is a so-called "pseudolite" correction. With a pseudolite a GPS transmitter transmits a timing signal much like a GPS satellite. See, The Use of PseudoSatellites For Improving GPS Performance, D. Klein, B. Parkinson, Navigation (1984), reprinted Vol. III GPS Navigation p. 135 (1986); Optimal locations of Pseudolites for Differential GPS, B. Parkinson, K. Fitzgibbon, 30 Navigation J. No. 4, winter 1986–87 (incorporated by reference for background). The pseudolite transmits from a known location on or near the standard GPS carrier frequency (e.g. L1 or L2) to appear to the GPS receiver like another gps satellite. The difference is the pseudolite does not have normal gps errors (or at least minimal), such as ephemeris, ionospheric, multipath, etc., and more importantly, the pseudolite does not have the intentional degradation, selective availability. Additionally, a differential correction signal can be added to the pseudolite signal if desired. A primary benefit of use of pseudolites is that unlike normal differential correction, pseudolites do not require a separate communications channel. That is, the pseudolites appear as another satellite channel to the receiver. Another benefit is that the timing data from the pseudolite channel is known to be much more precise.

## FREIGHT TRACKING SYSTEMS

Consider a railyard, airport, or sea terminal. A number of railcars or freight containers are constantly on the move into and out of the terminal. The cargo is generally of high value and often transit time is time critical. Indeed, transit time can be very costly when considering a large number of freight containers delayed by even a day extra. The incidence of misdirected or misplaced freight or cargo can add significantly to the shipping costs. Keeping track of where a particular freight container is located is a daunting task considering the often dynamic nature of a freight terminal and repositioning of the cargo.

Tracking inventory in an industrial yard is a similar problem. In manufacturing, it is desirable to track the location and availability of finished goods. Most systems use some form of manual label tracking or bar codes to track the inventory. Unfortunately, manual tracking often requires a person to traverse the inventory and scan labels to identify the presence of the inventory.

## SUMMARY OF THE INVENTION

The problems with finding freight in a freight yard are largely solved by the system and method of the present invention. The system tracks individual freight containers by

3

intermittently transmitting the position of a freight container to a base station. The base station is able to post process the GPS data to achieve an accurate location of an individual package within one meter or better accuracy. The base station preferably has an inventory of the contents of a container. Therefore, when a particular container must be located for reshipment or delivery, the base station need only consult its database to find a particular container's location and contents. This is particularly important when the containers are moving about a freight yard as containers are relocated.

Broadly speaking, the system includes a number of remote GPS receivers attachable to freight containers in a freight yard. The remote receivers are configured to intermittently transmit their location data to a base station. A communication network connects the remote receivers to the base station. The base station is configured to receive and display the location of a particular remote receiver attached to a freight container upon request. "Intermittent" means noncontinuous operation in the context of present invention. Continuous operation is usually unnecessary and adds battery bulk to a remote receiver where minimal size and weight is important. In one form, a timer sets the time for a remote receiver to transmit. In another form, a motion detector initiates a remote receiver operation.

In one form, the remote receivers are simply transmitters for receiving the GPS timing signals, amplifying the signals, and retransmitting the GPS timing signals to the base station. The base station then calculates the location of the remote receiver. In another form, the remote receiver includes a GPS engine which calculates an apparent position based on the GPS timing signals. The base station then applies a differential correction to obtain a more accurate position of the remote receivers.

The method for determining the locations of freight containers in a freight yard in accordance with the present invention includes attaching a number of GPS receivers to freight containers; intermittently operating the receivers to receive GPS signals, and intermittently transmitting data indicative of container location an identification to a base station. The base station receives and records position data of the receivers, and inferentially, the containers the receivers are attached to. Preferably, the base station receives the position data and refines the data by applying a differential correction to obtain an accurate position of the freight containers. Preferably, an inventory of the freight container contents are maintained at the base station so that the location and contents of the container are known.

In another form, the present invention contemplates a system for determining freight containers locations in a warehouse building. GPS signals are generally not available inside of structures because of their low power. The system uses two or more pseudolites positioned within the building for transmitting GPS type of signals, a plurality of remote receivers are attachable to freight containers within the building for intermittently receiving GPS type signals from the pseudolites. Each remote receiver intermittently transmits its GPS type data to a base station over a communication network. The base station receives the positioning data from the remote receivers and displays the location of the remote receivers in the building.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a rail yard utilizing the present invention;

FIG. 2 is a freight staging area utilizing the present invention;

4

FIG. 3 is a block diagram of a remote unit in accordance with the present invention attached to an aircraft;

FIG. 4 is a schematic of the packet radio network used to transmit position;

FIG. 5 is a block diagram of the base station in accordance with the present invention;

FIG. 6 is a block diagram of another embodiment of a remote unit including a radio link in accordance with the present invention; and

FIG. 7 is a block diagram depicting a warehouse freight system according to the present invention.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

The present invention is best illustrated by describing several embodiments which are believed preferable depending on the particular freight container location environment. Typically, a remote unit 10 is attached to a freight container and intermittently operates to determine its position and transmit its position to a base station 12. Some applications need only infrequent position updates or reporting, but must be useful for a long period of time, e.g. months. Other applications need frequent position reporting over a short, several week period.

FIRST EMBODIMENT

Turning to the drawings, the system of the present invention includes a remote unit 10, base station 12, and calibration system 40. A remote unit 10 is attached to a freight container in a freight yard and intermittently reports its position to the base station 12, at least while the container remains in the freight yard.

As shown in FIG. 3, the remote unit 10 include a packet radio system 20, a GPS antenna 21 and receiver 22, a CPU 24, storage 25, battery 26 and a control device 28. The GPS receiver 22 is preferably the multi-channel receiver such as the SV-6 Model or core module II made by Trimble Navigation of Sunnyvale, Calif. Other commercially available substitutes are acceptable such as made by Magellan or Rockwell/Collins. The antenna 21 is either remote or internal to the receiver 22, but in any event is mounted on the housing of the remote unit 10 for an upward look angle for optimum GPS signal reception. That is, the remote unit 10 is designed for mounting on the top or sides of a freight container for GPS signal reception.

In more detail, the remote unit 10 includes a CPU 24, nonvolatile memory storage 25 and control device 28. Preferably, the control device 28 is simply an activation switch which supplies power to the remote unit 10 to enable operation. In the preferred remote unit, the CPU 24, memory storage 25 (e.g. RAM), and GPS engine 22 are integral, and preferably low power. Of course integration or segregation of the components of FIG. 3 is a simple matter of design choice. CPU 24 includes an internal clock, as is conventional, which is used to initiate operation. That is, the internal clock is low powered and at a preset time initiates operation of the remote unit 10.

In FIG. 3, the packet radio system 20 is conventional, and includes modem 34, radio interface 36, and radio 38 (including an antenna, not shown). The radio system 20 is bi-directional in that it may receive signals and also transmit present position and messages back to the base station 12. A PAC-COM, Inc. (Orlando, Fla.) packet radio modem 300 baud is believed preferable for the modem 34. The ability to receive signals may be useful in certain applications where

US 6,266,008 B1

5

it is desired to locate a particular container and an indicator, e.g. light or tone, can be initiated to aid location.

In practice the radio system 20 of FIG. 3 may be unidirectional for simply transmitting its apparent location of the remote receiver 10 to the base station 12. An integrated chip set which combines most of the components of the radio system 20 on a single, low cost, low power chip is believed preferable.

The remote units 10 communicate to the base station 12 over a packet radio network as shown in FIG. 4. The packet radio system is designed to eliminate protocols and acknowledgments to reduce the communications overhead. That is, each remote unit 10 is assigned a time (or event) to operate and transmit its information.

FIG. 5 illustrates the base station 12, which is desirably placed in a routing office or terminal. The base station 12 includes a calibration section 40 which comprises a GPS receiver 42 and antenna 44. The calibration section 40 continuously determines apparent position of the antenna 44 and feeds this information to CPU 46. The CPU is conventional, such as a 486 type personal computer operating a 66 MHz. The control device 47 preferably includes a mouse and a standard keyboard. The antenna 44 is probably placed a short distance from the location of the CPU and monitor 46,50, but may be displaced a large distance depending on the physical constraints of the freight yard.

A database in storage 48 is connected to the CPU 46 and stores information such as freight yard layout, container inventory, and the present position of the remote units, or at least the last reported position. A monitor 50 is coupled to CPU 46 and is useful not only for initialization, but also is selectable to display the present position of all the remote receiver units 10 in the freight yard. The base station 12 includes a packet radio system similar to FIG. 3 coupled to the CPU 46, and comprises modem 52, interface 54, radio 56 and radio antenna 58.

The monitor 50 is capable of displaying the freight yard as shown in FIGS. 1 and 2. The remote units (freight containers) 10 are shown on the physical layout of the freight yard. A special symbol may be used (e.g. flashing container) for a container that is to be located. In the present application the term "freight yard" is used to denote any area for marshaling or holding the freight containers. FIG. 1 depicts the freight yard as a rail terminal switching yard while FIG. 2 illustrates a freight yard where shipboard containers are marshaled in a sea port. Other freight yards, such as a trucking trailer marshaling area or an airport container holding area are of course equally applicable.

Different signal processing techniques may be employed at the base station 12 as desired, such as filtering and compressing. The base station 12 collects each position from the remote units 10 and processes the apparent position to determine a more accurate location of the remote unit. The base station 12 can employ the amount of processing desired to improve the accuracy estimation of the location of the remote unit-commensurate with the time available, the processing load, accuracy desired, etc.

SECOND EMBODIMENT

The embodiment illustrated in FIG. 6 is useful to illustrate several alternatives that may be incorporated into the first embodiment illustrated in FIG. 3. The GPS "engine" is eliminated in the remote units 10. Rather, each remote unit 10 comprises a GPS repeater, such as a Tidget GPS sensor made by Navsys Corp. of Edinburgh, Scotland. The repeater

6

60 operates to receive the GPS raw data timing signals from the GPS satellites, digitize and compress the timing signals. Preferably, the repeater 60 can be set to look at a certain number of satellites, e.g. 5 satellites. The satellite timing signals are not processed. Instead, the signals are amplified and periodically relayed to the base station 12 via the radio interface 20.

In FIG. 6, the remote unit 10 includes a separate timer 62 and motion detector 64 for initiating operation. That is, the timer 62 can be set to initiate operation of the remote unit 10 at preset times. Additionally, or alternatively, the motion detector 64 can initiate operation when motion is detected—i.e. movement of the freight container to which the remote unit 10 is attached. Although a low-cost mercury switch is used as the motion detector 64, many other types of motion detectors may be used. The battery 66 is sized depending on the load imposed. A rechargeable 6 volt D-cell nickel cadmium rechargeable battery works for most applications.

The repeater system of FIG. 6 uses GPS time to allocate a transmit window to each remote unit, thus avoiding the handshake protocol communications overhead associated with conventional communications schemes. Each repeater 60 has a unique identification which is transmitted along with position data. Each repeater 60 is allocated, for example, a 5 second transmit time window to transmit its data. Because the base station 12 and all of the repeaters 60 have accurate GPS time data, such a time window allocation is possible. The timer 62 initiates operation of the remote unit, and during operation, the timer is reset to GPS time to ensure accurate time in the timer 62. A repeater 60 receives timing signals from 4 satellites and stores the signals in a temporary memory buffer (compressing if desired) for transmission in its allocated time window. These raw data timing signals include an identification of the satellite.

Different signal processing techniques may be employed if desired to obtain an accurate position estimate of these raw data timing signals, such as filtering and compressing. The base station collects each timing signal from the repeaters 60 and processes the timing signals to determine a location of the repeater. The base station 12 can employ the amount of processing desired to the timing signals to improve the accuracy estimation of the repeater—commensurate with the time available, the processing load, accuracy desired, etc.

The base station 12 receives the timing signals from a certain repeater 60 in the repeater's allocated timing window. The base station has already coprocessed a timing correction (from calibration section 40) for each satellite timing signal, and therefore can apply the correction upon receipt of the repeater timing signal. The repeaters 60 are receiving the timing signals from predominantly the same satellites, so the base station needs to only keep a current correction for the limited number of satellites in view. Using the corrected timing signals, the base station can accurately process the repeater timing signals to derive a location of the repeater in the freight yard.

This embodiment contemplates the use of time windows to avoid the communication overhead associated with hand shake protocols. With this method, it is believed that repeaters on over one thousand freight containers may transmit their timing signals on a single frequency on a daily basis without interference.

THIRD EMBODIMENT

FIG. 7 illustrates a number of freight containers 70 inside of a warehouse building 72. Remote units 10 in accordance

7

with the first or second embodiments, FIGS. 3 and 6, are attached to the freight containers 70. Because the freight containers are inside of a building 72, reception of GPS signals from the satellite constellation is not normally possible. Therefore, pseudolites 74, 75 are employed within the building 72 and operate like conventional GPS satellites. Each pseudolite includes an antenna 76 to receive GPS time from the OPS satellites. This eliminates the necessity for an atomic clock in the pseudolites 74 (with a concomitant reduction in cost).

While two pseudolites 74, 75 are sufficient to give accurate 3D position to the remote receivers 10, the system of FIG. 7 preferably uses three pseudolites. The elevation of the warehouse floor is known and freight containers may be positioned on the floor which simplifies position calculations. However, because of the closeness of the pseudolites 74, 75 to the remote receivers 10, three pseudolites add precision to the location determination. The pseudolites 74 have few of the errors associated with the GPS satellites, e.g. selective availability, ephemeris, ionospheric, multipath, geometry, etc.

FOURTH EMBODIMENT

As an alternative to conventional pseudolites, the pseudolites 74, 75 in FIG. 7 may be replaced with relays 74, 75 to rebroadcast GPS timing signals from the GPS constellation. Consider a GPS satellite S1 and a specific freight container 71 in the warehouse 72. The total time for the GPS signal to reach container 71 is the time t1 from the satellite S1 to relay 74 plus the time t2 from relay 74 to the container 71 plus the rebroadcast delay d. The rebroadcast delay can be made very accurate by updating a clock in the relay 74 with the accurate GPS time from the satellite.

Total=(t1+t2+d)

The method for determining the position of the container 71 from the relay 74 can take several forms. In one form, the total time is used from satellite S1 to container 71 minus the delay d to determine a distance from the satellite S1 to container 71. This ignores the angular relationship between container 71 and relay 74. With the distance from container 71 to satellite S1 deduced, the distance between container 71 and another satellite S2 can be deduced in similar fashion and so on. It is not necessary to determine distances to multiple satellites, but in many case the distance from container 71 to relay 74 can be made more accurate. A similar method using relay 75 can be used to determine the signal transit time between container 71 and relay 75, and hence the distance. Using conventional GPS algorithms, a suspected position of container 71 can be determined using 2 or more relays to determine the position of container 71.

In another form, the time t2 from relay 74 to container 71 is determined. The delay d is known and time t1 from the satellite S1 to relay 74 can be determined. That is, the almanac gives the position of the satellite S1 and the precise position of relay 74 can be determined ahead of time which means time t1 can be accurately computed. A measured time at the container 71 is Time total and the delay and t1 times are subtracted to give t2, the signal transit time from relay 74 to container 71. Knowing time t2 determines a distance between relay 74 and container 71. To determine the position of the container 71 in the warehouse 72 another distance is determined. The same procedure can be used to determine a distance between relay 75 and the container 71. That is, knowing the precise location of relay 75 and the rebroadcast delay d enable determination of the time and distance between the relay 75 and the container 71.

8

It is important that the rebroadcast delays d associated with each relay 74, 75 be either known or constant. Additionally, it is usually important for the remote receiver 10 on container 71 to be able to identify which relay 74, 75 is being used to rebroadcast the GPS satellite signals. One method has relays 74, 75 append an identification message onto the rebroadcast GPS signal. However, it is believed to be preferable to time delimit the rebroadcasts. That is, relay 74 is allocated a time window, e.g. every even second to rebroadcast and relay 75 is allocated another time window to rebroadcast, e.g. every odd second.

It should be understood that the remote unit 10 on the container 71 preferably does not perform these calculations. That is, the remote unit 10 is configured as in FIGS. 3 or 6 (first or second embodiments) and the data is transmitted to the base station 12 for determination of the position of the freight container 71. The base station receives the transmitted data with a time stamp and can determine that the data was rebroadcast through a particular relay by comparing the time stamp with the time windows allotted to the relays.

It should also be understood that this embodiment is illustrated for overcoming the obstruction of a building to receiving GPS signals inside. However, the same technique can be used to eliminate other obstructions to GPS signals. For example, in FIG. 2 the freight containers 90 may be stacked vertically and horizontally spaced close so that GPS signals to the remote receiver units 10 are partially or totally blocked. In this case, one or more relays can be positioned to augment or supplant the normal transmission path of the GPS signals to the remote units 10. For example, a relay may be positioned at the end of each accessway 92 in FIG. 2.

OPERATION

In FIG. 1, a number of railroad cars (i.e. freight containers) are marshalled in a rail yard (i.e. freight yard). As trains are assembled and disassembled, the railroad cars are constantly moved about the rail yard, to assemble the next train, it is important to know where a particular rail car with a particular inventory is located for inclusion in the next train. There is also an optimal movement of rail cars that will minimize the time and effort to assemble the next train. For example, if it is desired to configure the next train with cars 80–88, knowing the contents and locations of the rail cars 80–88 can minimize the effort (and cost) in assembling the next train.

For illustrative purposes, assume the remote receivers 10 of FIG. 3 are attached to the cars 80–88. Every 8 hours, the CPU 24 initiates operation of the remote unit 10. The GPS 22 powers up and begins determining its apparent location. After a nominal power up cycle, e.g. 3 minutes, the remote unit 10 transmits its apparent location and identification through radio system 20 to base station 12. The base station 12 of FIGS. 1, 4, and 5 receives the apparent position from a remote receiver and applies a calibration or differential correction from calibration section 40 to the apparent position to realize an accurate position of the rail cars within a meter or two. It should be appreciated that the apparent position may be sufficiently accurate for the rail car application of FIG. 1.

Knowing the location and identification of a remote unit 10 on a rail car 80–88, the base station consults the database in storage 48 to determine rail car contents. When a particular car or contents is desired, the database tells the user the location of the rail car in the rail yard.

Turning to FIGS. 2 and 6, another illustration of the operation of the present invention is illustrated. In FIG. 2,

US 6,266,008 B1

9

the freight yard has a number of freight containers 90 positioned along accessways 92. A number of the freight containers 90 have remote receivers 10 configured as depicted in FIG. 6 attached. The remote unit 10 is attached to a freight container 90 when it enters the freight yard. The remote unit 10 is configured to operate once a week unless it is moved. That is, the timer 62 is programmed to initiate operation of the remote unit 10 once every 7 days. Alternatively, motion detector 64 will initiate operation of the remote unit 10 whenever it senses movement.

When operation is initiated, the repeater 60 simply begins to amplify an transmit the GPS timing signals it receives. Therefore, the repeater 60 transmits an identification and a number of GPS timing signals. Each timing signal includes a satellite identification. The base station 12 receives the GPS timing signals (FIG. 5) and determines a location for each remote receiver. A differential correction from the calibration section 40 is applied to achieve a more accurate location if desired.

It should be understood that a variety of combinations of the above embodiments can be easily made. For example, a remote unit 10 may be configured to only operate when it is moved—therefore it includes only the motion detector 64. Movement initiates operation of the repeater 60 and radio system 20 for a short time period or alternatively, when movement stops.

What is claimed is:

1. A method for determining locations of freight containers in a freight yard comprising:

attaching a number of GPS receivers to a number of freight containers in said freight yard;

operating each receiver to receive GPS signals indicative of receiver position;

intermittently operating each receiver to transmit data indicative of receiver identification and receiver position, including the substep of determining time and initiating said intermittent transmission based on said time;

receiving said receiver identification and receiver position at a base station;

correcting said receiver positions at the base station to determine corrected positions of said receivers; and

displaying the identification and corrected position of said receivers in said freight yard.

2. The method of claim 1, including the step of determining an error correction for the global positioning satellite system comprising the substeps of

positioning a global positioning satellite receiver at a reference location having a known position,

determining the apparent position of the reference location using the receiver,

calculating an error correction based on the apparent position and the known position of the reference location, and

applying the error correction to the position of said receivers to determine a corrected position.

3. A system for determining freight container locations in a warehouse comprising:

two or more pseudolite means located proximate to the warehouse, operable for receiving a global positioning satellite system signal, and operable for transmitting positioning signals within the warehouse;

a plurality of remote receivers attachable to freight containers within the warehouse for receiving said positioning signals from the pseudolite means, each remote receiver including a transmitter for transmitting positioning data;

10

a base station;

means for communicating positioning data between said remote receiver transmitters and said base station,

the base station including means for receiving positioning data of a remote receiver from said communicating means and means for displaying the location of said remote receiver in said warehouse.

4. The system of claim 3, a number of said remote receivers including a microprocessor for determining the position of a respective remote receiver using said pseudolite positioning signals and said positioning data comprising the position of said respective remote receiver.

5. The system of claim 3, a number of said remote receivers comprising a GPS antenna and amplifier, where the pseudolite positioning signals comprise timing data which are amplified and transmitted as said positioning data to the base station.

6. The system of claim 3, each pseudolite including a GPS receiver and a GPS antenna positioned for receiving timing correction signals from the global positioning satellite system.

7. The system of claim 3, the base station including means for graphically displaying the location of said remote receiver in said warehouse.

8. The system of claim 3, each pseudolite comprising a relay for rebroadcasting GPS signals from a GPS satellite constellation.

9. The system of claim 8, each relay having a known or constant rebroadcast delay.

10. A system for determining freight container locations in a freight storage area comprising:

pseudolite means located proximate to the storage area, operable for receiving a global positioning satellite system signal, and operable for transmitting positioning signals within the storage area;

a plurality of remote receivers attachable to freight containers within the storage area for receiving said positioning signals from the pseudolite means, each remote receiver including a transmitter for transmitting positioning data;

a base station;

means for communicating positioning data between said remote receiver transmitters and said base station,

the base station including means for receiving positioning data of a remote receiver from said communicating means and means for displaying the location of said remote receiver in said storage area.

11. The system of claim 10, a number of said remote receivers including a microprocessor for determining the position of a respective remote receiver using said pseudolite positioning signals and said positioning data comprising the position of said respective remote receiver.

12. The system of claim 10, a number of said remote receivers comprising a GPS antenna and amplifier, where the pseudolite positioninginais comprise timing data which are amplified and transmitted as said positioning data to the base station.

13. The system of claim 10, said pseudolite means including a GPS receiver for receiving said global positioning satellite system signal comprising a timing signal.

14. The system of claim 10, said remote receivers including a timer means for initiating intermittent operation of the remote receiver to receive global positioning signals and to transmit data to the base station.

15. The system of claim 10, said remote receivers including moon detector means for initiating intermittent operation

US 6,266,008 B1

11

of the remote receiver to receive global positioning signals and to transmit data to the base station in response to movement of the remote receiver.

**16**. The system of claim **10**, said remote receivers including means for determining the present position of the remote receiver and for transmitting data to the base station in response to movement of the remote receiver.

**17**. The system of claim **10**, said remote receivers including means for determining the present position of the remote receiver and for transmitting data to the base station if the present position is proximate a defined location.

**18**. A method for determining freight container locations in a freight yard comprising:

attaching a number of GPS receivers to a number of freight containers in said freight yard;

operating each receiver to receive GPS signals and determine its current location;

intermittently operating each receiver to transmit an identification and position based on the current location of the receiver;

receiving said identification and position at a base station;

recording the identification and position of said receivers in said freight yard; and

determining an error correction for the global positioning satellite system comprising the substeps of

positioning a global positioning satellite reference receiver at a reference location having a known position,

determining the apparent position of the reference location using the reference receiver,

calculating an error correction based on the apparent position and the known position of the reference location, and

12

applying the error correction to the position of said receivers to determine a corrected position of said receivers in said freight yard.

**19**. The method of claim **18**, including the step of determining an error correction for the global positioning satellite system comprising the substeps of

positioning a global positioning satellite reference receiver at a reference location having a known position,

determining the apparent position of the reference location using the reference receiver,

calculating an error correction based on the apparent position and the known position of the reference location, and

applying the error correction to the position of said receivers to determine a corrected position of said receivers in said freight yard.

**20**. The method of claim **18**, the intermittent operation step comprising the substeps of

determining the current location, transmitting the current location if different from a previous location.

**21**. The method of claim **18**, the intermittent operation step comprising the substeps of

determining the current location, transmitting the current location if proximate a defined location.

**22**. The method of claim **19**, the error correction determining step comprising the substeps of

applying the error correction to the position data received at the base station, displaying the corrected position of the receivers in said freight yard.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.   : 6,266,008 B1                                    Page 1 of 1
DATED          : July 24, 2001
INVENTOR(S)   : Huston et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Column 10,</u>
Line 56, please delete "positioninginais" and substitute therefor -- positioning signals --.
Line 67, please delete "moon" and substitute therefor -- motion --.

Signed and Sealed this

Nineteenth Day of August, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

US007102564B2

(12) **United States Patent**
Huston et al.

(10) **Patent No.:** **US 7,102,564 B2**
(45) **Date of Patent:** *Sep. 5, 2006

(54) **SYSTEM AND METHOD FOR DETERMINING FREIGHT CONTAINER LOCATIONS**

(76) Inventors: **Charles Huston**, 2103 Hartford, Austin, TX (US) 78703; **Daryl Cornish**, 8017 Davis Mountain Pass, Austin, TX (US) 78726

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 67 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/823,806**

(22) Filed: **Apr. 13, 2004**

(65) **Prior Publication Data**

US 2004/0257276 A1    Dec. 23, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/859,294, filed on May 16, 2001, now abandoned, which is a continuation-in-part of application No. 07/804,368, filed on Dec. 10, 1991, now Pat. No. 5,364,093, and a continuation of application No. 08/334,733, filed on Nov. 4, 1994, now Pat. No. 6,266,008.

(51) **Int. Cl.**
*H04B 7/185* (2006.01)

(52) **U.S. Cl.** ............................... **342/357.09**; 342/357.1

(58) **Field of Classification Search** .......... 342/357.01, 342/357.03, 357.06, 357.09, 357.1; 701/207, 701/213, 215
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,771,483 A | 11/1973 | Bond | |
| 4,656,463 A | 4/1987 | Anders et al. | |
| 4,656,476 A | 4/1987 | Tavtigian | |
| 4,703,444 A | 10/1987 | Storms, Jr. et al. | |
| 4,896,580 A | 1/1990 | Rudnicki | |
| 4,910,677 A | 3/1990 | Remedio et al. | |
| 5,056,106 A | 10/1991 | Wang et al. | |
| 5,086,390 A | 2/1992 | Matthews | |
| 5,129,605 A | 7/1992 | Burns et al. | |
| 5,148,002 A | 9/1992 | Kuo et al. | |
| 5,223,844 A | 6/1993 | Mansell et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO          87/06713      11/1987

*Primary Examiner*—Dao Phan
(74) *Attorney, Agent, or Firm*—Charles D. Huston; Daffer McDaniel, LLP

(57) **ABSTRACT**

A system and method for determining the locations of freight containers in a freight yard is described. A remote unit that includes a GPS receiver is attached to the freight containers. The remote receivers have an independent power supply—a battery. Intermittently, either by a timer or by a motion detector, the remote receivers are operated. During operation, the remote receivers receive signals from the global positioning satellite system and at an allotted time, transmit the GPS data to a base station before shutting down to conserve power. The base station processes the GPS data to determine a position in the freight yard of each freight container. When a particular freight container or contents is desired, a database in the base station can be consulted and the contents and location of a particular freight container located. The freight yard is typically outside with a view of the GPS constellation, such as a rail yard. airport baggage area, ship yard, truck park, etc. An alternative is described for use where the freight yard is a warehouse and the satellite view is obstructed. The alternative uses pseudolite or repeaters to track freight containers within the warehouse.

**19 Claims, 7 Drawing Sheets**



**US 7,102,564 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,440,491 A | 8/1995 | Kawano et al. |
| 5,491,486 A | 2/1996 | Welles, II et al. |
| 5,512,902 A | 4/1996 | Guthrie et al. |
| 5,519,403 A | 5/1996 | Bickley et al. |
| 5,539,810 A | 7/1996 | Kennedy, III et al. |
| 5,550,551 A | 8/1996 | Alesio |
| 5,956,250 A | 9/1999 | Gudat et al. |



FIG. 1



FIG. 2

A0093



FIG. 3

Packet Radio
Network



FIG. 4

Base Station



FIG. 5



FIG. 6



FIG. 7

US 7,102,564 B2

1

# SYSTEM AND METHOD FOR DETERMINING FREIGHT CONTAINER LOCATIONS

## PRIOR APPLICATION

The present application is a continuation of application Ser. No. 09/859,294 filed May 16, 2001, now abandoned which is a continuation-in-part of U.S. patent application Ser. No. 07/804,368 filed Dec. 10, 1991, now U.S. Pat. No. 5,364,093, entitled "Golf Distance Measuring System and Method" and a continuation of Ser. No. 08/334,733 filed Nov. 4, 1994, now U.S. Pat. No. 6,266,088 entitled "System and Method for Determining Freight Container Locations."

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to a system and method for tracking inventory and freight using the global positioning satellite system.

2. Description of the Related Art

The present invention utilizes the global positioning satellite system (GPS) to determine the location of freight, inventory, packages or the like ("freight") in a holding area, such as a freight terminal, rail yard, airport, warehouse or other storage area. Knowledge of GPS and freight or inventory problems and procedures is useful for an appreciation of the present invention. U.S. patent application Ser. No. 07/804,368 entitled "Golf Distance Measuring System and Method" (incorporated by reference) describes inter alia a system for tracking golf carts and players on a golf course using GPS and is analogous to the present invention which tracks freight.

The Global Positioning Satellite System

GPS is a spaced based system of satellites which can provide an infinite otimber of receivers accurate three dimensional position (i.e. horizontal location and altitude), velocity, and time. A general understanding of GPS is useful to appreciate the operation of the present invention. Numerous books and articles are available on GPS operation and theory. See e.g., GPS—A Guide to the Next Utility, Trimble Navigation, (incorporated by reference for background).

The GPS system is an umbrella of satellites circling the earth passively transmitting signals. Each satellite has a very accurate atomic clock which is periodically updated. A GPS receiver with an accurate clock can identify a satellite and determine the transit time of the signal from the satellite to the receiver. Knowing the transit time and knowing that the speed of light is 136,000 miles per second enables a calculation of the distance from the satellite to the receiver. The signal carries with it data which discloses satellite position and time at transmission, and synchronizes the GPS receiver with the satellite clocks.

As a GPS receiver locates three or four satellites, it determines its distance from each satellite. The intersection of these three or four spheres enables a precise location of the receiver (and some compensation for timing errors in the receiver's internal clock). The GPS system should have 21 satellites and three spares once the system is fully deployed. The full constellation of 24 satellites was declared operational in 1994.

There are basically two types of GPS receivers—P (precision) code and C/A (coarse availability) code. P code is for government use only and requires specialized equipment. C/A code receivers are becoming widely available with the

2

continuing deployment of GPS satellites. One difficulty with C/A code receivers is that the government from time to time intentionally degrades the satellite signals—so called "selective availability." With selective availability turned on, horizontal accuracy is on the order of 50–100 meters. With selective availability disabled, horizontal accuracy can improve to around 15 meters, often better than 5 meters.

There are several methods presently available for improving the horizontal accuracy of GPS. One method is called "differential" and generally involves sending a correction signal from a base station located at a known coordinate. For example, the U.S. Coast Guard has placed a number of GPS base stations at known locations around the U.S. coast region. These base stations compare their GPS computed positions with the known coordinates of their location to calculate a differential correction. This differential correction is then broadcast to any GPS receiver in range. This correction may be a position correction, but normally the correction is to the timing signal for each individual satellite so that GPS receivers looking at different satellites may calculate their own correction. This is a "wide area" approach. A "local area" approach is also often used for differential correction where a private GPS base station is positioned at a known location and broadcasts a private or local correction.

Another correction approach which has not yet matured but is promising is a so-called "pseudolite" correction. With a pseudolite a GPS transmitter transmits a timing signal much like a GPS satellite. See, The Use of Pseudo-Satellites For Improving GPS Performance, D. Klein, B. Parkinson, Navigation (1934), reprinted Vol. III GPS Navigation, p. 135 (1936); Optimal locations of Pseudolites for Differential GPS, B. Parkinson, K. Fitzgibbon, 30 Navigation J. No. 4, winter 1936–37 (incorporated by reference for background). The pseudolite transmits from a known location on or near the standard GPS carrier frequency (e.g. LI or L2) to appear to the GPS receiver like another GPS satellite. The difference is the pseudolite does not have normal GPS errors (or at least minimal), such as ephemeris, ionospheric, multipath, etc., and more importantly, the pseudolite does not have the intentional degradation, selective availability. Additionally, a differential correction signal can be added to the pseudolite signal if desired. A primary benefit of use of pseudolites is that unlike normal differential correction, pseudolites do not require a separate communications channel. That is, the pseudolites appear as another satellite channel to the receiver. Another benefit is that the timing data from the pseudolite channel is known to be much more precise.

Freight Tracking Systems

Consider a rail yard, airport, or sea terminal. A number of railcars or freight containers are constantly on the move into and out of the terminal. The cargo is generally of high value and often transit time is critical. Indeed, transit time can be very costly when considering a large number of freight containers delayed by even a day extra. The incidence of misdirected or misplaced freight or cargo can add significantly to the shipping costs. Keening track or where a particular freight container is located is a daunting task considering the often dynamic nature of a freight terminal and repositioning of the cargo.

Tracking inventory in an industrial yard is a similar problem. In manufacturing, it is desirable to track the location and availability of finished goods. Most systems use some form of manual label tracking or bar codes to track the inventory. Unfortunately, manual tracking often requires a

US 7,102,564 B2

3

person to traverse the inventory and scan labels to identify the presence of the inventory.

## SUMMARY OF THE INVENTION

The problems with finding freight in a freight yard are largely solved by the system and method of the present invention. The system tracks individual freight containers by intermittently transmitting the position of a freight container to a base station. The base station is able to post process the GPS data to achieve an accurate location of an individual package within one meter or better accuracy. The base station preferably has an inventory of the contents of a container. Therefore, when a particular container must be located for reshipment or delivery, the base station need only consult its database to find a particular container's location and contents. This is particularly important when the containers are moving about a freight yard as containers are relocated.

Broadly speaking, the system includes a number of remote GPS receivers attachable to freight containers in a freight yard. The remote receivers are configured to intermittently transmit their location data to a base station. A communication network connects the remote receivers to the base station. The base station is configured to receive and display the location of a particular remote receiver attached to a freight container upon request. "Intermittent" means non-continuous operation in the context of present invention. Continuous operation is usually unnecessary and adds battery bulk to a remote receiver where minimal size and weight is important. In one form, a timer sets the time for a remote receiver to transmit. In another form, a motion detector initiates a remote receiver operation.

In one form, the remote receivers are simply transmitters for receiving the GPS timing signals, amplifying the signals, and retransmitting the GPS timing signals to the base station. The base station then calculates the location of the remote receiver. In another form, the remote receiver includes a GPS engine which calculates an apparent position based on the GPS timing signals. The base station then applies a differential correction to obtain a more accurate position of the remote receivers.

The method for determining the locations of freight containers in a freight yard in accordance with the present invention includes attaching a number of GPS receivers to freight containers, intermittently operating the receivers to receive GPS signals, and intermittently transmitting data indicative of container location and identification to a base station. The base station receives and records position data of the receivers, and inferentially, the containers to which the receivers are attached. Preferably, the base station receives the position data and refines the data by applying a differential correction to obtain an accurate position of the freight containers. Preferably, an inventory of the freight container contents are maintained at the base station so that the location and contents of the container are known.

In another form, the present invention contemplates a system for determining freight containers locations in a warehouse building. GPS signals are generally not available inside of structures because of their low power. The system uses two or more pseudolites positioned within the building for transmitting GPS type of signals. A plurality of remote receivers are attachable to freight containers within the building for intermittently receiving GPS type signals from the pseudolites. Each remote receiver intermittently transmits its GPS type data to a base station over a communication network. The base station receives the positioning data

4

from the remote receivers and displays the location of the remote receivers in the building.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a rail yard utilizing the present invention;
FIG. 2 is a freight staging area utilizing the present invention;
FIG. 3 is a block diagram of a remote unit in accordance with the present invention attached to an aircraft;
FIG. 4 is a schematic of the packet radio network used to transmit position;
FIG. 5 is a block diagram of the base station in accordance with the present invention;
FIG. 6 is a block diagram of another embodiment of a remote unit including a radio link in accordance with the present invention; and
FIG. 7 is a block diagram depicting a warehouse freight system according to the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is best illustrated by describing several embodiments which are believed preferable depending on the particular freight container location environment. Typically, a remote unit 10 is attached to a freight container and intermittently operates to determine its position and transmit its position to a base station 12. Some applications need only infrequent position updates or reporting, but must be useful for a long period of time, e.g. months. Other applications need frequent position reporting over a short, several week period.

### First Embodiment

Turning to the drawings. the system of the present invention includes a remote unit 10, base station 12. and calibration system 40. A remote unit 10 is attached to a freight container in a freight yard and intermittently reports its position to the base station 12, at least while the container remains in the freight yard.

As shown in FIG. 3, the remote unit 10 includes a packet radio system 20, a GPS antenna 21 and receiver 22, a CPU 24, storage 25, battery 26 and a control device 23. The GPS receiver 22 is preferably the multi-channel receiver such as the SV-6 Model or core module II made by Trimble Navigation of Sunnyvale, Calif. Other commercially available substitutes are acceptable such as made by Magellan or Rockwell/Collins. The antenna 21 is either remote or internal to the receiver 22, but in any event is mounted on the housing of the remote unit 10 for an upward look angle for optimum GPS signal reception. That is, the remote unit 10 is designed for mounting on the top or sides of a freight container for GPS signal reception.

In more detail, the remote unit 10 includes a CPU 24, nonvolatile memory storage 25 and control device 23. Preferably, the control device 23 is simply an activation switch which supplies power to the remote unit 10 to enable operation. In the preferred remote unit, the CPU 24, memory storage 25 (e.g. RAM), and GPS engine 22 are integral, and preferably low power. Of course integration or segregation of the components of FIG. 3 is a simple matter of design choice. CPU 24 includes an internal clock, as is conventional, which is used to initiate operation. That is, the internal clock is low powered and at a preset time initiates operation of the remote unit 10.

A0100

US 7,102,564 B2

5

In FIG. **3**, the packet radio system **20** is conventional, and includes modem **34**, radio interface **36**, and radio **38** (including an antenna, not shown). The radio system **20** is bi-directional in that it may receive signals and also transmit present position and messages back to the base station **12**. A PAC-COM, Inc. (Orlando. Fla.) packet radio modem 300 baud is believed preferable for the modem **34**. The ability to receive signals may be useful in certain applications where it is desired to locate a particular container and an indicator, e.g. light or tone, can be initiated to aid location.

In practice the radio system **20** of FIG. **3** may be uni-directional for simply transmitting its apparent location of the remote receiver **10** to the base station **12**. An integrated chip set which combines most of the components of the radio system **20** on a single, low cost, low power chip is believed preferable.

The remote units **10** communicate to the base station **12** over a packet radio network as shown in FIG. **4**. The packet radio system is designed to eliminate protocols and acknowledgments to reduce the communications overhead. That is, each remote unit **10** is assigned a time (or event) to operate and transmit its information.

FIG. **5** illustrates the base station **12**, which is desirably placed in a routing office or terminal. The base station **12** includes a calibration section **40** which comprises a GPS receiver **42** and antenna **44**. The calibration section **40** continuously determines apparent position of the antenna **44** and feeds this information to CPU **46**. The CPU is conventional, such as a 486 type personal computer operating at 66 MHz. The control device **47** preferably includes a mouse and a standard keyboard. The antenna **44** is probably placed a short distance from the location of the CPU **46** and monitor **50**, but may be displaced a large distance depending on the physical constraints of the freight yard.

A database in storage **48** is connected to the CPU **46** and stores information such as freight yard layout, container inventory, and the present position of the remote units, or at least the last reported position. A monitor **50** is coupled to CPU **46** and is useful not only for initialization, but also is selectable to display the present position of all the remote receiver units **10** in the freight yard. The base station **12** includes a packet radio system similar to FIG. **3** coupled to the CPU **46**, and comprises modem **52**, interface **54**, radio **56**, and radio antenna **58**.

The monitor **50** is capable of displaying the freight yard as shown in FIGS. **1** and **2**. The remote units (freight containers) **10** are shown on the physical layout of the freight yard. A special symbol may be used (e.g., flashing container) for a container that is to be located. In the present application, the term "freight yard" is used to denote any area for marshaling or holding the freight containers. FIG. **1** depicts the freight yard as a rail terminal switching yard, while FIG. **2** illustrates a freight yard where shipboard containers are marshaled in a sea port. Other freight yards, such as a trucking trailer marshaling area or an airport container holding area are, of course, equally applicable.

Different signal processing techniques may be employed at the base station **12** as desired, such as filtering and compressing. The base station **12** collects each position from the remote units **10** and processes the apparent position to determine a more accurate location of the remote unit. The base station **12** can employ the amount of processing desired to improve the accuracy estimation of the location of the remote unit—commensurate with the time available, the processing load, accuracy desired, etc.

6

Second Embodiment

The embodiment illustrated in FIG. **6** is useful to illustrate several alternatives that may be incorporated into the first embodiment illustrated in FIG. **3**. The GPS "engine" is eliminated in the remote units **10**. Rather, each remote unit **10** comprises a GPS repeater, such as a Tidget GPS sensor made by Navsys Corp. of Edinburgh, Scotland. The repeater **50** operates to receive the GPS raw data timing signals from the GPS satellites, to digitize and compress the timing signals. Preferably, the repeater **50** can be set to look at a certain number of satellites, e.g., five satellites. The satellite timing signals are not processed. Instead, the signals are amplified and periodically relayed to the base station **12** via the radio interface **20**.

In FIG. **6**, the remote unit **10** includes a separate timer **52** and motion detector **54** for initiating operation. That is, the timer **52** can be set to initiate operation of the remote unit **10** at preset times. Additionally or alternatively, the motion detector **54** can initiate operation when motion is detected—i.e., movement of the freight container to which the remote unit **10** is attached. Although a low-cost mercury switch is used as the motion detector **54**, many other types of motion detectors may be used. The battery **56** is sized depending on the load imposed. A rechargeable 6 volt D-cell nickel cadmium rechargeable battery works for most applications.

The repeater system of FIG. **6** uses GPS time to allocate a transmit window to each remote unit, thus avoiding the handshake protocol communications overhead associated with conventional communications schemes. Each repeater **50** has a unique identification which is transmitted along with position data. Each repeater **50** is allocated, for example, a 5 second transmit time window to transmit its data. Because the base station **12** and all of the repeaters **50** have accurate GPS time data, such a time window allocation is possible. The timer **52** initiates operation of the remote unit and during operation, the timer is reset to GPS time to ensure accurate time in the timer **52**. A repeater **50** receives timing signals from four satellites and stores the signals in a temporary memory buffer (compressing if desired) for transmission in its allocated time window. These raw data timing signals include an identification of the satellite.

Different signal processing techniques may be employed if desired to obtain an accurate position estimate of these raw data timing signals, such as filtering and compressing. The base station collects each timing signal from the repeaters **50** and processes the timing signals to determine a location of the repeater. The base station **12** can employ the amount of processing desired to the timing signals to improve the accuracy estimation of the repeater—commensurate with the time available, the processing load, accuracy desired, etc.

The base station **12** receives the timing signals from a certain repeater **50** in the repeater's allocated timing window. The base station has already co-processed a timing correction (from calibration section **40**) for each satellite timing signal and, therefore, can apply the correction upon receipt of the repeater timing signal. The repeaters **50** are receiving the timing signals from predominantly the same satellites, so the base station needs to only keep a current correction for the limited number of satellites in view. Using the corrected timing signals, the base station can accurately process the repeater timing signals to derive a location of the repeater in the freight yard.

This embodiment contemplates the use of time windows to avoid the communication overhead associated with hand shake protocols. With this method, it is believed that repeat-

US 7,102,564 B2

7

ers on over 1000 freight containers may transmit their timing signals on a single frequency on a daily basis without interference.

Third Embodiment

FIG. 7 illustrates a number of freight containers 70 inside of a warehouse building 72. Remote units 10 in accordance with the first or second embodiments, FIGS. 3 and 6, are attached to the freight containers 70. Because the freight containers are inside of a building 72, reception of GPS signals from the satellite constellation is not normally possible. Therefore. pseudolites 74, 75 are employed within the building 72 and operate like conventional GPS satellites. Each pseudolite includes an antenna 76 to receive GPS time from the GPS satellites. This eliminates the necessity for an atomic clock in the pseudolites 74, 75 (with a concomitant reduction in cost).

While two pseudolites 74, 75 are sufficient to give accurate 3D position to the remote receivers 10, the system of FIG. 7 preferably uses three pseudolites. The elevation of the warehouse floor is known and freight containers may be positioned on the floor which simplifies position calculations. However, because of the closeness of the pseudolites 74, 75 to the remote receivers 10, three pseudolites add precision to the location determination. The pseudolites 74, 75 have few of the errors associated with the GPS satellites, e.g., selective availability, ephemeris, ionospheric, multipath, geometry, etc.

Fourth Embodiment

As an alternative to conventional pseudolites, the pseudolites 74, 75 in FIG. 7 may be replaced with relays 74, 75 to rebroadcast GPS timing signals from the GPS constellation. Consider a GPS satellite S1 and a specific freight container 71 in the warehouse 72. The total time for the GPS signal to reach container 71 is the time t1 from the satellite S1 to relay 74 plus the time t2 from relay 74 to the container 71 plus the rebroadcast delay d. The rebroadcast delay can be made very accurate by updating a clock in the relay 74 with the accurate GPS time from the satellite.

$$Ttotal=(t1+t2+d)$$

The method for determining the position of the container 71 from the relay 74 can take several forms. In one form, the total time is used from satellite S1 to container 71 minus the delay d to determine a distance from the satellite S1 to container 71. This ignores the angular relationship between container 71 and relay 74. With the distance from container 71 to satellite S1 deduced, the distance between container 71 and another satellite S2 can be deduced in similar fashion, and so on. It is not necessary to determine distances to multiple satellites, but in many case the distance from container 71 to relay 74 can be made more accurate. A similar method using relay 75 can be used to determine the signal transit time between container 71 and relay 75, and hence the distance. Using conventional GPS algorithms, a suspected position of container 71 can be determined using two or more relays to determine the position of container 71.

In another form. the time t2 from relay 74 to container 71 is determined. The delay d is known and time t1 from the satellite S1 to relay 74 can be determined. That is, the almanac gives the position of the satellite S1 and the precise position of relay 74 can be determined ahead of time, which means time t1 can be accurately computed. A measured time at the container 71 is Time total and the delay and t1 times

8

are subtracted to give t2, the signal transit time from relay 74 to container 71. Knowing time t2 determines a distance between relay 74 and container 71. To determine the position of the container 71 in the warehouse 72, another distance is determined. The same procedure can be used to determine a distance between relay 75 and the container 71. That is, knowing the precise location of relay 75 and the rebroadcast delay d enables determination of the time and distance between the relay 75 and the container 71.

It is important that the rebroadcast delays d associated with each relay 74, 75 be either known or constant. Additionally, it is usually important for the remote receiver 10 on container 71 to be able to identify which relay 74, 75 is being used to rebroadcast the GPS satellite signals. One method has relays 74, 75 append an identification message onto the rebroadcast GPS signal. However, it is believed to be preferable to time delimit the rebroadcasts. That is, relay 74 is allocated a time window, e.g., every even second to rebroadcast, and relay 75 is allocated another time window to rebroadcast, e.g., every odd second.

It should be understood that the remote unit 10 on the container 71 preferably does not perform these calculations. That is, the remote unit 10 is configured as in FIG. 3 or 6 (first or second embodiments), and the data is transmitted to the base station 12 for determination of the position of the freight container 71. The base station receives the transmitted data with a time stamp and can determine that the data was rebroadcast through a particular relay by comparing the time stamp with the time windows allotted to the relays.

It should also be understood that this embodiment is illustrated for overcoming the obstruction of a building to receiving GPS signals inside. However, the same technique can be used to eliminate other obstructions to GPS signals. For example, in FIG. 2, the freight containers 90 may be stacked vertically and horizontally spaced close so that GPS signals to the remote receiver units 10 are partially or totally blocked. In this case, one or more relays can be positioned to augment or supplant the normal transmission path of the GPS signals to the remote units 10. For example. a relay may be positioned at the end of each accessway 92 in FIG. 2.

Operation

In FIG. 1, a number of railroad cars (i.e., freight containers) are marshaled in a rail yard (i.e., freight yard). As trains are assembled and disassembled, the railroad cars are constantly moved about the rail yard. to assemble the next train, it is important to know where a particular rail car with a particular inventory is located for inclusion in the next train. There is also an optimal movement of rail cars that will minimize the time and effort to assemble the next train. For example, if it is desired to configure the next train with cars 80–88, knowing the contents and locations of the rail cars 80–88 can minimize the effort (and cost) in assembling the next train.

For illustrative purposes, assume the remote receivers 10 of FIG. 3 are attached to the cars 80–88. Every eight hours, the CPU 24 initiates operation of the remote unit 10. The GPS 22 powers up and begins determining its apparent location. After a nominal power up cycle, e.g. three minutes, the remote unit 10 transmits its apparent location and identification through radio system 20 to base station 12. The base station 12 of FIGS. 1, 4, and 5 receives the apparent position from a remote receiver and applies a calibration or differential correction from calibration section 40 to the apparent position to realize an accurate position of the rail cars within a meter or two. It should be appreciated

US 7,102,564 B2

9

that the apparent position may be sufficiently accurate for the rail car application of FIG. 1.

Knowing the location and identification of a remote unit 10 on a rail car 80–88, the base station consults the database in storage 48 to determine rail car contents. When a particular car or contents is desired, the database tells the user the location of the rail car in the rail yard.

Turning to FIGS. 2 and 6, another illustration of the operation of the present invention is illustrated. In FIG. 2, the freight yard has a number of freight containers 90 positioned along accessways 92. A number of the freight containers 90 have remote receivers 10 attached, configured as depicted in FIG. 6. The remote unit 10 is attached to a freight container 90 when it enters the freight yard. The remote unit 10 is configured to operate once a week unless it is moved. That is, the timer 52 is programmed to initiate operation of the remote unit 10 once every 7 days. Alternatively, motion detector 54 will initiate operation of the remote unit 10 whenever it senses movement.

When operation is initiated, the repeater 50 simply begins to amplify and transmit the GPS timing signals it receives. Therefore, the repeater 50 transmits an identification and a number of GPS timing signals. Each timing signal includes a satellite identification. The base station 12 receives the GPS timing signals (FIG. 5) and determines a location for each remote receiver. A differential correction from the calibration section 40 is applied to achieve a more accurate location if desired.

It should be understood that a variety of combinations of the above embodiments can be easily made. For example, a remote unit 10 may be configured to only operate when it is moved—therefore, it includes only the motion detector 54. Movement initiates operation of the repeater 50 and radio system 20 for a short time period or, alternatively, when movement stops.

The invention claimed is:

1. A method for determining freight container locations in a freight yard comprising:

attaching a number of receivers for GPS signals to a number of freight containers in said freight yard;

intermittently operating each receiver to transmit an identification and position;

receiving said identification and position at a base station; and

recording the identification and position of said receivers in said freight yard.

2. The method of claim 1, including applying a correction signal to determine a more accurate position of said receivers in said freight yard.

10

3. The method of claim 1, said intermittently operating step including a timer which periodically initiates said transmission.

4. The method of claim 1, said intermittently operating step including a motion sensor which initiates said transmission.

5. The method of claim 1, including a database for recording the identification and position.

6. The method of claim 5, including accessing said database to determine a present position of a freight container, locating the freight container, and moving the freight container from said present position.

7. The method of claim 1, including operating one or more pseudolites in said freight yard and operating at least some of the GPS receivers to use the pseudolite signals to determine a position of a respective GPS receiver.

8. The method of claim 1, including operating a battery to power a GPS receiver.

9. The method of claim 2, wherein the correction signal is applied at the base station to the receiver positions.

10. The method of claim 2, wherein the correction signal is applied by each receiver to determine a more accurate position.

11. The method of claim 2, wherein the correction signal is a local area differential correction.

12. The method of claim 2, wherein the correction signal is a wide area correction.

13. The method of claim 2, wherein the correction signal is generated by a pseudolite.

14. The method of claim 1, wherein said intermittent operating step uses said GPS receiver to determine if said receiver position has changed, and transmits said identification and position if said receiver position has changed.

15. The method of claim 1, wherein the freight yard is an airport.

16. The method of claim 1, wherein the freight yard is an industrial yard.

17. The method of claim 5, wherein said database includes information about the inventory of a freight container.

18. The method of claim 1, wherein the freight yard is a rail yard and said containers are railcars, including the step of assembling a train based on the content of one or more railcars.

19. The method of claim 1, wherein the freight yard is a rail yard and said containers are railcars, including the step of assembling a train based on the destination for a freight container.

*    *    *    *    *

## PROOF OF SERVICE

I certify that on October 16, 2015, this CORRECTED BRIEF OF PLAINTIFF-APPELLANT FREIGHT TRACKING TECHNOLOGIES, LLC was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record for Defendants-Appellees, Virginia International Terminals, LLC's and NOW Solutions, Inc., as follows:

Carolyn Chang
Brian Edwin Lahti
Yixin Zhang
FENWICK & WEST LLP
Silicon Valley Center
801 California St
Mountain View, CA 94041
Phone: (650) 988-8500
Fax: (650) 938-5200
cchang@fenwick.com
blahti@fenwick.com
yzhang@fenwick.com

*/s/ Steven A. Maddox*
Steven A. Maddox
MADDOX EDWARDS PLLC
1900 K St. NW, Suite 725
Washington, DC  20006
(202) 830-0707
smaddox@meiplaw.com

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Counsel for Plaintiff-Appellant Freight Tracking Technologies, LLC certifies the following:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)

The brief contains 13,646 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point New Times Roman font.


Respectfully submitted,

**MADDOX EDWARDS, PLLC**

Dated:  October 16, 2015               By: */s/ Steven A. Maddox*
STEVEN A. MADDOX
    *Counsel of Record*
KAVEH SABA


*Attorneys for Plaintiff-Appellant*
Freight Tracking Technologies, LLC